No. 23-1956

# United States Court of Appeals for the Federal Circuit

WILLIAM KING ET AL.,
*Plaintiffs-Appellants,*

v.

UNITED STATES,
*Defendant-Appellee.*

Appeal from the United States Court of Federal Claims
in No. 1:18-cv-01115-RAH

## BRIEF OF APPELLANTS

Noah A Messing
Messing & Spector LLP
250 Park Avenue, 7th Floor
New York, NY 10177
nm@messingspector.com
Telephone: (212) 960-3720

Phillip M. Spector
Messing & Spector LLP
145 West Ostend Street, Suite 600
Baltimore, MD 21230
ps@messingspector.com
Telephone: (202) 277-8173

Jason H. Kim
Schneider, Wallace, Cottrell, Konecky LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
jkim@schneiderwallace.com
Telephone: (415) 421-7100

October 16, 2023

*Counsel for Appellants*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1956

**Short Case Caption** King v. United States

**Filing Party/Entity** Plaintiffs-Appellants

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/16/2023

Signature: /s/ Noah A. Messing

Name: Noah A. Messing

Case: 23-1956 Document: 12 Page: 3 Filed: 10/16/2023

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☑ None/Not Applicable |
| William King | | |
| Anthony Gugliuzza | | |
| Stephen Dardzinski | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

Case: 23-1956 Document: 12 Page: 4 Filed: 10/16/2023



**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☒ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..... i

TABLE OF CONTENTS ..... iv

TABLE OF AUTHORITIES ..... vi

STATEMENT OF RELATED CASES ..... 1

STATEMENT OF JURISDICTION ..... 1

STATEMENT OF THE ISSUES ..... 1

INTRODUCTION ..... 1

STATEMENT OF THE CASE ..... 5

1. The Fund ..... 5

2. Passage of the Multiemployer Pension Reform Act ..... 8

3. MPRA's Process for Authorizing Pension Cuts ..... 10

4. The Fund's MPRA Applications ..... 12

5. The Voting Process, Authorization, and Resulting Plan Amendment ..... 13

6. The Plaintiffs ..... 14

7. This Lawsuit and ARPA ..... 16

8. The Summary Judgment Opinions ..... 18

SUMMARY OF ARGUMENT ..... 20

STANDARD OF REVIEW ..... 22

ARGUMENT ..... 22

I. PLAINTIFFS HAVE AN ENFORCEABLE PROPERTY INTEREST. ..... 22

II. THE *PER SE* TEST GOVERNS THIS LITIGATION. ..... 27

A. There was an Appropriation of Plaintiffs' Vested Property.........27

B. The *Connolly* Line of Cases Does Not Exempt This Takings Claim From the *Per Se* Test. ..........................................34

III. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE UNDISPUTED RECORD SHOWS THAT THE *PER SE* TEST IS SATISFIED. ..................................................42

A. Plaintiffs Have an Enforceable Property Interest. ........................43

B. The Property Interest Was Taken by the Government................44

C. The Taking Had a Public Purpose..............................................49

D. The Property Interest Taken by the Government Had Value.......49

IV. PLAINTIFFS' PROPERTY WAS TAKEN EVEN IF THE COURT APPLIES A REGULATORY TAKINGS TEST. ................52

A. *Lucas* Applies to Regulatory Takings of Parcels of Money ........52

B. There Was a Taking Even if *Penn Central* Governs This Case ..........................................................................53

1. Character of the governmental action.................................54

2. Reasonable investment-backed expectations.......................55

3. Economic impact on the Plaintiffs......................................56

CONCLUSION ..........................................................................58

CERTIFICATE OF COMPLIANCE.............................................59

ADDENDUM ............................................................................60

# TABLE OF AUTHORITIES

## Cases

*A&D Auto Sales, Inc. v. United States*,
748 F.3d 1142 (Fed. Cir. 2014) .................................................................... 45, 52

*Adams v. United States*,
391 F.3d 1212 (Fed. Cir. 2004) .............................................................. 22, 37, 38

*Alessi v. Raybestos-Manhattan, Inc.*,
451 U.S. 504 (1981) .........................................................................................7, 22

*Alimanestianu v. United States*,
888 F.3d 1374 (Fed. Cir. 2018) .................................................................... 29, 55

*Am. Bankers Ass'n v. United States*,
932 F.3d 1375 (Fed. Cir. 2019) ..........................................................................24

*Ark. Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012) ........................................................................................ 41, 45

*Armstrong v. United States*,
364 U.S. 40 (1960) ..............................................................................................29

*Bloch v. Powell*,
227 F. Supp. 2d 25 (D.D.C. 2002), *aff'd* 348 F.3d 1060 (D.C. Cir. 2003) ... 23, 42

*Boston Chamber of Comm. v. Boston*,
217 U.S. 189 (1910) ............................................................................................45

*Branch v. United States*,
69 F.3d 1571 (Fed. Cir. 1995) ............................................................................38

*Brown v. Legal Foundation of Wash.*,
538 U.S. 216 (2003) ......................................................................................... *passim*

*Casitas Mun. Water Dist. v. United States*,
543 F.3d 1276 (Fed. Cir. 2008) ........................................................ 22, 36, 40, 49

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) .................................................................................... *passim*

*Central Laborers' Pension Fund v. Heinz*,
541 U.S. 739 (2004) .................................................................. 2, 7, 20, 22

*Chancellor Manor v. United States*,
331 F.3d 891 (Fed. Cir. 2003)..........................................................................55

*Chi. Coating Co., LLC v. United States*,
892 F.3d 1164 (Fed. Cir. 2018)........................................................................22

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003)................................................................. 54, 56

*Coffman v. New Mexico*,
No. 10-CV-1027, 2011 WL 13284465 (D.N.M. Sept. 12, 2011) ........................23

*Commonwealth Edison Co. v. United States*,
271 F.3d 1327 (Fed. Cir. 2001) (en banc)................................................. 36, 37

*Concrete Pipe v. Construction Laborers Pension Trust*,
508 U.S. 602 (1993) ...................................................................... 4, 34, 38

*Connolly v. PBGC*,
475 U.S. 211 (1986) .................................................................... *passim*

*Dimare Fresh, Inc. v. United States*,
808 F.3d 1301 (Fed. Cir. 2015)........................................................................53

*Duncan v. Muzyn*,
833 F.3d 567 (6th Cir. 2016)............................................................................23

*E. Enterprises v. Apfel*,
524 U.S. 498 (1998) ....................................................................................4, 34

*Hawaii Housing Auth. v. Midkiff*,
467 U.S. 229 (1984) ..........................................................................................39

*Hendler v. United States*,
952 F.2d 1364 (Fed. Cir. 1991)................................................................. 41, 45

*Hoffman v. City of Warwick*,
909 F.2d 608 (1st Cir. 1990) ............................................................................23

*Horne v. Dep't of Agriculture*,
576 U.S. 350 (2015) ........................................................................ 28, 29, 50, 51

*Katzin v. United States*,
908 F.3d 1350 (Fed. Cir. 2018) .........................................................................28

*Kizas v. Webster*,
707 F.2d 524 (D.C. Cir. 1983) ..........................................................................23

*Koontz v. St. Johns River Water Mgmt. District*,
570 U.S. 595 (2013) .................................................................... 31, 32, 34, 36, 38

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) ...............................................................................3, 22

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) ......................................................................................... 30

*Lion Raisins, Inc. v. United States*,
416 F.3d 1356 (Fed. Cir. 2005) .........................................................................45

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ..................................................................... 2, 29, 44, 45, 46

*Louisville Bank v. Radford*,
295 U.S. 555 (1935) ................................................................................ 29, 39

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ........................................................................ 21, 51, 52, 53

*Majausaks v. Majauskas*,
463 N.E.2d 15 (N.Y. 1984) ................................................................................26

*Mass. Mut. Life Ins. Co. v. Russell*,
473 U.S. 134 (1985) .........................................................................................24

*Nachman Corp. v. PBGC*,
446 U.S. 359 (1980) .........................................................................................24

*Norman v. United States*,
429 F.3d 1081 (Fed. Cir. 2005) .........................................................................52

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) ....................................................................................53

*PennEast Pipeline Co. v. New Jersey*,
141 S. Ct. 2244 (2021) ................................................................................28

*Piszel v. United States*,
833 F.3d 1366 (Fed. Cir. 2016)...................................................... 23, 52

*Poslock v. Tchrs.' Ret. Bd. of Tchrs.' Ret. Sys*.,
209 A.D.2d 87 (1st Dept. 1995) ..................................................................26

*Preseault v. United States*,
100 F.3d 1525 (Fed. Cir. 1996)....................................................................44

*Rose Acre Farms, Inc. v. United States*,
373 F.3d 1177 (Fed. Cir. 2004)...................................................................45

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ....................................................................................48

*San Diego Police Officers' Ass'n v. San Diego City Employees' Retirement Sys.*,
568 F.3d 725 (9th Cir. 2009)........................................................................23

*Sartori v. United States*,
67 Fed. Cl. 263 (2005)..................................................................................53

*Seiber v. United States*,
364 F.3d 1356 (Fed. Cir. 2004)....................................................................26

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002) .............................................................. 27, 30, 33, 53

*Taylor v. Hennepin County*,
598 U.S. 631 (2023) ....................................................................................33

*Tereszkiewicz v. Tereszkiewicz*,
512 N.Y.S.2d 862 (2d Dept. 1987)...............................................................26

*Thole v. U.S. Bank N.A.*,
140 S. Ct. 1615 (2020) ................................................................................24

*Toews v. United States*,
376 F.3d 1371 (Fed. Cir. 2004) .....44

*United States v. Pennie*,
132 U.S. 464 (1889) ..... 2, 24, 48

*Webb's Fabulous Pharmacies v. Beckwith*,
449 U.S. 155 (1980) ..... *passim*

*Welty v. United States*,
926 F.3d 1319 (Fed. Cir. 2019) ..... 42, 48

*Winston v. City of New York*,
759 F.2d 242 (2d Cir. 1985) .....42

*Zucker v. United States*,
758 F.2d 637 (Fed. Cir. 1985) .....23

**Statutes**

28 U.S.C. § 1295(a)(3) .....1

28 U.S.C. § 1491(a)(1) .....1

29 U.S.C. § 1053(a) .....7

29 U.S.C. § 1054(g)(1) .....7

29 U.S.C. § 1085(e)(9)(A) .....11

29 U.S.C. § 1085(e)(9)(C)(i) .....10

29 U.S.C. § 1085(e)(9)(D)(ii) .....10

29 U.S.C. § 1085(e)(9)(D)(iii) .....10

29 U.S.C. § 1085(e)(9)(G)(i) .....10

29 U.S.C. § 1085(e)(9)(G)(iii) .....11

29 U.S.C. § 1085(e)(9)(H) .....11

29 U.S.C. § 1085(e)(9)(H)(ii) .....11

29 U.S.C. § 1085(e)(9)(H)(vi) ..... 11, 43

29 U.S.C. § 1085(e)(9)(I)(iii) ........ 11, 52

29 U.S.C. § 1432 ........ 16

29 U.S.C. § 1432(k)(1) ........ 17

29 U.S.C. § 1432(k)(2) ........ 17

Pub. L. No. 113-235, 128 Stat. 2130 (2014) ........ 10

**Regulations**

RCFC 56(a) ........ 51

**Regulations**

IRS Notice 2021-38, I.R.B. 2021-30 (July 26, 2021) ........ 17

Special Financial Assistance by PBGC, 87 Fed. Reg. 40968 (July 8, 2002) ........ 17

**Other Authorities**

Annuity, Black's Law Dictionary (11th ed. 2019) ........ 25

Hearing Before the House Committee on Educ. and the Workforce, Subcommittee on Health, Employment, Labor, and Pensions, No. 113-21 (June 12, 2013) ........ 9, 39

Hearing Before the House Committee on Educ. and the Workforce, Subcommittee on Health, Employment, Labor, and Pensions, No. 113-35 (Oct. 29, 2013) ........ 39

## STATEMENT OF RELATED CASES

This action has not previously been before the Court. No other case known to counsel will directly affect or be directly affected by this Court's decision.

## STATEMENT OF JURISDICTION

This is an appeal from an April 20, 2023, order of the Court of Federal Claims ("CFC") that granted Defendant's motion for summary judgment. APPX00001. The CFC had jurisdiction under 28 U.S.C. § 1491(a)(1). Plaintiffs timely appealed on May 4, 2023. This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## STATEMENT OF THE ISSUES

Plaintiffs each earned a vested pension by working at a private company for 20 or more years. The pension fund is private, and Plaintiffs' vested rights are created and protected by a private agreement. Years after Plaintiffs retired, the Defendant ("Government") took the unprecedented step of authorizing Plaintiffs' pension fund to cut their vested pensions by more than $1,000 per month. By authorizing the pension fund to reduce each Plaintiff's private, vested pension, did the Government engage in an uncompensated taking of property under the Fifth Amendment's Takings Clause?

## INTRODUCTION

In 2014, Congress inserted a provision into an appropriations bill, without debate, that authorized struggling, solvent pension plans to cut vested pensions.

Perhaps this was a wise policy choice, perhaps not. But either way, the Government's approach suffered from a constitutional defect: The pensions that could be reduced included rights that had vested, and once rights vest, retired workers have an enforceable legal right to this stream of money, without reductions. Thus, these pension rights were not the Government's either to take directly or to authorize a third party to appropriate. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982) ("We conclude that a permanent physical occupation [by a third party] authorized by government is a taking"); *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003) (applying *per se* test where a state government required that interest from IOLTA accounts be turned over to a private legal-aid group).

Courts have repeatedly warned the Government that pension rights and other employment benefits cannot be appropriated once they have vested. *See infra* at 23 (citing nine cases). That is because vesting is the magical moment when a promise or expectation matures into an ironclad right: Vesting is "the process by which an employee's already accrued pension account becomes irrevocably his property." *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 749 (2004). "[T]he Fifth Amendment's Takings Clause prevents … government actors … from depriving private persons of vested property rights except for public use and upon payment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994).

The current litigation arose after the Government, in 2017, authorized Plaintiffs' pension fund to cut their vested pensions. In 2018, Plaintiffs filed a Takings Clause claim in the Court of Federal Claims ("CFC"). The case was eventually resolved on summary judgment, and the CFC came achingly close to getting the case right:

- It correctly decided that Plaintiffs had a property interest related to their vested pension. APPX10333-52.
- It correctly decided that Plaintiffs' pension fund eliminated this right. APPX00021 ("The plaintiffs lost a contractual right to a specific level of pension benefits.")
- It correctly held that the Government could be held liable for authorizing one party to seize the vested property interests of another. APPX10362-65.

But then the CFC took a seriously wrong turn. It followed a line of inapt cases (starting with *Connolly*) in which the Supreme Court, in the retirement-benefit context, used the *Penn Central* regulatory takings test rather than the *per se* test. Relying on these cases, however, was legal error: As Plaintiffs show in this appeal, five Supreme Court and Federal Circuit decisions—almost wholly disregarded by the CFC—confine the *Connolly* line of cases to situations in which governments impose monetary liability on a party that can be paid from any source. Those same

controlling decisions instruct that the *per se* rule applies when the Government commands the relinquishment of money from a specific fund (here, Plaintiffs' pension fund) or money that is otherwise linked to an identifiable property interest (here, Plaintiff's pension). Thus, the *per se* test applies, not *Connolly*.

Had the CFC used the correct test (the *per se* test), Plaintiffs would have prevailed without need for a trial: they lost property, the Government caused that loss, the Government acted for a public purpose, and the taken property interest had value. *See infra* Section III. And Plaintiffs should have won, too, even under the standard used by the CFC—as shown below. *See infra* Section IV.

One factual change that occurred during the litigation warrants note. Since Plaintiffs filed their lawsuit in 2018, Congress reversed course, in part. In March 2021, Congress decided to reimburse many—but not all—of the people whose vested pensions had been seized under its authorization. Thus, in January 2023, many Class Members received Make Up Payments equal to the amount of their pension cuts. But more than 1,100 Class Members—widows, widowers and estates—did *not* receive Make Up Payments equal to their loss, and some received no Make Up Payment at all. Further, *none* of the Class Members received interest to compensate them for the lengthy delay between when their pensions were taken and when, if applicable, they received Make Up Payments. Thus, none of the Class Members have received full compensation under the Takings Clause for what was

taken from them; more than 700 have received no compensation at all.

Condoning what the Government has done to Plaintiffs and the Class would have dangerous consequences for an array of property rights. To allow the Government to seize or reallocate retirement funds jeopardizes the financial security of the millions of people who participate in pension plans, 401(k) plans, 403(b) plans, or 457 plans, as well as those who buy private annuities. It also would empower Congress and other governmental actors to freely reallocate bank accounts, stocks, bonds, options, liens, mortgages, trusts, loans, life-insurance proceeds, copyrights, patents, trademarks, and other property. This case will either protect vested property interests or will vest the Government with broad, new, habit-forming powers.

## STATEMENT OF THE CASE

### 1. The Fund

The New York State Teamsters Conference Pension & Retirement Fund is a private pension fund that was established in 1954. APPX04886. The Fund is a multiemployer pension plan, meaning that multiple companies contribute money into a single trust fund, which the Fund's trustees invest for the benefit of retirees and workers. Each retiree who has earned a vested pension acquires a contractual right under the Fund's plan documents to receive a pension of a specific amount monthly—measurable to the penny—until he or she dies. Thereafter, if the retiree

was married, their surviving spouse typically continues to receive a pension benefit. APPX04919-22.

The Fund reports assets exceeding $2.5B and receives around $140M each year from participating companies. APPX05585; APPX12526; APPX12567. Approximately 78% of its annual receipts come from United Parcel Service (UPS). APPX06439.

From the Fund's earliest days, vesting was one of the "main features" of the pension plan. APPX04561. The Fund's 30(b)(6) deponent confirmed that an "individual could earn a vested pension under the plan documents as of 1954." APPX05577. Vesting is a critical part of the pension ecosystem because once a pension vests, it is sacrosanct: Vesting provides a "guaranteed 100% interest in the pension benefit." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510 n.6 (1981). As early as 1963, the Fund informed workers that "**All pensions are payable for life without reduction**." APPX04561 (emphasis in original). By the time that Congress enacted The Employee Retirement Income Security Act of 1974 (ERISA), the Fund had already provided an entire generation of workers with vested rights.

Through ERISA, Congress sought to ensure that all private, multiemployer plans provided employees with just such a path. ERISA achieved this through "minimum vesting requirements", which require that "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable"

at either a particular age or after a specific number of years of work. 29 U.S.C. § 1053(a). As explained by the Supreme Court, section 1053(a) "regulates vesting," which is "the process by which an employee's already-accrued pension account becomes **irrevocably his property**." *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 749 (2004) (emphases added). Since vesting already existed (pre-ERISA) for the Fund's participants, section 1053(a) merely mandated what the Fund was already doing: giving workers a path to a vested pension.

Another provision of ERISA barred trustees from reducing accrued benefits,[1] whether or not those benefits had vested. *Id.* § 1054(g)(1). This measure, the "anti-cutback" rule, provides that "the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." *Id.*

After the enactment of ERISA, Plaintiffs' Fund continued to provide workers with a path toward a secure pension, consistent with ERISA's minimum vesting requirements. A formula in the pension agreement determined the size of the life-long monthly annuity payment that each retiree would receive. APPX04919 ("The monthly amount of Vested Pension shall be equal to" a sum based on a calculation set out in the agreement); APPX04921 ("The Life Annuity form of payment provides monthly payments for the life of the Pensioner"). These quotations come from the

[1] An accrued benefit is one that an employee has earned or built up. *Heinz*, 541 U.S. at 749.

2015 iteration of the Fund's own plan documents ("the Plan"), which is the contract that governs retirees' pension rights. The Plan defined "vested" as giving workers "a non-forfeitable right to a pension." APPX04896.

The Fund's trustees regularly issued documents to workers and retirees that explained what these vested rights meant. Those documents told workers and retirees that "[a] 'vested' benefit is not forfeitable and, therefore, **cannot later be curtailed** or eliminated." APPX00597 (2013 plan summary) (emphasis added); *see also* APPX06219 (1999 plan summary) ("When you apply for your pension, you must select a form of payment that will determine the amount of your monthly benefit during your lifetime.") (emphasis added); APPX04639 (1992 Plan Summary) ("When you are vested, you cannot lose … your rights to benefits from the Pension Fund."). The workers were also sent individual statements telling them that their pensions had "vested" and "your monthly pension benefit will be paid for your lifetime." APPX04706-07.

**2. Passage of the Multiemployer Pension Reform Act**

In 2012 and 2013, a congressional subcommittee held hearings about multiemployer-pension funds. In the hearings, subcommittee members worried that struggling pension funds might bankrupt the government-run agency that insures these funds (the PBGC) and expressed concerns that "insolvency of this program

[the PBGC] would raise tremendous public pressure for a taxpayer bailout of the agency."[2]

On December 9, 2014, Representatives Kline (R-MN) and Miller (D-CA) offered a legislative package, during a lame-duck session, that sought to empower the Department of Treasury to authorize cuts of vested pensions already in pay status. Referred to by the acronym "MPRA," the legislation was titled The Kline-Miller Multiemployer Pension Reform Act of 2014. No hearings were held, and no committee report analyzed the bill. APPX11750. Two days later, MPRA passed the House after being slipped into a massive spending bill. APPX11743-46. After another two days, the Senate approved the legislation. MPRA cleared Congress without substantive floor debates in either chamber of Congress. On December 16, 2014, President Obama signed the spending bill. Pub. L. No. 113-235, 128 Stat. 2130, 2773-2822 (2014). As one Treasury official testified, MPRA became law "in the dead of night." APPX05466-67.

Under MPRA, Treasury may authorize private pension funds to reduce vested pensions even though vested rights are, as one senator observed, "at their core, privately-bargained-for contracts—negotiated without the federal government's

[2] Hearing Before the House Committee on Educ. and the Workforce, Subcommittee on Health, Employment, Labor, and Pensions, No. 113-21 (June 12, 2013) (hereinafter "June 2023 hearing"), at 2 (Statement of Rep. Roe (R-TN)).

input."[3] The Fund's top lawyer described these cuts as "very, very novel." APPX05568. Treasury's 30(b)(6) deponent agreed: "[R]educing benefits that are in pay status is something that has not happened before MPRA." APPX05559.

### 3. MPRA's Process for Authorizing Pension Cuts

MPRA has six key steps. First, a fund that purports to be in "critical and declining" status submits an application that must specify the size of the proposed cuts that the fund's trustees want to impose and show that the cuts are projected to prevent the fund's insolvency. 29 U.S.C. § 1085(e)(9)(C)(i), (G)(i). MPRA bars any pension cuts for people who are over the age of 80 or disabled.[4] *Id.* § 1085(e)(9)(D)(ii), (iii).

Second, the Secretary of the Treasury must review the MPRA application, aided by PBGC and the Department of Labor. *Id.* § 1085(e)(9)(G). The Secretary must approve or reject the proposal within 225 days. *Id.* § 1085(e)(9)(G)(iii).

Third, if an application receives Treasury approval, Treasury runs an election in which plan participants vote on the proposed cuts. *Id.* § 1085(e)(9)(H). Under MPRA, however, every non-voter is treated as having voted to approve the cuts. *Id.* § 1085(e)(9)(H)(ii). This voting mechanism exists nowhere else in federal law. Under these rules, no MPRA vote has ever failed, even though "[p]retty big

---

[3] Joint Select Comm. on Solvency of Multiemployer Pension Plans, 115th Cong. (June 13, 2018) (Statement of Sen. Orrin Hatch, Co-Chair).

[4] Cuts are prorated for retirees between 75 and 80. *Id.* § 1085(e)(9)(D)(ii).

majorities" of those who have submitted ballots have voted against nearly all of the MPRA cuts. APPX05486.

Fourth, even if a vote is unsuccessful, Treasury must assess whether the applicant is "systemically important," which occurs if the fund's insolvency would expose PBGC to more than $1 billion (indexed to inflation) in insurance obligations. *Id*. § 1085(e)(9)(H)(ii), (v). If a fund is systemically important, its application must be approved regardless of the vote's outcome. *Id.*

Fifth, Treasury issues a "final authorization" to the applicant to cut vested benefits. *Id.* § 1085(e)(9)(H)(vi). MPRA bars retirees whose pensions are cut from bringing "a cause of action under this subchapter." *Id.* § 1085(e)(9)(I)(iii).

Sixth and last, trustees rewrite the contract that creates retirees' vested rights (i.e., the plan documents). *Id.* § 1085(e)(9)(A).

Thereafter, that fund sends reduced pension payments to participating retirees.

As Treasury officials started to apply MPRA, they quickly recognized that the statute "weighs too heavily against the interests of retirees and their participation in the process". APPX05033. This comment reflects that a Fund's trustees are "equally divided between management, who only really cares about actively working employees … and the union, who gets their revenue from active employees." APPX05452. But as Treasury observed, it is these trustees who decide "how proposed cuts will be distributed between and among retirees and active workers."

APPX05031. As a result, Treasury concluded, the statute "exacerbates a pre-existing imbalance" against retirees. APPX05031. The former head of Treasury's MPRA suspensions was asked "Was it the view of the Treasury Department at this time that Kline-Miller was heavily tilted against retirees?" He answered, "Of course." APPX06448.

Like Treasury, PBGC concluded that the deck was stacked against retirees. APPX05452 (trustees choosing cuts have a "higher degree of loyalty to the active employees" than retirees). But PBGC took the view that the resulting "benefit reductions, though regrettable for Fund participants, mean that more money will be available for PBGC." APPX05285; *see* APPX05549. A PBGC official agreed that PBGC has "the pocketbook … interest" in the outcome of MPRA applications. APPX05305.

### 4. The Fund's MPRA Applications

The Fund's trustees submitted an MPRA application on August 31, 2016. APPX06444. The Fund was the second-largest pension fund to apply to cut vested benefits. APPX05133; APPX05450 (the application "was a big deal" to PBGC). By January 12, 2017, Treasury had decided that the initial application would not be approved. APPX05091. Treasury encouraged the Fund to withdraw and resubmit. APPX05089; APPX05114. On April 3, 2017, Treasury conveyed this preference to

the Fund. APPX05116-20. The next day, the Fund withdrew its application. APPX05125; APPX05129.

Six weeks later, the Fund submitted a second MPRA application ("Application"). APPX05201. The Application proposed cutting pensions by 29% for retirees but just 18% for active members. APPX05203. During this period, PBGC advised Treasury that the Fund was "systemically important" (i.e., big enough that any adverse MPRA vote would be overridden). APPX06449.

On August 2, 2017, Treasury's MPRA staff recommended approving the application. APPX05231-49. Treasury Secretary Mnuchin accepted that recommendation, and the Fund was formally notified on August 3, 2017. APPX05261-62. It was time for a vote.

### 5. The Voting Process, Authorization, and Resulting Plan Amendment

Treasury runs the voting process. APPX05557-58; APPX05494; APPX05570-71. In August 2017, Treasury prepared a draft of the ballot materials and instructions for the Fund's counsel to review. APPX05265; APPX05573. The Fund's counsel made substantial revisions. Most notably, he objected to the draft-ballot's description of vested retirement benefits as "non-forfeitable" since those

benefits were being cut. APPX06445. Treasury agreed and removed that phrase. APPX06445.

A private vendor hired by Treasury then mailed the ballots to plan participants on August 16, 2017. APPX05273. Voting closed on September 6. APPX05287. Of the Fund's 35,173 eligible voters, 39% submitted a ballot. APPX05287; APPX05291. Among these almost 14,000 voters, the measure failed decisively, by a margin of 71% to 29%. APPX05287. Yet despite this result, Treasury treated the measure as succeeding, because MPRA requires counting non-votes as "Yes" votes. The MPRA team notified Secretary Mnuchin of the outcome on September 12. APPX05287-88. He then "issued a final authorization to reduce benefits". APPX05291; *see* APPX05288.

On September 13, 2017, Treasury informed the Fund's trustees that they were authorized to cut the vested pensions of approximately 11,000 people. APPX05291. Treasury promptly worked with the Fund to amend the Fund's plan documents. APPX05270-71; APPX05309-30; APPX05286. The Fund's trustees then inserted an amendment into the Plan, and the pension cuts began on October 1, 2017. APPX05423; APPX12881-82.

**6. The Plaintiffs**

Plaintiffs are William King, Stephen Dardzinski, and Anthony Gugliuzza. Each of them was retired when this lawsuit was filed. Each of them earned a vested

pension by working fulltime at UPS. APPX04705; APPX04762; APPX04702. Each had his monthly vested pension cut by 29%—more than $1,000 per month. APPX03318.

Plaintiff Bill King is 75 years old. He worked from 1977 to 2008 to earn his pension, accruing 27 years of service with UPS and several more years with another employer in the Fund. APPX04703-04; APPX05499-5500. The pension was a central reason that he took his job at UPS. APPX05624. He and other workers gave up multiple raises in exchange for UPS contributing more money to the Fund. *Id*. His focus on earning a pension led him to decline at least one job offer and to refrain from searching for other jobs. APPX05625. He retired in 2008, relying on his pension. *Id*. The cuts to those payments created financial challenges for him. APPX05632.

Steve Dardzinski is 74 years old and accrued his pension by working at UPS from 1989 to 2011. APPX05440. To obtain a pension, he left a job with normal hours to work a nightshift—from 6:00 PM to 2:30 AM—for more than 20 years. APPX05595. Like Mr. King, Mr. Dardzinski stayed at UPS for the pension. *Id.* In choosing to retire, he counted on receiving the lifetime annuity that he had earned. APPX05598. The pension cuts forced him to skip medical care for financial reasons and to engage in other dangerous cost-saving efforts. APPX05602. His savings dwindled. *Id.*

Tony Gugliuzza [pronounced *gah-LOOTZ*] died in May 2023 at the age of 79. He worked for UPS for 30 years, from 1971 to 2001, beginning before ERISA was enacted. APPX05635. He counted on his pension to afford retirement. *Id*. The pension cuts caused him to fall behind on his mortgage payments and utility bills. APPX05616. They almost completely depleted his savings. *Id*. To make ends meet, he and his wife scrimped on food. *Id*. His health was too poor to return to the workforce. *Id.*

### 7. This Lawsuit and ARPA

Plaintiffs filed a Class Action Complaint against the United States on July 31, 2018, seeking just compensation under the Takings Clause. APPX00075. Following an unsuccessful motion to dismiss and a year-and-a-half of discovery, the parties cross-moved for summary judgment.

On March 11, 2021, days after Plaintiffs filed their cross-motion for summary judgment, Congress enacted The American Rescue Plan Act of 2021 (ARPA). ARPA created a process for certain private pension funds—including Plaintiffs' Fund—to apply to receive "Special Financial Assistance" (SFA). 29 U.S.C. § 1432. To obtain funding under ARPA, any fund that had obtained authorization under MPRA to cut vested benefits would need to unwind those pension cuts in two ways. First, the fund would need to restore pensions prospectively to pre-MPRA levels. *Id.* § 1432(k)(1). In other words, future monthly payments would need to revert to the

original level. Second, a fund receiving SFA would need to provide compensation (termed "Make Up Payments") to "participants or beneficiaries in pay status" in an amount "equal to the amount of benefits previously suspended" under MPRA. *Id.* § 1432(k)(2).

On March 26, 2021, the Court of Federal Claims stayed the litigation while the Government promulgated regulations under ARPA. APPX06356. Those regulations eventually would include two provisions relevant to this case. *First*, they would provide that any participant who passed away would not be treated as in "pay status". This meant that many Class Members would not receive a complete Make Up Payment or, in many instances, any Make Up Payment (as described further, *infra* at 19). Special Financial Assistance by PBGC, 87 Fed. Reg. 40968, 40991 (July 8, 2022). *Second*, the regulations provided that no adjustment for interest would be permitted for Make Up Payments. Thus, participants would receive no interest for the five-year period that they were deprived of pension payments to which they had a legal right. IRS Notice 2021-38, I.R.B. 2021-30, at 5 (July 26, 2021).

The Fund submitted an application for SFA on January 28, 2022; withdrew it; and then submitted a revised application on July 21, 2022. APPX12491. PBGC approved the revised application on November 18, 2022. APPX12567. On December 8, 2022, the Fund received SFA totaling $963 million. APPX12567;

APPX12599. The Fund would later confirm that pursuant to the Government's regulations:

- if a participant died before the SFA was received by the Fund, but the participant had no surviving beneficiary, then "no make-up payment will be made to that participant or his/her estate," APPX12596;
- if a participant died before the SFA was received, and the participant had a surviving beneficiary, then "no make-up payment will be made to the surviving spouse for the period between October 2017 and the participant's death," APPX12597; and
- "no participant or beneficiary will receive any interest as part of their make-up payment," APPX12596.

### 8. The Summary Judgment Opinions

After the stay ended in 2021, the Government moved for summary judgment on two questions: whether plaintiffs had a cognizable property interest, and whether the Government could be liable given that it did not take Plaintiffs' property for itself. On April 8, 2022, the CFC denied the motion. APPX10324. It issued an opinion holding that Plaintiffs had an enforceable property interest in their right "to unreduced vested pension benefits," and that the Government could be liable under the Takings Clause for authorizing the alleged taking. APPX10325.[5]

[5] The CFC granted the Government's motion as to whether the Government could be liable under principles of agency or coercion. APPX10325. Plaintiffs do not appeal those determinations.

On June 24, 2022, Plaintiffs moved to certify a class. The Court granted that motion[6] and named the three Plaintiffs as Class Representatives. APPX10465. The damages sought by the Class now fall into two categories:

- More than 1,100 Class Members (widows, widowers and estates) received either no Make Up Payment or a Make Up Payment that was smaller than the amount of the pension cuts.[7]
- All Class Members have a claim for interest for the period during which the Fund withheld pension payments from them or their family member.

On December 23, 2022, Plaintiffs filed a motion for summary judgment. They showed that the litigation is governed by the *per se* test and that, under that test, the Government took Plaintiffs' money (which, as the motion explained, included both their pension and the payments arising out of that pension). The Government cross-moved for summary judgment.

---

[6] The CFC certified a class consisting of: "Any person (whether a participant, beneficiary, or other individual) who received one or more pension payments from the New York State Teamsters Conference Pension and Retirement Fund on or after October 1, 2017," unless that person was an active participant at the time of the cuts or their pension was not cut under MPRA. APPX10471.

[7] To illustrate, one of these Class Members is the estate of Robert Campbell. Campbell began working for UPS in 1972—before ERISA was enacted. He retired from UPS in 2002, at which time he began receiving his vested pension. The Fund cut Campbell's pension in 2017. He died on October 5, 2022. The next month, the Fund's SFA application was approved. Because Campbell passed away before the Fund received the SFA on December 8, 2022, Campbell's estate received no Make Up Payment. Had Campbell survived 63 more days, he would have received a full Make Up Payment. APPX10541-42.

On April 20, 2023, the CFC denied Plaintiffs' motion and granted the Government's cross-motion. APPX00001. The CFC held that the *per se* test is inapplicable "because the federal government has neither appropriated the plaintiffs' property nor occupied it". APPX00004. Applying the *Penn Central* regulatory-taking test, the Court then held that Plaintiffs could not demonstrate that a regulatory taking occurred. *Id.* The Court entered judgment for Defendants. APPX00002.

This appeal followed.

## SUMMARY OF ARGUMENT

This brief makes four central points.

First, Plaintiffs have a property interest. Each Plaintiff's pension vested, and vesting is "the process by which an employee's already-accrued pension account becomes irrevocably his **property**." *Heinz*, 541 U.S. at 749 (emphasis added). The fact that parties have a property interest in vested pensions is confirmed by many federal cases; New York law (which governs the Fund); documents produced by the Fund during this litigation or sent by the Fund to Plaintiffs; and the Government's own statements. For instance, one federal agency has acknowledged that vested pensions "cannot be taken away." APPX06400. The CFC was correct in finding that Plaintiffs have a property interest.

Second, when a government appropriates a property interest or authorizes a third-party to do so, controlling caselaw makes clear that the *per se* test is used to

assess whether a taking occurred. By contrast, the *Penn Central* test (which the CFC mistakenly deployed) applies when a government enacts a regulation that restricts a private individual's ongoing use of property or imposes a general "liability" on a party, payable from any source. Here, Plaintiffs' pension was not simply regulated. And Plaintiffs were not subjected to some general liability. They *lost* the pension that they earned and the payments stemming from that pension. That property was appropriated. So the *per se* test should have been applied.

Third, Plaintiffs have satisfied the four elements of the *per se* test:

1. As just discussed, they had a property interest.
2. The Government authorized another private party to take Plaintiffs' property, so the Government is liable under the Takings Clause for the seizure.
3. The Government's actions advanced a public purpose.
4. The undisputed record shows that Plaintiffs' pensions had value. This value is measurable to the penny, so no trial is needed. Or, at a minimum, a trial on damages is required.

Finally, in the alternative, Plaintiffs show that they prevail even if (i) the *Lucas* "categorical" test is used or, as the CFC mistakenly concluded, (ii) *Penn Central* governs Plaintiffs' claims.

This Court should reverse and direct the CFC to enter judgment for Plaintiffs.

## STANDARD OF REVIEW

"This court reviews legal conclusions by the Court of Federal Claims *de novo* and factual findings for clear error." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1351 (Fed. Cir. 2013). Whether a taking occurred is a legal question based on factual underpinnings. *Chi. Coating Co., LLC v. United States*, 892 F.3d 1164, 1169 (Fed. Cir. 2018).

## ARGUMENT

### I. PLAINTIFFS HAVE AN ENFORCEABLE PROPERTY INTEREST.

Any inquiry into whether a taking occurred begins with "the threshold requirement" of showing "a recognized property interest, *i.e.*, whether [plaintiffs] possessed any cognizable property interests within the meaning of the Takings Clause." *Adams v. United States*, 391 F.3d 1212, 1218–19 (Fed. Cir. 2004).

Here, *vesting* answers that question: The "Fifth Amendment's Takings Clause prevents … government actors … from depriving private persons of **vested** property rights except for a public use and upon payment of just compensation." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) (quotations omitted) (emphasis added). As to pensions in particular, the Supreme Court has explained that vesting is "the process by which an employee's already-accrued pension account becomes irrevocably his **property**." *Heinz,* 541 U.S. at 749 (emphasis added); *see also Alessi*, 451 U.S. at 513 (pension plans provide "a legally enforceable claim to 100% of the

pension benefits created by a covered plan for those employees" who satisfy the vesting schedule). These cases resolve whether Plaintiffs have an enforceable property interest, given that the undisputed record shows that each Plaintiff earned a vested pension. APPX04705; APPX04762; APPX04702; *see also* APPX10324 (CFC opinion concluding Plaintiffs had a cognizable property interest).

Precisely because vested pensions give rise to a property interest, courts have long warned governmental actors that they cannot seize vested benefits without paying compensation.[8] That vested pension rights fall within this class of protected

---

[8] *See Piszel v. United States*, 833 F.3d 1366, 1374-75 (Fed. Cir. 2016) (concluding that plaintiff had "a vested property interest in his contractual rights to severance" under the Takings Clause); *Zucker v. United States*, 758 F.2d 637, 638-40 (Fed. Cir. 1985) (concluding that statute did not diminish a "vested property right in retirement benefits" under Takings Clause because plaintiffs had not "become[] eligible to receive a particular" benefit); *Duncan v. Muzyn*, 833 F.3d 567, 582 (6th Cir. 2016) (rejecting Takings Clause claim because cost-of-living adjustments for pension benefits had not "vested"); *San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.*, 568 F.3d 725, 736, 740-41 (9th Cir. 2009) (rejecting plaintiffs' constitutional claims because their deferred retirement salaries were not "vested pension rights entitled to protection" under Takings and Contracts Clauses); *Hoffman v. City of Warwick*, 909 F.2d 608, 615-16 (1st Cir. 1990) (requiring plaintiffs to show they had a "contractual right" that gave rise to a "vested property" interest in seniority benefits for purposes of Takings Clause); *Kizas v. Webster*, 707 F.2d 524, 534 (D.C. Cir. 1983) (plaintiffs have a property interest under Takings Clause in special preference benefits "only if they have a vested right" to those benefits); *Coffman v. New Mexico*, No. 10-CV-1027, 2011 WL 13284465, at *13 (D.N.M. Sept. 12, 2011) ("Plaintiffs correctly contend that their vested and matured pension benefits are constitutionally protected property interests" that "could not be diminished without a just benefit in return"); *Bloch v. Powell*, 227 F. Supp. 2d 25, 38 (D.D.C. 2002) ("[C]ourts consistently find property rights when an employer's pension system clearly gives its employees a vested right in retirement annuities"), *aff'd*, 348 F.3d 1060 (D.C. Cir. 2003); *see also, e.g.*, *United States v. Pennie*, 132

property interests is hardly surprising, because "contract rights are a form of property that may be compensable under the Fifth Amendment." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1385 (Fed. Cir. 2019). And as recently as three years ago, the Supreme Court reiterated that vested participants in a defined-benefit plan "are legally and contractually entitled to receive those same monthly payments for the rest of their lives." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020); *see also, e.g., Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) (retirees are "entitled to benefits under the provisions of the plan contract"). This has been the law since before ERISA. *See Nachman Corp. v. PBGC*, 446 U.S. 359, 365 (1980) (benefits were "vested in a contractual sense" under pre-ERISA pension plan (quotations omitted)).

Applying those principles here shows that the contract in question protected Plaintiffs against the pension cuts they each suffered. The version of the Plan in effect when the pension cuts occurred defined "vested" as giving workers "**a non-forfeitable right** to a pension." APPX04896 (2015 Plan) (emphasis added). The Plan also stated that the "monthly amount" of a pension "**shall be equal** to the amount" provided for in the Plan, and that retirees shall receive a "**Life Annuity**" that "provides monthly payments **for the life of the Pensioner**." APPX04904,

U.S. 464, 471 (1889) (government could not have reduced pension rights under Due Process Clause if those rights had "vested").

APPX04919, APPX04921 (emphases added). The capitalized term Life Annuity was not defined, but life annuities are, by their nature, fixed instruments. *See* Annuity, Black's Law Dictionary (11th ed. 2019) ("[1] An obligation to pay a stated sum …. [2] A fixed sum of money payable periodically").

The 2013 Plan Summary (written by the trustees and their counsel) likewise explained that "a 'vested' benefit is non-forfeitable and, therefore, **cannot later be curtailed** or eliminated." APPX00597 (emphasis added). This has been true since before Plaintiffs began working. *E.g.*, APPX04561 (1963 Plan Summary) ("**All pensions are payable for life without reduction**.") (emphasis in original). And it was true while Plaintiffs were each earning their pension. *E.g.*, APPX04637 (1992 Plan) ("When you are vested, you cannot … lose your rights to benefits from the Pension Fund.").

That Plaintiffs' pensions were an irreducible lifelong benefit is corroborated by many other communications that the Fund sent to Plaintiffs. For example:

- "You are VESTED…. When you are vested you earn a non-forfeitable right to a pension benefit." APPX04705-06.
- "[B]enefits that you have earned a right to receive and that cannot be forfeited (called vested benefits) are guaranteed." APPX05425
- "When you retire, your monthly pension benefit will be paid for your lifetime." APPX04767.

State law, too, confirms that vested pensions are protected property. State law "has a significant role in defining the property interests that may be afforded

constitutional protection under the Takings Clause." *Seiber v. United States*, 364 F.3d 1356, 1369 (Fed. Cir. 2004). Here, New York law governs the agreement. APPX04937. And New York law treats vested pensions as inviolable property. The New York Court of Appeals has held that "vested" pension rights are a form of property. *Majauskas v. Majauskas*, 463 N.E.2d 15, 17 (N.Y. 1984). Another New York court held that "[a] vested pension right is a form of deferred compensation for work performed and as such constitutes property." *Tereszkiewicz v. Tereszkiewicz*, 128 A.D.2d 605, 606 (N.Y. App. Div. 1987) (quotations omitted). Yet another New York court wrote that "future pension benefits, once vested," are "a property right." *Poslock v. Tchrs.' Ret. Bd. of Tchrs.' Ret. Sys*., 209 A.D.2d 87, 94 (N.Y. App. Div. 1995).

Thus: The Supreme Court, this Court, other federal courts, New York state courts, and the Fund all understood vested pensions to be irreducible. And so did the three federal agencies involved in approving Plaintiffs' pension cuts. Each has previously acknowledged in official documents that vested pension benefits are property or that such benefits cannot be reduced. The Internal Revenue Service (a bureau within Treasury) acknowledged that "'Vesting' in a retirement plan means **ownership**." APPX05767 (emphasis added). PBGC defined "become vested" in its public materials as "obtain **a permanent right** to the benefits." APPX05774 (emphasis added). And the Department of Labor explained that "vested" means "the

employee has earned the right to retire with benefits which cannot be forfeited." APPX05838 (emphasis added). Yet another federal agency (the Government Accountability Office) described "vesting" as "receiving a right to benefits that **cannot be taken away**." APPX06400 (emphasis added).

In light of the above authorities and the undisputed record, the CFC was correct to hold that Plaintiffs had a cognizable property interest for purposes of the Takings Clause. (Some nuances of this property interest are examined further, *infra* at Section III.A.)

## II. THE *PER SE* TEST GOVERNS THIS LITIGATION.

Once plaintiffs show that they have a property interest, courts decide which Takings Clause test applies. This section shows that the *per se* takings test governs this case.

### A. There was an Appropriation of Plaintiff's Vested Property.

The Supreme Court has explained that there is a "longstanding distinction between acquisitions of property," which are governed by the *per se* test, and "regulations prohibiting private uses," where a regulatory takings test applies. *Tahoe-Sierra Preservation Council, Inc.*, 535 U.S. 302, 323 (2002); *see also, e.g.*, *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (*per se* test applies when the government is "appropriating private property," while the regulatory taking test applies when the government "instead imposes regulations that restrict an

owner's ability to use his own property"); *Horne v. Dep't of Agriculture*, 576 U.S. 350, 360-61 (2015) (*per se* test applies to "acquisitions" of property interests whereas a regulatory taking is a "restriction on the use of property that went too far" (quotations omitted)). Like the Supreme Court, the Federal Circuit instructs courts to apply the *per se* test when the government "engages in the functional equivalent of a practical ouster of the owner's possession." *Katzin v. United States*, 908 F.3d 1350, 1361 (Fed. Cir. 2018) (internal content omitted).

Here, more than $1,000/month was taken from each Plaintiff for years—so practical ouster occurred. Plaintiffs *wish* they had continued to receive their payments and that the Government had merely regulated their use of those sums. That wish is even stronger among the more than 1,100 widows and other class members who received either no Make Up Payment or one that was smaller than the pension cuts.

Critically to this case, the *per se* test is equally proper whether the Government appropriates someone's property or lets a third party take it. The Supreme Court has reaffirmed this point twice in the last three years alone. *See Cedar Point Nursery*, 141 S. Ct. at 2071 (*per se* test applies when a government is "appropriating private property for itself or a third party") (emphasis added); *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2255 (2021) ("For as long as the eminent domain power has been exercised by the United States, it has also been delegated to private parties.").

The appropriation of an identifiable property interest is the essence of the *per se* test—regardless of whether the Government keeps the property, gives it to someone else, or (as occurred here) authorizes a third party to appropriate it. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 & n.9 (1982) (*per se* test applies "without regard to whether the State, or instead a party authorized by the State, is the occupant").

The *per se* test also is "equally applicable to a physical appropriation of personal property" as it is to real property. *Horne*, 576 U.S. at 360. "The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home." *Id.* at 358; *see also Alimanestianu v. United States*, 888 F.3d 1374, 1380 (Fed. Cir. 2018) ("A per se taking involves the appropriation of private property, including both real and personal."). And the *per se* test applies with equal force whether the property interest in question is tangible or intangible: the Court has applied the *per se* test to cases involving a lien,[9] sums earned on an interpleader account,[10] the right to foreclose on a mortgage,[11] and interest generated from sums held in trust.[12]

Finally, the Supreme Court has affirmed time and again that the amount of the

---

[9] *Armstrong v. United States*, 364 U.S. 40, 48-49 (1960).
[10] *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 159 (1980).
[11] *Louisville Bank v. Radford*, 295 U.S. 555, 601-02 (1935).
[12] *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 235 (2003).

loss is inconsequential when a *per se* taking occurs—as long as *something* is lost. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) ("[W]here government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation."); *Tahoe-Sierra*, 535 U.S. at 323 (*per se* taking occurs "whether the interest that is taken constitutes an entire parcel or merely a part thereof").

The most analogous controlling case, *Brown v. Legal Foundation of Washington*, confirms that a *per se* taking is the right way to view Plaintiffs' claim. There, a state law required that interest in clients' IOLTA accounts be turned over to a private legal-aid group. *Brown*, 538 U.S. at 221-22. The interest had never been in the clients' possession, and the plaintiffs did not have a demand account in their individual names. All nine justices, however, agreed that the *per se* test applied to the transfer of the interest to legal aid. *Id.* at 235 (majority) ("We agree that a *per se* approach is more consistent with the reasoning in our *Phillips* opinion than *Penn Central*'s ad hoc analysis."); *accord id.* at 242 (dissenters agreeing that *per se* test applies). *Brown* even expressly noted that the *per se* test applies when the property interest relates to money held in trust in a pooled account. *Id.* at 230 ("[I]nterest generated by IOLTA ***pooled trust accounts*** is property of the clients and customers") (quotations omitted) (emphasis added). Here, the Fund holds money in a pooled trust account.

Likewise, the Supreme Court in *Webb's* applied a *per se* test while assessing whether a county government committed a taking of property when it took accrued interest earned on sums that it was holding in an interpleader account on behalf of private creditors. *Webb's Fabulous Pharmacies v. Beckwith*, 449 U.S. 155, 158 (1980). The creditors had never possessed the principal in the account (let alone the interest). *Id.* at 157. And the creditors did not even have an immediate claim to the money. *Id.* at 161. They merely had a property interest in eventually receiving "their respective portions of the fund" once their claims were recognized and distributions were ordered. *Id.* at 162. Nonetheless, a unanimous Supreme Court held that the *per se* test applied to the county's failure to distribute to the plaintiffs the interest that had accrued.

Further confirmation that the *per se* test applies here is provided in *Koontz v. St. Johns River Water Mgmt. District*, where the Supreme Court considered whether a community could require a landowner to spend money on mitigation projects on public land as a condition of obtaining approval to develop his own property. 570 U.S. 595 (2013). The Court rejected the suggestion that the government's demand for money amounted to a "tax" or a "user fee" such that it would fall outside of the Takings Clause. *Id.* at 615. Instead, the *Koontz* Court followed *Brown* and *Webb's* and was unequivocal that the *per se* test applies: "[W]hen the government commands the **relinquishment of funds linked to a specific, identifiable property interest**

such as a bank account or parcel of real property, a '**per se [takings] approach**' is the proper mode of analysis under the Court's precedent." *Id.* at 614 (quoting *Brown*. 538 U.S. at 235) (emphasis added); *see id.* at 616 ("confiscations of money" are *per se* takings even if they bear a similarity to taxes) (citing *Brown* and *Webb's*). Here, the Government authorized the Fund to command Plaintiffs to relinquish "funds linked to a specific, identifiable property interest": their vested pension.

The CFC's opinion does not even mention *Koontz*—much less explain why it is inapt. The opinion mentions *Webb's* once, but again does not try to distinguish it. APPX00020.

And its treatment of *Brown* is flawed and unpersuasive. The CFC took the view that the appropriation of Plaintiffs' pension benefits in this case was unlike the appropriation of IOLTA interest in *Brown*, because Plaintiffs' pension benefits "were not transferred to a new, intervening third party; rather, they remained part of the trust estate." APPX00029. Caselaw and common sense, however, both dispense with this theory. The Supreme Court repeatedly has found a *per se* taking where the property did not move location or change hands. For instance, in *Webb's*, the interest that was earned on sums held in interpleader stayed put—it remained in the same government-run account. 499 U.S. at 158. The government simply refused to pay the money out to the creditors, claiming the money as its own. Yet the Court unanimously held that the "county's **retention of that interest**" was an

appropriation of that money and therefore a *per se* taking. *Webb's*, 449 U.S. at 163-64 (emphasis added); *id.* at 158-60 (interest "**was not turned over**" to the receiver and the creditors) (emphasis added).

The CFC's suggestion that a *per se* taking does not occur when the money "remains" in one place was disproved again by the Supreme Court *just this past Term.* In *Taylor v. Hennepin County*, 598 U.S. 631 (2023), Minnesota permitted its counties to hold onto the proceeds of a foreclosed home that exceeded the sum needed to satisfy unpaid tax debts. The surplus money was never in the homeowner's physical possession. Rather, the excess proceeds **"remain with the County"**. *Id.* at 635 (emphasis added); *see id.* at 637 (the County "**kept**" the excess money) (emphasis added); *id.* at 644 ("any excess value **always remains** with the State") (emphasis added). The homeowner argued that "the County had unconstitutionally **retained** the excess value of her home above her tax debt" in violation of the Takings Clause. *Id.* at 635 (emphasis added). The Supreme Court agreed, holding that the homeowner had a property interest in the "money remaining" and that the County's retention of that money stated a "classic taking" under *Tahoe-Sierra* and other *per se* cases. *Id.* at 638-39 (quotation omitted). Not a single justice dissented.

The contrary rule adopted by the CFC would work implausible, troubling results. Under the CFC's theory, the government in *Brown* could have allowed the *banks* to keep the interest earned on the deposited sums, because that would have

simply (in CFC's words) "remained part" of the bank's assets. Nothing in *Brown* remotely suggests that the Court would have endorsed that outcome. Here, as in *Brown*, *Webb's*, *Koontz*, *Taylor*, and other cases, each Plaintiff lost his property interest.[13] Plaintiffs' pensions were not *regulated*. They were *appropriated*. And so, the *per se* test applies.

### B. The *Connolly* Line of Cases Does Not Exempt This Takings Claim From the *Per Se* Test.

The CFC declined to follow the *per se* test mainly because it misread three cases involving retirement benefits. In *Connolly v. PBGC*, 475 U.S. 211 (1986), the Supreme Court found no taking when a statute amended ERISA to impose withdrawal liability on companies that exited pension funds. A few years later, in *Concrete Pipe v. Construction Laborers Pension Trust*, 508 U.S. 602 (1993), the Court affirmed this result as to a different company. And in *E. Enterprises v. Apfel*, 524 U.S. 498 (1998), the Court found unconstitutional a non-ERISA statute that had imposed liability for the medical expenses of retired miners on a company that had

[13] The CFC suggests that the Fund's trustees had the power "to reduce plaintiffs' pension benefits as allowed by the plan documents." APPX00029. To the extent this comment might be read to suggest that the Plan documents permitted the trustees to seize Plaintiffs' pensions even before MPRA, it is plainly untrue—*as the CFC itself held in an earlier opinion on this exact issue*. APPX10348-49. Plaintiffs had explained that under extensive federal and state case law, a general power-to-amend clause such as the one in the Plan does not empower trustees to retroactively abrogate vested rights. The CFC agreed, concluding that the power-to-amend clause can only be used retroactively in a manner that "does not abrogate the plaintiffs' rights", and that any other result "would lead to absurd consequences". APPX10349.

long since left the industry.[14] Each case involved not an appropriation of money from a particular fund, but something very different—a general assessment of liability on the companies for some action they took, to be paid from whatever source the companies saw fit. Each case applied the *Penn Central* test.

The CFC misreads these cases as standing for the following rule: "[I]n the context of congressional amendments to ERISA to shore up multiemployer pension plans, when the government takes nothing for its own use, the regulatory-takings framework applies." APPX00024. This reading of the *Connolly* line is completely novel. And wrong. The Supreme Court has not once in the nearly forty years since *Connolly* even hinted that these cases meant to establish a "for its own use" requirement for the *per se* test, in the pension setting or otherwise. To the contrary, the Supreme Court has affirmed time and again—most recently just two years ago—that the *per se* test applies whenever the government appropriates property **either for its own use or for the use of a third party**. *See Cedar Point Nursery*, 141 S. Ct. at 2071 (*per se* taking where government is "appropriating private property **for itself or a third party**") (emphasis added); *see id.* at 2072 (*per se* taking where a "regulation appropriates **for the enjoyment of third parties**") (emphasis added); *Brown*, 538 U.S. at 224 ("**transfer of the interest to the Foundation**" for its use

[14] Four justices found a Takings Clause violation, *id.* at 504 (plurality), and one found a Due Process violation, *id.* at 539 (Kennedy, J., concurring).

was a *per se* taking) (emphasis added); *see also Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1290 (Fed. Cir. 2008) (discussing multiple Supreme Court cases where there was a *per se* taking because property was reallocated "to government use **or third party use**") (emphasis added).

What then is the actual meaning of the *Connolly* trilogy? The Supreme Court and the Federal Circuit have given a clear and consistent answer: The regulatory takings test applies when the government imposes an obligation to pay money as a general liability that a private party can pay from any source it chooses. But the *per se* test applies when—as here—a government commands the relinquishment of (i) money from an **identifiable fund** or (ii) money that is otherwise **linked to a specific, identifiable property interest**. Five controlling cases have made this point.

To start, a majority of the Justices said exactly this in *Eastern Enterprises* itself. *See* 524 U.S. at 540 (Kennedy, J., concurring) ("The Coal Act … does not **operate upon or alter an identified property interest** …. The law simply imposes an obligation to perform an act, the payment of benefits. The statute is **indifferent as to how the regulated entity elects to comply or the property it uses to do so**.") (emphases added); *id.* at 555 (Breyer, J., dissenting for four Justices) ("Here there is **no specific fund of money**; there is only a **general liability**….") (emphases added).

More recently, the Supreme Court distinguished between the regulatory taking test of *Eastern Enterprises* and the *per se* test of *Brown* precisely on the

ground that the latter involved the relinquishment of money tied to an identifiable property interest such as a bank account:

> **Unlike the financial obligation in *Eastern Enterprises,*** the **demand for money at issue here did "operate upon … an identified property interest**"
> ….
> [W]e need not apply *Penn Central's* essentially ad hoc, factual inquiry, at all, much less extend that already difficult and uncertain rule to the vast category of cases in which someone believes that a regulation is too costly. *Eastern Enterprises.* (opinion of KENNEDY, J.). Instead, petitioner's claim rests on the more limited proposition that **when the government commands the relinquishment of funds linked to a specific, identifiable property interest** such as a bank account or parcel of real property, a *per se* takings approach is the proper mode of analysis under the Court's precedent. *Brown v. Legal Founation of Wash.*"

570 U.S. at 613-14 (citations and brackets omitted) (emphases added).

The Federal Circuit repeatedly has drawn the same boundary around the *Connolly* line of cases—reading these opinions to mean that the *Penn Central* test applies to mere obligations to pay money as a liability, while the *per se* test applies to appropriations of money from an identifiable fund or otherwise tied to a particular property interest. *See Commonwealth Edison Co. v. United States*, 271 F.3d at 1338-40 (en banc) (distinguishing *per se* cases such as *Phillips* and *Webb's* where there was "a specific, separately identifiable fund of money," from regulatory taking cases such as *Eastern Enterprises* where there was merely an "obligation to pay money" as a "liability"); *Adams*, 391 F.3d at 1224-26 (distinguishing *per se* cases such as *Phillips* and *Webb's* that involve money "held in a specific, consolidated" account

or that is connected to a "property interest", from regulatory takings cases such as *Eastern Enterprises* that involved mere "obligations to pay money"); *Branch v. United States*, 69 F.3d 1571, 1578 (Fed. Cir. 1995) (reading *Connolly* and *Concrete Pipe* for proposition that "[w]hen addressing constitutional challenges to new rules of liability, the Supreme Court … has given broad scope to legislative prerogatives").

Under this clear and governing precedent, the *per se* test applies here, not the *Connolly* trilogy. Rather than imposing some general obligation to pay money as a liability[15] that the Plaintiffs could pay from any source (for example, a tax liability, *Branch*, 69 F.3d at 1578), the Government here authorized the taking of money that is from an identifiable fund (the Fund) and is linked to a specific property interest (a vested pension). We respectfully but emphatically note that the CFC ignored this law. It did not even consider *Koontz*. Or *Branch*. Or *Adams*. The CFC instead chose to embark on its own quixotic and flawed reading of the *Connolly* line of cases—

---

[15]The CFC suggested that "[t]he MPRA altered pension plans' liability to plan participants." APPX00025. But this quote does not describe the Government *imposing* a liability *on the plaintiffs*, but rather the Government *removing* the liability of the Fund *to the plaintiffs*. The former is what the law demands before a case can be exempted from the *per se* test. The latter—the Government immunizing the Fund from any cause of action for cutting plaintiffs' vested pensions, 29 U.S.C. § 1085(e)(9)(I)(iii)—is, if anything, just further reason under the law to find a taking. *See infra* at 53.

rather than following controlling precedent about how to read them. This was legal error.

The CFC's detour from controlling caselaw evidently rested on its policy concerns. Rather than follow (or even cite) the controlling cases just discussed, the CFC signaled that it believed the *per se* rule should not apply because there are "limited economic resources" in the multi-employer pension sector, such that protecting vested pensions would leave Congress with (in its words) a "binomial choice" of pension fund insolvency or a taxpayer bailout, and "tie the hands of policymakers" facing the "difficulty" of balancing the "competing interests at stake" APPX13216, APPX13234-35. At the outset, this suggestion that Congress only had a binomial choice is untrue. Congress had before it a great many options for reforming the multiemployer pension system that did not involve cutting vested pensions.[16]

---

[16] These included: require funds to cut adjustable benefits; allow funds to cut accrued-but-unvested benefits; authorize PBGC to facilitate mergers prior to insolvency; allow fund sharing of participants or assets; foster new types of pension plan designs; give PBGC greater power to partition multiemployer plans; give PBGC greater power to compel troubled plans to shore up funding; increase PBGC premiums through employer contributions; increase PBGC premiums through employee contributions; loan money to pension plans; provide federally guaranteed bond offerings to plans; raise the retirement age for active workers; appropriate more funds to the PBGC; lower PBGC insurance payouts; require greater pension contributions from employers (akin to *Connolly*); impose a tax on all pension payouts to prop up struggling plans; and impose a society-wide tax to fund a bailout. *See* June 2023 Hearing, *supra* note 9; Hearing Before the House Committee on Educ.

But even if the CFC had been correct in its description of the available policy options, none of that should matter, because there is no "limited resources" or "Congress is doing the best it can" exception to the *per se* rule. Courts often use the *per se* test when the Government is forced to make difficult decisions in the face of scarce resources. *See Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 232-33 (1984) (scarce available land); *Louisville Bank*, 295 U.S. at 601-602 (mortgage restructuring during the Great Depression); *Casitas*, 543 F.3d at 1294 (scarce water). Courts also apply the *per se* rule when the Government is acting for the most salutary of purposes. *See Brown*, 538 U.S. at 232 (applying *per se* test to seizure of IOLTA interest to support financially struggling legal aid programs, despite the "dramatic success of these programs in serving the compelling interest in providing legal services to literally millions of needy Americans"). The question is not whether the Government took people's property to solve a major problem. That is the *point* of the Takings Clause: In the prototypical takings case, governments face a "binomial" choice about whether to let landowners keep their property or to seize that property and use it to build roads. Yet governments must provide compensation to seize the

---

and the Workforce, Subcommittee on Health, Employment, Labor, and Pensions, No. 113-35 (Oct. 29, 2013).

private land without which roads cannot be built. They cannot just seize it to solve a societal problem.[17]

Ultimately, the CFC substituted its own policy instincts (*Congress needs latitude to act*) for the constitutional rule (*Congress cannot act by appropriating vested property without providing fair compensation*). The Supreme Court has instructed courts specifically not to create exceptions from general Takings Clause jurisprudence for subsets of cases because of some policy concern that Congress otherwise might be handcuffed:

> Time and again in Takings Clause cases, the Court has heard the prophecy that recognizing a just compensation claim would unduly impede the government's ability to act in the public interest. We have rejected this argument when deployed to urge blanket exemptions from the Fifth Amendment's instruction.

*Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 36 (2012) (citations omitted). And yet that is precisely what the CFC did here.

One final point bears emphasis. The fact that the Government has since issued Make Up Payments to some Class Members does not change the above analysis: A

---

[17] The CFC pointed to *Cedar Point Nursery*'s statement that the Government has the authority to "engage in health and safety inspections". APPX00026. But MPRA is a far cry from an inspection—it is an outright seizure of property. And *Cedar Point Nursery* was careful to locate even this narrow right to inspect not in some general authority of the Government to do good, but in its specific power to "condition[s] the grant of a benefit such as a permit, license, or registration on allowing access." 141 S. Ct. at 2079. Congress is not placing a condition on any permit, license or registration here, and it is seeking far more than "access"—it is reallocating Plaintiffs' hard-earned property.

*per se* taking remains a *per se* taking even if the Government later returns the property. As this Court explained in *Hendler v. United States*, the appropriation of property is a *per se* taking even if the Government "subsequently decide[s] to return the property to its owner." 952 F.2d 1364, 1376 (Fed. Cir. 1991). "[N]o one would argue that that would somehow absolve the government of its liability for a taking during the time the property was denied to the property owner." *Id.*; *accord Cedar Point Nursery*, 141 S. Ct. at 2074.

The Government's actions here are akin to ousting someone from their home; changing the deed to authorize someone else to move in; and then reversing course after several years—by re-inserting the original owner's name on the deed. The Government's decision to return the seized home would affect the amount of *damages*. But the test of whether a taking occurred would be the same: The *per se* standard. (And, of course, hundreds of widows and many other Class Members are still awaiting a (supposedly) "complete" Make Up Payment.)

## III. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE UNDISPUTED RECORD SHOWS THAT THE *PER SE* TEST IS SATISFIED.

We just showed that the per se test applies. We explain below why, on the undisputed facts, the *per se* test is satisfied. To state a Fifth Amendment taking, "a plaintiff must establish that he possessed an [1] enforceable property right that was [2] taken by the government [3] for public purposes [4] without just compensation."

*Welty v. United States*, 926 F.3d 1319, 1323 (Fed. Cir. 2019) (emphases added). Plaintiffs can meet their burden, amply, as to each of these four elements.

### A. Plaintiffs Have an Enforceable Property Interest.

As shown *supra*, Plaintiffs have a cognizable property interest.

The CFC agreed. As the CFC framed it, the specific property interest at issue was Plaintiffs' "right to unreduced benefits under their vested pensions". APPX10327. That frame actually merges two distinct property interests. *First*, Plaintiffs have a property interest in the **vested pension itself**. *See, e.g., Winston v. City of New York*, 759 F.2d 242, 249 (2d Cir. 1985) (finding a property interest in "contractual rights to a pension"). *Second*, Plaintiffs have a property interest in **payments** (i.e., money) under that vested pension. *See, e.g., Bloch*, 227 F. Supp. 2d at 38 (explaining that "courts consistently find property rights" in "a vested right in retirement annuities").

This double-barreled property interest is sensible enough, as one has a cognizable property right in both property and the proceeds of that property—both the tree and the fruit. A homeowner has a right to the rent. A bond-holder has the right to coupon payments. A bank-account owner has the right to interest. A songwriter owns both the song and resulting royalties. Here, Plaintiffs have a property interest in their pension itself (tree) and the monthly pension payments (fruit).

### B. The Property Interest Was Taken by the Government.

As the CFC correctly held, governments are liable for a taking when they authorize a third party to appropriate someone else's property interests.

The Government has admitted repeatedly that it authorized the Fund to amend the contracts that created Plaintiffs' property interest. *See, e.g.,* APPX02440 (Counsel for Defendant: "[W]e've conceded from the start … that Treasury authorized the fund's application.").[18] Numerous Government witnesses admitted that the Fund could not have reduced Plaintiffs' pensions without this authorization.[19] These two facts resolve this element of the *per se* test. That is because a government takes private property, as a legal matter, when it "authorizes" a third party to deprive someone else of property. *Loretto*, 458 U.S. at 432 n.9 ("A permanent physical occupation authorized by state law is a taking without regard to whether the State, or instead **a party authorized by the State**, is the occupant."

[18] MPRA itself describes the actions of the United States as an "authorization." 29 U.S.C. § 1085(e)(9)(H)(vi). The action memorandum approving the suspension described that approval as an "authorization." APPX05287 ("Final Authorization to Suspend Benefits"). The government's letter to the Fund authorizing the suspension described those actions as an "authorization." APPX05293. There is more, but this should suffice.

[19] APPX05516 (Treasury's Janet Laufer agreeing that "until final authorization, vested benefits may not be reduced"); APPX05554 (Treasury's Danielle Norris admitting "without the final authorization … the plan would be in violation"); APPX05533 (Treasury's Rob Neis: "Q: [W]hy did it matter whether Treasury authorized the Fund to suspend benefits? A: The Fund would not have been permitted to suspend benefits").

(emphasis added)); *accord Cedar Point Nursery*, 141 S. Ct. at 2069; *Arkansas Game & Fish Comm'n*, 568 U.S. at 31. Thus, when a city authorized a cable company to run wires across a private building's roof, a *per se* taking occurred—even though the government never used or possessed the property itself. *Loretto*, 458 U.S. at 438.

Like the Supreme Court, this Court repeatedly has made clear that authorization suffices to establish the liability of the United States for a taking. *See Toews v. United States*, 376 F.3d 1371, 1376 (Fed. Cir. 2004) ("It is elementary law that if the Government uses (**or authorizes the use of** … ) an existing railroad easement … the Government has taken the landowner's property" (emphasis added)); *Preseault v. United States*, 100 F.3d 1525, 1551 (Fed. Cir. 1996) (en banc) (finding the United States responsible for the "occupation of the [plaintiffs'] property by the [city] under the authority of the Federal Government"). Numerous other Federal Circuit cases support this point.[20]

Any other rule would fail to protect property rights under the Takings Clause. *See Boston Chamber of Comm. v. Boston*, 217 U.S. 189, 195 (1910) ("[T]he question is what the owner lost, not what has the taker gained."). Put differently, if the

[20] *See Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1196 (Fed. Cir. 2004); *Hendler*, 952 F.2d at 1378-79; *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154 (Fed. Cir. 2014); *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1363-64 (Fed. Cir. 2005).

government authorizes your bank to empty out your bank account, the economic loss is the same as if the account is plundered by the government.

Only two years ago, the Supreme Court confirmed this point once again: that *authorization is enough*. In *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2069 (2021), the State of California had promulgated a regulation authorizing private labor organizers to enter the property of agricultural farms in order to solicit support from their workers for unionization. The Court held that the government was liable for a *per se* taking because it had "authorized" the third party labor organizers to "appropriate" a right of access to the plaintiffs' property. *Id.* at 2071-73. Citing *Loretto*, the Court was emphatic: "[I]t comes as little surprise that the Court has long treated **government-authorized** physical invasions as takings requiring just compensation." *Id.* at 2073 (emphasis added); *id.* at 2074 (the "upshot of this line of precedent is that **government-authorized** invasions of property" are *per se* takings) (emphasis added).

In case any doubt exists, this authorization-is-enough principle applies with equal force to takings of money. For example, the Supreme Court made clear in *Brown* that a government cannot authorize one private party to take another private party's interest income. 538 U.S. at 224. The Supreme Court concluded that this transfer of property was a taking under the logic of *Loretto*: "[T]he transfer of the

interest to the Foundation here seems more akin to the occupation of a small amount of rooftop space in *Loretto*." *Id.* at 235.

The CFC agreed that the Government's authorization supported a *per se* taking in this case. APPX10319-20 ("[G]overnment authorization to a third party to seize a plaintiff's property may give rise to a taking."). The CFC, however, suggested a puzzling rationale for why the Government might not be liable even though it authorized the Fund to take plaintiffs' property. The CFC reasoned that because Plaintiffs could lose their vested pensions **if the Fund went insolvent**, the Government should be able to authorize a third party to seize Plaintiffs' pensions without compensation at any time, even though the Fund was solvent. APPX00026.

This is a false, dangerous proposition. Everyone who owns a home with a mortgage knows that they could lose their home if they default on that mortgage. But that does not give the government carte blanche to seize that home if they have not defaulted. Likewise, depositors could lose the money in their bank account if the bank goes belly up. But that possibility does not give the Government the right to seize sums in their bank accounts if the bank is still solvent. *Brown,* 538 U.S. at 235. The CFC's quixotic rule—that if a property owner can lose their property because of insolvency, then the Government can seize that property even in the absence of insolvency—would swallow the Takings Clause whole.

The CFC claimed to locate a legal basis for this rule in *Cedar Point Nursery*'s recognition that "many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights". APPX00026-27. But unlike the legal principles actually discussed in *Cedar Point Nursery*—for instance, the centuries-old common law rule that the government can demand that a homeowner abate a nuisance, *see* 141 S. Ct. at 2079—there is certainly no "longstanding background restriction" that empowers the Government to seize retirees' vested pensions.[21] If anything, there has been a longstanding principle that the Government *cannot* take such a step. *See Pennie*, 132 U.S. at 471 (recognizing more than a century ago that the government cannot reduce "vested" pensions).

In sum, an authorized seizure of a property interest is a taking, and so the Government is liable for authorizing the Fund to seize Plaintiffs' property interest.

[21] The CFC observes that prior to MPRA, "accrued pensions" could be taken if a fund faced a substantial business hardship short of insolvency. APPX00005, APPX00026. Yes, but that is the point: certain *accrued* pensions could be taken, but *vested* pensions in pay status could not. Every stakeholder in this case—government officials, the Fund, pension experts—agreed that MPRA's cuts to vested pensions were entirely unprecedented. APPX05559 ("has not happened before MPRA"); APPX05568 ("very, very novel"); APPX05390 ("unprecedented"). The CFC was alone in its view that there was a longstanding tradition of cuts to vested pensions in the absence of insolvency.

### C. The Taking Had a Public Purpose.

The taking here was "for public purposes." *Welty*, 926 F.3d at 1323. The public purpose element (the third element for showing a *per se* taking) is met as "long as the taking has a conceivable public character." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1014 (1984). The Government has not contested throughout this case that it acted to advance a purpose of a public character. The public record shows—and the CFC agreed—that Congress sought to solve policy questions related to pension finances and PBGC's solvency. APPX00008. That more than suffices to show a valid public purpose. *See Ruckelshaus*, 467 U.S. at 1014-15 (looking to legislative history to show public purpose).

### D. The Property Interest Taken by the Government Had Value.

Finally, to prevail under the *per se* test, Plaintiffs must show that they lost something of value. *Brown*, 538 U.S. at 240; *Welty*, 926 F.3d at 1323. The pension cuts appropriated more than $1,000/month from each Plaintiff from October 2017 to December 2022—totaling more than $75,000 apiece. *See supra* at 15. Even a one-penny loss would suffice: "The size and scope of a physical invasion is immaterial to the analysis" in a *per se* taking. *Casitas*, 543 F.3d at 1288. Thus, "even if the government only appropriates a tiny slice of a person's holdings, a taking has occurred." *Id*. Here, the Government sliced tens of thousands of dollars from each named Plaintiff. Notably, even the Government's expert admitted that the pensions

had value: "Q. Is it clear that each plaintiff's pension has value …? A. Seems obvious, yes." APPX05440.

Indeed, by providing money to pension funds to issue "Make Up Payments," the Government is acknowledging that there is a chasm between how much Plaintiffs and other class-members earned and how much they actually received: That's what the "Make Up Payment" was making up for. And the retirees' claims undeniably have value even after the Make Up Payment. *First*, the Government has not authorized full Make Up Payments to more than 1,100 Class Members. *See supra* at 17-18. *Second*, the Government has refused to pay interest on the money that it took from nearly 11,000 Class Members for the five-year period that they were dispossessed of their pension payments. Thus, none of the Class Members have received—or will receive—the full just compensation they are due under the Takings Clause. *See Knick v. Township of Scott, Penn.*, 139 S. Ct. 2162, 2182 (2019) ("just compensation … includ[es] interest for any time elapsed"); *Otay Mesa*, 779 F.3d at 1327 ("It is now axiomatic that the Fifth Amendment's reference to 'just compensation' entitles the property owner to receive interest from the date of the taking to the date of payment as a part of his just compensation." (quotations omitted)). The Takings Clause bars the Government from taking citizens' property, returning it on the Government's own timetable, and retaining the interest, capital gains, or rents acquired along the way.

The Government argued earlier in the case that courts must go further and consider whether Plaintiffs would have been better off if the taking had not occurred. But this Court clearly has limited this inquiry to the regulatory-taking test. *A & D Auto*, 748 F.3d at 1157 ("[T]o **establish a regulatory taking**, a plaintiff must show that his property suffered a **diminution** in value or a deprivation of economically beneficial use." (emphasis added)). The Supreme Court has agreed, rejecting the contention (by the Government, in another case) that courts should consider the offsetting benefits to plaintiffs from the government taking their property, explaining that "the Government cites **no support for its hypothetical-based approach to just compensation**" in a *per se* case. *Horne*, 576 U.S. at 368 (emphasis added). Put differently, when the Government takes your car, courts give no weight to arguments about how lucky you are to save money on insurance, tolls, and gas.

Even if this were wrong, reversing and remanding would be required. The parties submitted competing expert reports by actuaries; Plaintiffs' expert showed that all three Plaintiffs were harmed even if one considers offsetting benefits, and this disputed issue cannot be resolved in the Government's favor at the summary judgment stage. APPX05656; APPX05688; RCFC 56(a). The experts even *agreed* that at least one of the three Plaintiffs was harmed economically. On this record, even if this Court declines to follow *Horne*, the resulting, fact-intensive question of

whether Plaintiffs suffered a diminution of value would be inappropriate for summary judgment and should be resolved during a trial on damages.

*****

In sum, the *per se* test governs this litigation, Plaintiffs satisfy the four elements of the *per se* test, and a *per se* taking occurred.

## IV. PLAINTIFFS' PROPERTY WAS TAKEN EVEN IF THE COURT APPLIES A REGULATORY TAKINGS TEST.

Even if the Court applies *Lucas*'s "categorical" test or *Penn Central*'s fact-specific balancing test, a taking occurred.

### A. *Lucas* Applies to Regulatory Takings of Parcels of Money.

A categorical regulatory taking occurs when a statute or regulation wipes away essentially all of a property's value but does not change the property's owner. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992). The Federal Circuit has explained that a regulatory taking is categorical only when the government action deprives "the owner of all beneficial use of the entire relevant parcel." *Norman v. United States*, 429 F.3d 1081, 1091 (Fed. Cir. 2005). But this Court has not yet decided to extend that principle to cases involving intangible property, such as monetary benefits. *See A&D Auto Sales*, 758 F.3d at 1151-52 (declining to decide whether *Lucas* extends to "intangible property").

Plaintiffs respectfully submit that this is an appropriate case to consider this question anew, for two reasons: *First*, if one accepts the CFC's definition of the

property interest in this case as the right to "unreduced" vested benefits, *supra* at 18, 43, then that right was taken in its entirety in every meaningful sense: The clause entitling them to fixed pension payments was replaced with a less-valuable clause that provided for 29% lower payments. APPX12881-82 (Clause 5.07 to permit pension reductions); APPX12883 (reducing Plaintiffs' pensions by 29%). *Second*, MPRA removed Plaintiffs' right to seek recourse from the Fund for the taking of their benefits. 29 U.S.C. § 1085(e)(9)(I)(iii) (eliminating Plaintiffs' cause of action against the Fund for cuts under the MPRA). This Court has signaled that it would look for precisely such a deletion of a cause of action for there to be a *Lucas* taking of intangible property. *See Piszel*, 833 F.3d at 1381-82 (holding that the government's reduction of the plaintiff's severance payments "did not amount to a total taking of [his] property" under *Lucas* "because the government's actions left intact his potential breach of contract claim against" his employer).

This case should be viewed as a *per se* taking—but if it *is* assessed as a regulatory taking, it should be viewed as a categorical regulatory taking.

### B. There Was a Taking Even If *Penn Central* Governs This Case.

If a taking is deemed not *per se* and if *Lucas* does not apply, a court would then "embark on the fact-based inquiries dictated by *Penn Central*." *Sartori v. United States*, 67 Fed. Cl. 263, 274 (2005). In *Penn Central*, the Supreme Court recognized three inquiries of "particular significance": (i) "the character of the

governmental action"; (ii) the "extent to which the regulation has interfered with distinct investment-backed expectations"; and (iii) "the economic impact of the regulation on the claimant." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Each of these inquiries supports a taking.

### 1. Character of the governmental action

To assess the character of the governmental action, the Federal Circuit looks to factors that bear on the "nature or substance" of the taking. *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1307 (Fed. Cir. 2015). Here, these factors point to a taking. *First,* Plaintiffs' cuts were of lengthy duration—more than five years, and for more than 1,100 widows, widowers and estates, they continue to be permanent. *See Tahoe-Sierra*, 535 U.S. at 342 ("duration of the restriction is one of the important factors"). *Second,* MPRA allows cuts to apply "retroactively" to those who had already earned vested pensions in pay status, and retroactive changes are especially problematic under the Takings Clause. *See E. Enterprises,* 524 U.S. at 501 (plurality). *Third,* the suspension places a "disproportionate" burden on Plaintiffs and other retirees. *Cienega Gardens v. United States*, 331 F.3d 1319, 1340 (Fed. Cir. 2003). *Finally*, the regulation "is intrusive beyond the level of traditional governmental limits" in this area. *Id.* at 1338-39.

The CFC agreed these were the correct factors if *Penn Central* applies. But it concluded that these factors counseled *against* a taking. APPX00043-44. It was able

to reach this result only by downplaying these undisputed facts: More than 1,100 widows, widowers and estates had their pensions seized permanently, *supra* at 18-19; Plaintiffs' pensions were taken decades after they had vested as property and many years after Plaintiffs had retired, *supra* at 15; (iii) senior government officials, in documents that emerged in discovery and deposition testimony, acknowledged the cuts were unfair to and "heavily tilted against" retirees, *supra* at 12; and (iv) cutting vested pensions was, in the words of the Government and the Fund themselves, "very, very novel" and "has not happened before MPRA", *supra* at 10. That is, the CFC was able to find in favor of the Government on the relevant factors—whether the cuts were lengthy, retroactive, disproportionate and traditional—only by bypassing the undisputed facts, including admissions by the Government's own officials. This is error.

**2. Reasonable investment-backed expectations**

*Penn Central*'s second element asks whether a plaintiff had reasonable "investment-backed expectations." 438 U.S. at 124; *see Chancellor Manor v. United States*, 331 F.3d 891, 904 (Fed. Cir. 2003) (inquiry looks to "what a reasonable [worker] in the [plaintiffs'] position should have anticipated"). Here, Plaintiffs' investment-backed expectations were not only reasonable, but extensive. Plaintiffs took their jobs because of the chance to earn a vested pension. APPX05597; APPX05626. They worked challenging hours even when sick or in pain; gave up

pay raises and other benefits; and declined other job opportunities to earn their vested pension. APPX05597; APPX05626-28. They were informed often that their pensions were protected. *Supra* at 15, 25. They relied on the fact that their pension was vested in choosing to leave the workforce. APPX05597; APPX05611-13. Even the Fund and UPS acknowledged, respectively, that their retirees had "worked their entire lives expecting their pension would be there for them," and "planned on this income throughout their entire working lives." APPX05299; APPX05890.

The CFC agreed, concluding that Plaintiffs had reasonable, investment backed expectations. APPX00038-40. But it found that the Government had not interfered with those expectations, because (in its view) the Plaintiffs had "received the advantage of the Teamster Fund's solvency". APPX00041. The CFC cites *Alimanestianu*, 888 F.3d at 1383, a case where this Court found the reasonable expectations prong was not met because the plaintiffs' recovery was "speculative". Here, far from being "speculative", both parties' expert reports show that at least some Class Members experienced harm. *Supra* at 51. The CFC did not even mention these expert reports that spoke directly to this factor. Again, this was error.

### 3. Economic impact on the Plaintiffs

Finally, Plaintiffs satisfied the third element of *Penn Central*, which looks to the economic impact on the regulated parties. 438 U.S. at 124. For this element, what "has evolved in the case law is a threshold requirement that plaintiffs show 'serious

financial loss' from the regulatory imposition in order to merit compensation." *Cienega Gardens*, 331 F.3d at 1340 (citation omitted). Here, Plaintiffs showed that the cuts deprived them of the money they needed to subsist, forced them to forgo medical care, and thrust them into debt. APPX05602; APPX05616; APPX05632. Likewise, Fund documents characterized the cuts to participants as "devastating," and described as "accurately reported" accounts that retirees were "struggl[ing] to survive." APPX12622-31. The Fund's own actuaries predicted that, wholly apart from the financial impact, the cuts would shorten retirees' lives. APPX05084. Even Treasury itself criticized the "severity" and "harshness" of the cuts to vested pensions under MPRA. APPX05029-32.

Despite this widespread evidence of harmful impact, the CFC concluded that the economic impact prong counseled against a regulatory taking, on the ground that Plaintiffs "suffered at most a 29-percent reduction in the value of their pension benefit", and the court was unaware of any case "in which a court has found a taking where a diminution in value was less than 50 percent." APPX13224-25 (quotations omitted). But the *Connolly* line of cases—the very cases the CFC invoked to apply the regulatory takings test—make clear that no strict numerical threshold exists in *Penn Central* cases when the government takes a sum of money. As the Court explained in *Connolly* itself: "[A]s to the severity of the economic impact of the [Act], there is no doubt that the Act completely deprives an employer of whatever

amount of money it is obligated to pay to fulfill its statutory liability." 475 U.S. at 225. So too here.

If anything, the CFC's use of a 50 percent threshold only confirms why the *Penn Central* test is such an inapt fit for a case like this, where what is being assessed is not the incidental effect on property of a general regulation, but the deprivation of a property interest to which Plaintiff had a legal right. The CFC's opinion would empower the Government to transfer at its will to another party the rights to up to 50 percent of any retiree's vested pensions. And not just pensions. Under the CFC's reasoning, Congress may plunder up to 50 percent of any financial asset—annuities, 401(k)s, bank accounts, brokerage accounts, trusts—where it believes it has "limited economic resources" to pursue the public good. APPX00045. Allowing the Government such a sweeping power would gut the Takings Clause.

Even if *Penn Central* applies—which it does not—this was a taking of Plaintiffs' hard-earned, vested property.

## CONCLUSION

The CFC's judgment should be reversed.

Respectfully submitted,

*/s/ Noah A. Messing*

Noah A. Messing
Messing & Spector LLP
250 Park Avenue, 7th Floor
New York, NY 10177
nm@messingspector.com
Telephone: (212) 960-3720

Jason H. Kim
Schneider, Wallace, Cottrell, Konecky LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
jkim@schneiderwallace.com
Telephone: (415) 421-7100

Phillip M. Spector
Messing & Spector LLP
145 West Ostend Street, Suite 600
Baltimore, MD 21230
ps@messingspector.com
Telephone: (202) 277-8173

October 16, 2023

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE WITH RULE 32

Pursuant to Federal Circuit Rule 32(b)(3) and Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(e) and Federal Circuit Rule 32(b)(1) because it contains no more than 14,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief was prepared using Microsoft Word in 14-point Times New Roman font.

*/s/ Noah A. Messing*

Noah A. Messing

**ADDENDUM**
**Judgment, Order and Opinion Appealed From**

Order of Judgment (April 20, 2023) ...................................................... APPX00001

Judgment (April 20, 2023) ........................................................................ APPX00002

Memorandum Opinion (April 28, 2023) ............................................... APPX00003

# In the United States Court of Federal Claims

No. 18-1115
Filed: April 20, 2023

**WILLIAM KING, et al.,**

***Plaintiffs,***

**v.**

**UNITED STATES,**

***Defendant.***

## ORDER OF JUDGMENT

For the reasons provided in the Memorandum Opinion filed concurrently with this Order, the defendant's motion for summary judgment (ECF 169) is **GRANTED**. The plaintiffs' motion for summary judgment (ECF 164) is **DENIED**. The plaintiffs' motion to certify conditional subclasses (ECF 159) is **DENIED as moot**.

In accordance with the protective order pending in this case, the Memorandum Opinion has been filed under seal. So that the Court may release the Opinion publicly, the parties shall meet and confer and jointly propose redactions to the Memorandum Opinion by **April 27, 2023**.

The Clerk is **DIRECTED** to enter judgment for the defendant. No costs are awarded.

It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

# In the United States Court of Federal Claims

**No. 18-1115 C**
**Filed: April 20, 2023**

**WILLIAM KING, et al.**
**Plaintiffs**

**JUDGMENT**

**v.**

**THE UNITED STATES**
**Defendant**

Pursuant to the court's Memorandum Opinion and [separate] Order of Judgment, filed April 20, 2023, denying plaintiff's motion for summary judgment and granting defendant's cross-motion for summary judgment,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of defendant. No costs are awarded.

Lisa L. Reyes
Clerk of Court

By: s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 18-1115
Filed: April 28, 2023
FOR PUBLICATION*

| |
|---|
| **WILLIAM KING, ANTHONY GUGLIUZZA, STEPHEN DARDZINSKI, et al.,** |
| ***Plaintiffs,*** |
| **v.** |
| **UNITED STATES,** |
| ***Defendant.*** |

*Noah A. Messing*, Messing & Spector LLP, New York, NY, for the plaintiffs, with *Phillip M. Spector* and *Jason H. Kim*, of counsel.

*Geoffrey M. Long*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for the defendant.

**MEMORANDUM OPINION**

***HERTLING*, Judge**

In this certified class action, the plaintiffs are vested participants and beneficiaries in a pension plan. They allege that the United States, acting through the Department of the Treasury ("Treasury"), in consultation with the Department of Labor ("Labor") and the Pension Benefit Guaranty Corporation ("PBGC"), violated the takings clause of the fifth amendment of the U.S. Constitution in October 2017 by authorizing a 29-percent cut to their pension benefits under the Multiemployer Pension Reform Act of 2014 ("MPRA"). The plaintiff class members who were still alive in December 2022 saw their pension benefits restored under the American Rescue Plan Act of 2021 ("ARPA") and received lump-sum make-up payments without interest in the amount that had been withheld from them. The plaintiffs maintain their suit for interest on the amounts withheld while the benefit cuts were in effect and because the estates of the participants and

* Pursuant to the protective order in this case, the Court initially filed this opinion under seal on April 20, 2023, and directed the parties to review the opinion and propose redactions of confidential or proprietary information. The parties have proposed no redactions. Accordingly, the Court hereby releases in full the memorandum opinion of April 20, 2023.

beneficiaries who died between October 2017 and December 2022 have received reduced or no make-up payments.

The parties cross-move for summary judgment under Rule 56 of the Rules of the Court of Federal Claims ("RCFC"). The cross-motions present two issues: (1) whether the plaintiffs' claims are more appropriately resolved as a classic physical taking or under the more flexible regulatory-takings test provided in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978); and (2) the application of the appropriate takings test. This case has important implications for the constitutional limits on the ability of Congress and regulators to address the problem of multiemployer-pension-plan insolvency.

The physical-takings test is inapplicable to the plaintiffs' claims because the federal government has neither appropriated the plaintiffs' property nor occupied it. Accordingly, the regulatory-takings test provides the applicable measure for the plaintiffs' claims. Under the *Penn Central* factors, the plaintiffs have not demonstrated that a regulatory taking occurred. The defendant therefore has not violated the takings clause of the fifth amendment. The plaintiffs' motion for summary judgment is denied, and the defendant's motion for summary judgment is granted.

## I. BACKGROUND

This summary of the legal and factual background does not constitute findings of fact but is simply a recitation of the parties' representations. The facts underlying the parties' arguments are not in dispute.

When appropriate, this summary reiterates the background detailed in the opinion on the previous round of summary judgment motions, *King v. United States*, 159 Fed. Cl. 450, 456-60 (2022). Neither party has challenged any aspect of the background sections of that opinion.

### A. ERISA

The Employee Retirement Income Security Act ("ERISA") was enacted in 1974. Under ERISA, "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age . . . ." 29 U.S.C. § 1053(a).[1] A "normal retirement benefit" is statutorily defined as "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age." *Id.* § 1002(22). A plan participant reaches "normal retirement age" under the terms of the plan or at the later of "the time a plan participant attains age 65, or . . . the 5th anniversary of the time a plan participant commenced participation in the plan." *Id.* § 1002(24). ERISA also defines the term "nonforfeitable":

---

[1] Many of the statutes cited in this section were amended in December 2022. Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4,459 (2022). The amendments do not apply to the substance of the provisions quoted.

> The term "nonforfeitable" when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan.

*Id.* § 1002(19).

Under ERISA, pension benefits are generally protected by the "anti-cutback" rule. The "anti-cutback" rule forbids pension plans from reducing plan participants' accrued benefits unless a statutory exception applies. Section 1054(g)(1) of Title 29 of the U.S. Code provides: "The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title." *See also* 26 U.S.C. § 411(d)(6) (providing functionally identical language).

Section 1082(d)(2) permits a plan administrator to apply to Treasury to reduce accrued benefits as "necessary because of a temporary substantial business hardship . . . or a substantial business hardship (as so determined) in the case of a multiemployer plan," provided certain conditions are met regarding the timing of the reduction of accrued benefits and the unavailability or inadequacy of other options available to the fund. Although § 1082(d)(2) was amended in 2014, a prior version of the section also permitted pension funds to reduce accrued benefits when facing a "substantial business hardship," so long as other criteria were also satisfied. 29 U.S.C. § 1082(d)(2) (enacted Dec. 23, 2008, and effective until Apr. 6, 2014).

Section 1441(d)(1) provides: "In any case in which benefit payments under a plan which is insolvent . . . exceed the resource benefit level, any such payments which are not basic benefits shall be suspended, in accordance with this subsection, to the extent necessary to reduce the sum of such payments and such basic benefits to the greater of the resource benefit level or the level of basic benefits" guaranteed by the PBGC, a government agency that insures pension funds.[2] The PBGC may pay a guaranteed benefit to the participants and beneficiaries of an insolvent pension fund, but the level of benefits would be lower than if the fund were solvent. *Id.* §§ 1322a(c), 1322a(d).

A plan found in violation of the "anti-cutback" rule risks losing its qualified tax status under the Internal Revenue Code's minimum vesting requirements. *See* 26 U.S.C. § 411(a). Participants may also have a cause of action against a pension fund to recover benefits due under the terms of the plan or to enjoin a plan amendment that violates the "anti-cutback" rule. *See* 29 U.S.C. § 1132(a).

---

[2] The phrase "resource benefit level" is defined as "the level of monthly benefits determined . . . to be the highest level which can be paid out of the plan's available resources." 29 U.S.C. §§ 1426(b)(2), 1441(d)(2)(B).

**B. The Fund**

The New York State Teamsters Conference Pension and Retirement Fund ("the Teamsters Fund") was established in 1954, 20 years before ERISA was enacted. (Pls.' App., ECF 165-1, at 329.) The Teamsters Fund is a multiemployer pension plan, defined in ERISA as a plan "to which more than one employer is required to contribute," and "which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer." 29 U.S.C. § 1301(a)(3). Approximately 78 percent of the Teamsters Fund's annual receipts come from a single employer, United Parcel Service ("UPS"). (ECF 165-6 at 1843.)

The Teamsters Fund plan agreement provides that the "general administration of the plan and the responsibility for carrying out the provisions [of the plan] are placed in the Trustees and shall be constituted in accordance with the terms of the Trust Agreement." (Def.'s App., ECF 169-1 at 61.) Eight trustees serve the Teamsters Fund; four are selected by the unions holding collective bargaining agreements with contributing employers, and four are selected by employers contributing to the plan. (*Id.* at 146.) The plan empowers the trustees to demand employer contributions, invest funds, and pay pension and retirement benefits. (*Id.* at 142-43, 145-46.) The corpus of money and property held by the trustees of the Teamsters Fund is the "Fund Estate," to which participants and beneficiaries have limited access. (*Id.* at 143, 145-46.) Participants in the Teamsters Fund pension plan may not receive parts of the employer contributions instead of pension benefits, and they can neither assign nor sell their pension benefits. (*Id.* at 145-46.)

The Teamsters Fund plan documents lay out the definitions and entitlements of active participants in the plan—*i.e.*, participants who are still employed by a contributing employer and continue to earn their pension benefits; vested participants of the plan, who are usually retired and receiving their monthly pension benefits; and beneficiaries of the plan, who are usually the surviving spouses of deceased vested participants when a survivorship benefit applies.

The Teamsters Fund plan provides a schedule for workers to accrue benefits and for those benefits to vest. (ECF 165-1 at 349-63, 374-79.) An "active participant" in the plan is usually an active employee "on whose behalf a Contributing Employer is required to make contributions to the Plan." (ECF 169-1 at 13.) A participant ceases to become active when the participant incurs a break in service, retires, or becomes disabled. (*See id.*) The plan defines "accrued benefit" in the case of an active participant as "that portion of the Participant's prospective monthly benefit . . . that has been earned or accrued to the date of reference, as computed pursuant to the provisions of the Plan." (*Id.*)

The plan defines "vested" as meaning that a participant "has (a) met the minimum service requirements . . . and has acquired a non-forfeitable right to a pension benefit under the Plan, or (b) attained Normal Retirement Age." (ECF 165-1 at 339.) A participant attains "Normal Retirement Age" at the age of 65 with five years of service credits, on the fifth anniversary of a date the participant commenced participation in the plan before a break in service, or in some cases at the age of 64. (ECF 169-1 at 18.) The "normal form of benefit payment" is a life

annuity, which "provides monthly payments for the life of the Pensioner."[3] (*Id.* at 45.) The plan also allows participants to elect a survivor annuity if the participant is married upon retirement. (*Id.* at 45-46.) The plan defines "accrued benefit," in the case of a participant who has reached normal retirement age, as "the monthly pension benefit, payable in the normal form, that would be payable upon the retirement of the Participant as of the date of reference." (*Id.* at 13.)

Since its establishment, the Teamsters Fund has advertised that "[a]ll pensions are payable for life without reduction." (ECF 165-1 at 4.) The Teamsters Fund has also explained in informational materials sent to participants and beneficiaries that "[a] 'vested' benefit is non-forfeitable and, therefore, cannot later be curtailed or eliminated." (*Id.* at 234.)

Despite that representation, at least as early as 1963, plan documents provided how funds would be allocated if the Teamsters Fund were "terminated." (*Id.* at 17-18.) Plan participants would be entitled to "shares" according to age and pension credits, but "[i]f the funds of the Plan are insufficient to provide in full for the shares" due to plan participants, "each share . . . as to which the funds are insufficient shall be reduced pro [ ] rata." (*Id.*) Further, the trustees would have discretion as to the method of distribution of those shares: "The Board of Trustees may require that all shares be withdrawn in cash or in immediate or deferred annuities or other periodical payments as they may determine." (*Id.*)

The Teamsters Fund plan agreement has been amended repeatedly since its inception in 1954. (ECF 169-1 at 10.) The agreement was "amended and completely restated" on January 1, 1976, to comply with ERISA. (*Id.*) The agreement was amended again in 1978, 1990, and 1997 due to mergers with other pension funds. (*Id.*) The agreement was also amended in 2000 due to additional mergers and to "comply with changes required by recent legislation." (*Id.* at 11.) The agreement was amended again in 2004, 2010, and 2015. (*Id.*) In sum, the agreement was amended "on several . . . occasions by action of the Trustees to incorporate technical changes requested by the Internal Revenue Service and to comply with changes required by continuing legislation." (*Id.* at 10.) The trustees intend "that the Plan operate in accordance with the applicable provisions of the [Internal Revenue] Code, ERISA, and regulations issued thereunder." (*Id.* at 12.)

### C. The Named Plaintiffs

The three class representatives are retired employees of UPS and vested participants in the Teamsters Fund.

As of the time the plaintiffs filed their pending motion for summary judgment, William King is 74 years old and worked to earn his pension for 30 years, 27 of those years at UPS. (ECF 165-3 at 930.) The pension was a primary reason Mr. King worked at UPS. (*Id.* at 1055.)

---

[3] Other forms of payment described in the plan agreement include a five-year certain annuity, ten-year certain annuity, and social security leveling option. Other forms of payment are not at issue in this case. (ECF 169-1 at 45-47.)

Mr. King believed that once his pension benefit vested, it could not be reduced. (*Id.* at 1056.) Mr. King declined an alternative job offer based, in significant part, on his expectation of receiving a pension upon retirement. (*Id.*) Mr. King also refrained from searching for other job positions. (*Id.*)

Stephen Dardzinski is currently 73 years old and accrued his pension by working at UPS from 1989 until 2011. (*Id.* at 871.) Mr. Dardzinski accepted a job at UPS because of a small raise relative to his prior position and the pension benefits; those benefits made the trade-off of needing to work a night shift at UPS (working from 6:00 p.m. to approximately 2:30 a.m.) worthwhile. (*Id.* at 1026.) Like Mr. King, Mr. Dardzinski also did not expect his pension benefits to be reduced. (*Id.* at 1027.)

Anthony Gugliuzza is currently 79 years old and began earning his pension at UPS in 1971, before ERISA was enacted. (*Id.* at 921.) He worked for UPS for 30 years and retired in 2001. (*Id.*) Like the other class representatives, Mr. Gugliuzza had the subjective expectation that he would receive his vested pension benefit at an unreduced level for the rest of his life. (*Id.* at 1046.)

### D. The MPRA

The PBGC's multiemployer program "insures the benefits of more than 10 million workers and retirees in 1,400 plans. When multiemployer plans fail, PBGC provides financial assistance so the plans can pay benefits at no more than PBGC's statutory multiemployer benefit guarantee level." *PBGC Reports Record Deficit of $62 Billion in 2014*, 20 Pension & Benefits Week Newsletter 47, 2014 WL 6491783 (Nov. 24, 2014). In 2014, the PBGC's insurance program faced a record-breaking deficit of $62 billion "due largely to the declining financial condition of multiemployer plans." *Id.* The PBGC projected that, absent legislative intervention, it faced a more than 50-percent chance of becoming insolvent by 2022 and a 90-percent chance of becoming insolvent by 2025. *Id.* If the PBGC were to become insolvent, it would only be able to pay a fraction of the statutorily guaranteed level of basic benefits to participants of insolvent multiemployer pension plans, a level that is already a fraction of what vested pension plan participants receive when a plan is financially sound. *Id.*

In December 2014, Congress passed the MPRA. According to the PBGC, the aim of the MPRA was to "provide[ ] new options for troubled multiemployer plans to avoid insolvency." *Pension Benefit Guaranty Corporation: PBGC Paid Nearly $6 Billion in Pension Benefits to Retirees in FY 2015*, PBGC Press Release No. 15-12, 2015 WL 7249945 (Nov. 17, 2015); *see also* 160 Cong. Rec. H9264 (daily ed. Dec. 11, 2014) (statement of Rep. King) (the MPRA was enacted to give trustees of "troubled" pension plans "additional tools to maintain the solvency of the plans").

The MPRA provided a new, additional statutory exception to ERISA's "anti-cutback" rule. The MPRA permitted solvent pension funds that were in "critical and declining" status to, "by plan amendment, suspend benefits" of plan participants to avoid insolvency. 29 U.S.C.

§ 1085(e)(9)(A).[4] The MPRA defined a "suspension of benefits" as "the temporary or permanent reduction of any current or future payment obligation of the plan to any participant or beneficiary under the plan, whether or not in pay status at the time of the suspension of benefits." *Id.* § 1085(e)(9)(B)(i). Before a pension fund could suspend benefits under the MPRA, the MPRA required the completion of five steps.

First, a pension fund had to apply to the Secretary of the Treasury for approval of its plan to reduce pension benefits. *Id.* § 1085(e)(9)(G)(i). A fund's application had to specify the size of the proposed cuts and demonstrate that the cuts are projected to prevent insolvency. *Id.* § 1085(e)(9)(C)(i). The MPRA imposed conditions on a pension fund's proposed reduction of benefits.

The plan sponsor (*i.e.*, the trustees) had to demonstrate that "all reasonable measures to avoid insolvency have been taken (and continue to be taken during the period of the benefit suspension)." *Id.* § 1085(e)(9)(C)(ii). The plan sponsor could take into account factors such as "[c]urrent and past contribution levels," "[c]ompetitive and other economic factors facing contributing employers," the "impact of benefit and contribution levels on retaining active participants and bargaining groups under the plan," the "impact of past and anticipated contribution increases under the plan on employer attrition and retention levels," and "[m]easures undertaken by the plan sponsor to retain or attract contributing employers." *Id.*

Furthermore, the suspensions "shall be equitably distributed across the participant and beneficiary population, taking into account factors, with respect to participants and beneficiaries and their benefits," including:

> (I) Age and life expectancy.
>
> (II) Length of time in pay status.
>
> (III) Amount of benefit.
>
> (IV) Type of benefit: survivor, normal retirement, early retirement.
>
> (V) Extent to which participant or beneficiary is receiving a subsidized benefit.
>
> (VI) Extent to which participant or beneficiary has received post-retirement benefit increases.
>
> (VII) History of benefit increases and reductions.
>
> (VIII) Years to retirement for active employees.
>
> (IX) Any discrepancies between active and retiree benefits.

---

[4] The Internal Revenue Code contained an identical provision at 26 U.S.C. § 432(e)(9)(A). For consistency, the Court cites the provisions in 29 U.S.C. § 1085(e)(9), but the same language could be found in 26 U.S.C. § 432(e)(9).

> (X) Extent to which active participants are reasonably likely to withdraw support for the plan, accelerating employer withdrawals from the plan and increasing the risk of additional benefit reductions for participants in and out of pay status.
>
> (XI) Extent to which benefits are attributed to service with an employer that failed to pay its full withdrawal liability.

*Id.* § 1085(e)(9)(D)(vi).

The suspension of benefits under the MPRA was prohibited for anyone who was over the age of 80 or disabled at the date of suspension. *Id.* §§ 1085(e)(9)(D)(ii), 1085(e)(9)(D)(iii). Participants or beneficiaries between the ages of 75 and 80 faced lesser reductions than participants or beneficiaries under the age of 75. *Id.* § 1085(e)(9)(D)(ii). The proposed suspensions could not reduce benefits below 110 percent of the benefit level guaranteed by the PBGC. *Id.* § 1085(e)(9)(D)(i). The proposed suspensions had to be "reasonably estimated to achieve, but not materially exceed, the level that is necessary to avoid insolvency." *Id.* § 1085(e)(9)(D)(iv).

Second, Treasury would consult with the PBGC and Labor to review the application. *Id.* § 1085(e)(9)(G)(i). No later than 30 days after receiving the application, Treasury, PBGC, and Labor are required to publish notice in the Federal Register "soliciting comments from contributing employers, employee organizations, and participants and beneficiaries of the plan for which an application was made and other interested parties." *Id.* § 1085(e)(9)(G)(ii). Treasury had to approve or reject the application within 225 days of submission of the application; otherwise, the application would be deemed approved. *Id.* § 1085(e)(9)(G)(iii). Treasury was required to approve the application unless the application was "clearly erroneous." *Id.* § 1085(e)(9)(G)(v).

Third, if the application is approved, Treasury, the PBGC, and Labor had to administer an election in which plan participants vote on the proposed reductions. *Id.* § 1085(e)(9)(H)(i). For the proposal to be rejected, an actual majority of all plan participants had to vote to reject the cuts. *Id.* § 1085(e)(9)(H)(ii). Plan participants who did not cast a vote were counted as voting to approve the proposed reductions. *Id.* Even if the majority of all plan participants voted to reject the cuts, Treasury could override the vote if it determined that the proposed reductions were "systematically important," *i.e.*, the PBGC would be exposed to more than $1 billion in insurance obligations if the pension plan were to become insolvent. *Id.* § 1085(e)(9)(H)(v).

Fourth, Treasury, the PBGC, and Labor had to issue a final authorization for the suspension within seven days of the vote. *Id.* § 1085(e)(9)(H)(vi). For the fifth and final step, the pension fund would amend its plan documents to implement the suspension of benefits. *Id.* § 1085(e)(9)(A).

A pension plan that applied under the MPRA and received approval from Treasury to reduce its benefits would be immunized from liability for any reduction in benefits resulting from the approved MPRA application. *Id.* § 1085(e)(9)(B)(iii). "A participant or beneficiary

affected by a benefit suspension . . . shall not have a cause of action" under the MPRA. *Id.* § 1085(e)(9)(I)(iii).

### E. Approval of the Teamsters Fund's MPRA Application

The Teamsters Fund submitted its first MPRA application to reduce the amount it paid to plan participants on August 31, 2016. (ECF 165-6 at 1848.) Treasury identified concerns regarding some of the application's actuarial assumptions. (ECF 165-2 at 496.) Treasury encouraged the Teamsters Fund to withdraw its application and resubmit it, offering to expedite its consideration of the resubmission. (*Id.* at 526, 551.) The Teamsters Fund subsequently withdrew its application. (*Id.* at 562.)

The Teamsters Fund submitted a revised application on May 15, 2017. (*Id.* at 638.) The Teamsters Fund projected that it was likely to become insolvent during 2026, but the suspension of benefits under the MPRA would postpone the projected insolvency until 2049. (ECF 169-1 at 266.) In its revised application, the Teamsters Fund proposed an 18-percent cut to the accrued benefits of plan participants still actively employed and a 29-percent cut to the benefits of retirees.[5] (ECF 165-2 at 640.) Treasury approved the application on August 3, 2017. (*Id.* at 698-99.)

Treasury proceeded to hold an election among Teamsters Fund plan participants. Participants and beneficiaries were given approximately three weeks to vote by mail, phone, or internet. (ECF 165-2 at 710.) Materials sent to voters provided in bold that if eligible voters did not vote or their vote was not received prior to the close of voting, they would be treated as though they had voted to approve the benefit reduction. (ECF 165-7 at 2030.) The voting materials explained that the Teamsters Fund "would run out of money beginning in 2027 if the benefit reduction does not happen." (*Id.*) The voting materials also explained that even if a majority of the participants and beneficiaries voted to reject the proposed benefit reductions, benefits might still be reduced. (*Id.*) This point was made because, regardless of the outcome of the vote, the PBGC had advised Treasury that the Teamsters Fund would likely qualify as "systematically important"—*i.e.*, big enough to permit Treasury to override any adverse MPRA vote. (ECF 165-6 at 1853.)

Of the Teamsters Fund's 34,636 eligible participants who received a ballot, only 40 percent voted.[6] (ECF 165-2 at 724-25.) Of those who voted, 71 percent rejected the proposed reductions, and 29 percent approved them. (*Id.*) Treasury treated the outcome of the election as

---

[5] The cuts to active employees took effect through the recalculation of their adjusted monthly benefits that would be due to those employees upon retirement. (*See* ECF 169-1 at 134.)

[6] Treasury sent ballots to 35,173 eligible voters, but 388 ballots were not mailed because the Teamsters Fund could not provide an address for the voters, and 149 ballots were returned to the vote administrator as undeliverable. (ECF 165-2 at 724.) Those ballots were not counted as approving the proposed benefit reductions.

approval of the proposed reductions because, pursuant to the MPRA, the 60 percent of plan participants who did not vote were counted as voting to approve the proposed reductions. (*Id.*)

Following the vote, Treasury issued a final authorization for the Teamsters Fund to reduce its benefit payments by the amounts that had been requested by the application, approved by Treasury, and ratified by the vote of plan participants. (*Id.* at 728-29.) With technical assistance and recommended edits from Treasury, the Teamsters Fund then amended its plan documents to implement the reductions. (*Id.* at 754-59.)

An amended provision of the plan agreement explains: "Notwithstanding any other provision of this Plan to the contrary, effective October 1, 2017, all Affected Participants . . . shall have their pension benefit reduced in accordance with the provisions of Article 18." (ECF 169-1 at 133.) Article 18, titled the "Pension Preservation Plan," reduces the monthly pension benefits of active participants by 18 percent and the monthly pension benefits of non-active (*i.e.*, retired) participants by 29 percent. (*Id.* at 133-34.)

### F. Reduction of the Plaintiffs' Benefits

The reduction in pension benefits became effective on October 1, 2017. (*Id.*) Between October 2017 and December 2022, the monthly pension benefits paid to the three named plaintiffs reflected a 29-percent reduction in their pre-MPRA benefits.

The plaintiffs suffered personal hardships during that period related to the suspension of their benefits, including relying on dwindling savings, forgoing necessary medical care, scrimping on food, and falling behind on mortgage payments and other bills. Approximately 1,100 of the class members died before their benefits were restored.

### G. The ARPA

In March 2021, Congress enacted the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. 117-2, 135 Stat. 4. The ARPA requires the PBGC to "provide special financial assistance to an eligible multiemployer plan under this section, upon the application of a plan sponsor of such a plan for such assistance." 29 U.S.C. § 1432(a)(1).[7] The financial assistance is appropriated from funds for Treasury instead of the PBGC's existing multiemployer fund. *Id.* § 1305(i). Multiemployer plans that suspended benefits under the MPRA are eligible for the special financial assistance. *Id.* § 1432(b)(1)(B).

Under the ARPA, Treasury and the PBGC "shall ensure that an eligible multiemployer plan that receives special financial assistance . . . reinstates any benefits that were suspended under section 1085(e)(9) of this title . . . ." *Id.* § 1432(k)(1). A fund receiving special financial assistance shall "provide[ ] payments equal to the amount of benefits previously suspended under section 1085(e)(9) . . . of this title to any participants or beneficiaries in pay status as of the effective date of the special financial assistance, payable, as determined by the eligible

[7] The Internal Revenue Code contains a functionally similar provision at 26 U.S.C. § 432(k).

multiemployer plan." *Id.* § 1432(k)(2). The payment can be made in a lump sum within three months of receipt of special financial assistance or in monthly installments over a period of five years. *Id.* These reimbursement payments do not include any interest for the suspended benefits. *Id.*

The amount of special financial assistance a fund receives must be sufficient for the fund to pay participants' and beneficiaries' unreduced benefits until 2051:

> The amount of financial assistance provided to a multiemployer plan eligible for financial assistance under this section shall be such amount required for the plan to pay all benefits due during the period beginning on the date of payment of the special financial assistance payment under this section and ending on the last day of the plan year ending in 2051, with no reduction in a participant's or beneficiary's accrued benefit as of March 11, 2021, except to the extent of a reduction in accordance with section 1085(e)(8) of this title adopted prior to the plan's application for special financial assistance under this section, and taking into account the reinstatement of benefits required under subsection (k).

*Id.* § 1432(j)(1).

Under the ARPA, make-up payments are required to be made only to "participants or beneficiaries in pay status" when the special financial assistance becomes effective. *Id.* § 1432(k). Accordingly, the PBGC has issued a regulation providing whether and how make-up payments would be paid to the beneficiaries or estates of participants who died before special financial assistance was received:

> Because a participant who died before the [special financial assistance ("SFA")] is paid is not in pay status as of the effective date of the SFA, no make-up payments are made for reductions that applied to that participant and, accordingly, make-up payments are limited to the total amount of benefits that would have been paid to the beneficiary in the absence of the suspension but that were not paid to the beneficiary because of the suspension. However, if a participant dies after the SFA is paid to the plan but before all of the make-up payments are paid to the participant, the unpaid portion of the make-up payments must be made to the participant's beneficiary.

Special Financial Assistance by PBGC, 87 Fed. Reg. 40,968 (July 8, 2022) (to be codified at 29 C.F.R. pt. 4262).

### H. Restoration of the Plaintiffs' Benefits

The Teamsters Fund submitted its first application for special financial assistance on January 28, 2022. (ECF 165-7 at 1991.) The Teamsters Fund withdrew its application on May 26, 2022, to revise the application and re-filed it on July 21, 2022. (*Id.* at 1992, 1994.)

The PBGC approved the revised application on November 18, 2022. (*Id.* at 1985.) The Teamsters Fund received more than $963 million in special financial assistance from Treasury on December 8, 2022. (*Id.* at 1985-86.)

The Teamsters Fund restored monthly benefit payments to pre-MPRA suspension levels beginning on January 1, 2023. (*Id.* at 2005-12.) Participants and beneficiaries received any make-up payment to which they were entitled under the ARPA by March 1, 2023. (*Id.*)

No participant or beneficiary received interest as part of the make-up payment. (*Id.* at 2014.) Beneficiaries of participants who died before December 8, 2022, received reduced make-up payments, and estates of participants who died before December 8, 2022, without beneficiaries received no make-up payments. (*Id.* at 2014-15.) The plaintiffs estimate that more than 1,100 estates will have a claim for principal because they received reduced or no make-up payments. (ECF 164 at 11-12.)

## II. PROCEDURAL HISTORY

Much of the relevant procedural history is recounted in the previous opinion on the defendant's motion for summary judgment, *King*, 159 Fed. Cl. 450.

### A. First Round of Summary Judgment

Mr. King, Mr. Gugliuzza, and Mr. Dardzinski filed suit on behalf of themselves and all others similarly situated on July 31, 2018, which was approximately ten months after the plaintiffs' benefits were suspended under the MPRA and three years before the ARPA was enacted. (ECF 1.) The defendant moved to dismiss the plaintiffs' claims under RCFC 12(b)(1) and 12(b)(6). (ECF 7.) After holding oral argument on the defendant's motion, that motion to dismiss was converted into a motion for summary judgment to be briefed after discovery regarding the defendant's alleged liability. (ECF 21.)

The case was transferred to the undersigned on December 17, 2019. (ECF 36; ECF 37.) The parties proceeded with discovery.

The defendant filed a motion for summary judgment on January 22, 2021. (ECF 99.) The plaintiffs responded to the defendant's motion and cross-moved for summary judgment on March 6, 2021. (ECF 105.)

On March 11, 2021, Congress enacted the ARPA. The following day, the defendant moved to vacate the schedule for summary-judgment briefing and to stay the proceedings. (ECF 109.) The plaintiffs opposed the motion. (ECF 110.) Following oral argument on the

defendant's motion, on March 26, 2021, the proceedings were stayed until July 30, 2021. (ECF 114.)

Following the expiration of that stay, the plaintiffs argued that the ARPA did not fully moot their claims even if the Teamsters Fund received special financial assistance because no participant or beneficiary would receive interest, and participants and beneficiaries who died would receive supposedly incomplete or no make-up payments. (*See* ECF 120.)

The Court requested that the defendant choose any discrete legal issues that were ripe for consideration on a motion for summary judgment even before the Teamsters Fund applied for relief under the ARPA. (*See* ECF 125 at 7:8-15.) The parties' previous cross-motions for summary judgment were denied as moot. (ECF 123.)

### B. Second Round of Summary Judgment

On September 27, 2021, the defendant moved for summary judgment on two specific grounds: (1) that the plaintiffs do not have a constitutionally cognizable property interest in their entitlement to unreduced pension benefits; and (2) that no government action gave rise to a taking. (ECF 126.) The plaintiffs cross-moved for summary judgment on the grounds: (1) that the plaintiffs had a cognizable property interest in their contractual entitlement to receive a specific amount of pension benefits for life; and (2) that the government's authorization of the Teamsters Fund under the MPRA, the government's coercion of the Teamsters Fund to apply under the MPRA, or the government's agency relationship with the Teamsters Fund gave rise to a taking. (ECF 128.)

The cross-motions were fully briefed, and the Court held oral argument on the motions. After oral argument, the Court ordered supplemental briefing on the applicability of the doctrine of *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923), to the plaintiffs' claims. (ECF 132.) The parties filed supplemental briefs accordingly. (ECF 139; ECF 140; ECF 142; ECF 143.) A decision was initially issued under seal and published without redactions on April 8, 2022.

In that ruling, the plaintiffs were found to have identified a cognizable property interest in receiving their unreduced and vested pension benefits at a level contractually promised by the Teamsters Fund plan agreement. *King*, 159 Fed. Cl. at 462-77.

In analyzing whether sufficient government action gave rise to a taking, however, the Court was "constrained by the present stage of litigation . . . because no decision has yet been made as to whether the per se physical-takings test or the more flexible regulatory-takings test should apply to this case." *Id.* at 477. "Given the enactment of the ARPA and its potential impact on the plaintiffs' pensions, the defendant has reserved that issue for a later stage in the litigation." *Id.* In analyzing whether sufficient government action had given rise to a taking, the parties had relied on different types of caselaw—the defendant relied on regulatory-takings cases, while the plaintiffs relied on physical-takings cases. The Court therefore addressed only the issue of "whether the plaintiffs have successfully demonstrated that the government acted in a manner that *could* potentially give rise to a taking, depending on the applicable test, or whether

the defendant has successfully demonstrated that the government did not act in a way that could ever constitute a taking, no matter which test is applied to the plaintiffs' claims." *Id.*

The Court held that *Omnia*, 261 U.S. 502, did not defeat the plaintiffs' claims. 159 Fed. Cl. at 485. The Court also held that under the physical-takings test, "government authorization to a third party to seize a plaintiff's property may give rise to a taking." *Id.* at 487. That holding "does not mean that the plaintiffs have demonstrated government action sufficient to give rise to a physical taking." *Id.* "The issue of the appropriate test is reserved and remains to be resolved." *Id.*

The Court held, however, that the plaintiffs could demonstrate neither an agency relationship between the Teamsters Fund and the government nor coercion by the government of the Teamsters Fund. *Id.* at 487-491.

Because of the ongoing evolution of the regulatory landscape under the ARPA, the Court reserved for later evaluation the character of the government's action and whether precedent required that the plaintiffs' claims be analyzed under the physical-takings test or regulatory-takings test. *Id.* at 492-93.

### C. Class Certification

After denying the defendant's motion for summary judgment, discovery was reopened for the purpose of addressing class certification. (ECF 150.) The plaintiffs filed a motion for class certification on June 24, 2022. (ECF 154.) The defendant did not oppose the plaintiffs' motion but identified a class-related legal issue regarding whether the plan participants who did not vote or voted to approve the MPRA suspensions could maintain a claim for a taking. (ECF 156.)

After holding a status conference on the plaintiffs' motion to certify a class, the plaintiffs' motion to certify a class was granted. *King v. United States*, No. 18-1115, 2022 WL 3716442, at *6 (Fed. Cl. Aug. 29, 2022). The following class was certified pursuant to RCFC 23:

> Any person (whether a participant, beneficiary, or other individual) who received one or more pension payments from the New York State Teamsters Conference Pension and Retirement Fund (the "Fund") on or after October 1, 2017 unless either (1) that person was an "Active Participant" as of October 1, 2017 or (2) all pension payments that were received by that person since October 1, 2017 were reduced by 0% relative to the sum the recipient would have been entitled to receive if the Defendant had not authorized the Fund, in or around September 2017, to reduce certain pension benefits under the Kline-Miller Multiemployer Pension Reform Act of 2014.

*Id.* The Teamsters Fund's data indicate that there are 10,893 potential class members. (ECF 164 at 11 n.7.) Mr. King, Mr. Gugliuzza, and Mr. Dardzinski were designated as representatives of the class. *King*, 2022 WL 3716442, at *6. Messing & Spector LLP and Schneider Wallace

Cottrell Konecky LLP were appointed as class counsel. The parties were instructed to propose definitions for subclasses according to whether and how participants voted in the election administered by Treasury. *Id.*

The plaintiffs responded with definitions for four proposed subclasses. (ECF 159 at 3-4.) The plaintiffs noted potential logistical issues related to opting into the subclasses: there are no records of how each individual voted, and many class members may not remember how they voted or may have died in the intervening time period. (*Id.*) The plaintiffs suggested deferring a decision on their motion to certify subclasses until after a decision on summary judgment was reached. (*Id.* at 13-15.)

After holding a status conference on the plaintiffs' proposed subclasses and their suggestion to address summary judgment before any decision on the scope of the four subclasses was made, the Court stayed briefing and consideration of certifying subclasses. (ECF 161.) The potential class members have yet to opt into the case. A schedule for summary judgment briefing was adopted. (*Id.*)

### D. Third Round of Summary Judgment

The plaintiffs filed a motion for summary judgment on December 23, 2022. (ECF 164.) The plaintiffs also filed an amended complaint on January 6, 2023; no responsive pleading from the defendant was required. (ECF 166.)

The plaintiffs' pending complaint includes allegations that Treasury has now given special financial assistance to the Teamsters Fund to issue make-up payments, but participants and beneficiaries who died before December 8, 2022, received no such payments or received smaller make-up payments. (*Id.* at ¶ 13.) The plaintiffs also allege that no participant or beneficiary has received interest on the make-up payments. (*Id.*)

In their motion for summary judgment, the plaintiffs note that they intended to add an additional named plaintiff and class representative: the estate of Robert Campbell. (ECF 164 at 14.) Because Mr. Campbell died 63 days before the Teamsters Fund received special financial assistance, his estate received no make-up payment. (*Id.* at 14-15.) Although Mr. Campbell's estate has not been formally added as a plaintiff, the plaintiffs' pending complaint raises the problems posed for the estates of deceased plan participants that are part of the certified class. (ECF 166 at ¶¶ 13, 90, 95, 121.) The Court therefore considers the claims of the deceased participants and beneficiaries on these pending cross-motions.

The defendant filed a cross-motion for summary judgment and a response to the plaintiffs' motion on February 3, 2023. (ECF 169.) The plaintiffs filed a response brief to the defendant's cross-motion for summary judgment and a reply brief in support of their motion for summary judgment on March 6, 2023. (ECF 171.) The defendant filed a reply brief in support of its cross-motion for summary judgment on March 20, 2023. (ECF 175.)

On March 23, 2023, the Court held oral argument on the cross-motions for summary judgment in Syracuse, New York.[8]

## III. JURISDICTION

The Tucker Act, 28 U.S.C. § 1491(a)(1), gives the Court of Federal Claims jurisdiction over claims for damages against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

The Court of Federal Claims has jurisdiction over claims brought under the takings clause of the fifth amendment. *Id.*; *see also Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008) ("It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction.")

The plaintiffs argue that the United States, acting through Treasury, Labor, and the PBGC, has taken the plaintiffs' property without providing just compensation in violation of the fifth amendment. Their complaint falls within the subject-matter jurisdiction of the Court of Federal Claims under the Tucker Act.

## IV. STANDARD OF REVIEW

Under RCFC 56(a), a party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A dispute over material fact must also be "genuine" to preclude summary judgment—*i.e.*, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "If the evidence [in favor of the non-moving party] is merely colorable, . . . or is not

[8] During the briefing on the pending cross-motions, the parties disagreed on the potential applicability of the equitable one-way intervention doctrine, which would affect putative class members' ability to opt into the class if summary judgment were granted to the plaintiffs. (*See* ECF 172.) During oral argument, the parties were directed to confer regarding this issue and file a joint status report prior to resolution of the pending cross-motions for summary judgment. (ECF 176.) The parties have filed a joint status report indicating that the defendant has waived any intention to rely on the one-way intervention doctrine to try to prevent any class member from filing a claim. (ECF 177 at 4.) Accordingly, this issue does not affect the timing of the resolution of the cross-motions for summary judgment.

significantly probative, . . . summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

In this case, the underlying facts regarding the suspension of the plaintiffs' pension benefits are not in dispute. Although the parties dispute the legal characterization of those facts, a trial would not affect the outcome of the suit under governing law and would not make either party's argument more or less probative. *See id.* Both parties agree that no material facts remain in dispute, and no disputed facts are apparent. Accordingly, summary judgment is appropriate in this case.

## V. DISCUSSION

"Binding precedent requires the Court to analyze government action under the correct takings test." *King*, 159 Fed. Cl. at 492. "One major remaining issue in this case is whether the government has 'appropriated' the plaintiffs' cognizable property interest," and that issue is "relevant to the determination of whether to employ the test for physical takings or the test for regulatory takings in resolving the plaintiffs' claims." *Id.* (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (2002)).

The Court must now resolve "which takings test applies and the application of that test." *King*, 159 Fed. Cl. at 462. The plaintiffs argue that the defendant authorized the taking of money from the plaintiffs, and when such a taking occurs courts should apply the physical-takings test, or what the plaintiffs term a "*per se* test," to determine if compensation for the taking is due. In the alternative, the plaintiffs argue that even if the appropriate test is *Penn Central*'s regulatory-takings test, their property has been taken, and they are due compensation for that taking. The defendant argues that the physical-takings test does not apply, and the plaintiffs cannot demonstrate that a regulatory taking occurred.

### A. Applicability of the Physical-Takings Test

The Supreme Court has held that the "longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Tahoe-Sierra*, 535 U.S. at 323 (internal footnote omitted).

A physical taking occurs "[w]hen the government physically takes possession of an interest in property for some public purpose." *Id.* at 322. The takings clause categorically requires just compensation when "the government occupies the property for its own purposes," or when "the government appropriates" property. *Id.*

By contrast, even if property remains in the owner's possession and has not been appropriated or used by the public, a regulation that goes "too far" may give rise to a regulatory taking. *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). When "the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property

suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 522-23 (1992).

The parties dispute which aspects of this case affect the analysis to support the appropriate takings framework. Specifically, the plaintiffs argue that the physical-takings test can be applied to intangible and personal property interests, that the government's eminent-domain power may be exercised by a third party, and that a physical taking is no less a physical taking because it is characterized as a regulation.

The plaintiffs are correct that the physical-takings test may be applied to a variety of property interests. The Supreme Court has applied the physical-takings test to interest earned from interest-on-lawyers' trust accounts ("IOLTA"), raisins, liens, patents, and sums on an interpleader account, to name a few property interests cognizable under the takings clause. *Brown v. Legal Found. Wash.*, 538 U.S. 216, 233-35 (2003) (interest on IOLTA accounts); *Horne v. Dep't Agric.*, 576 U.S. 350, 360-61 (2015) (raisins); *Armstrong v. United States*, 364 U.S. 40, 48 (1960) (liens); *James v. Campbell*, 104 U.S. 356, 358 (1881) (patents); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 158-64 (1980) (sums in an interpleader account).

The plaintiffs' argument that a non-governmental actor may effect a taking if authorized to do so by the government is also accepted. A taking may be predicated on the actions of non-governmental third parties. *See PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2251 (2021) ("Since the founding, the United States has used its eminent domain authority to build a variety of infrastructure projects. It has done so on its own and through private delegatees, and it has relied on legal proceedings and upfront takings.") *See also King*, 159 Fed. Cl. at 487 (holding that "government authorization to a third party to seize a plaintiff's property may give rise to a taking," but that the plaintiffs had not yet "demonstrated government action sufficient to give rise to a physical taking").

Additionally, a physical taking may "come[ ] garbed as a regulation (or statute, or ordinance, or miscellaneous decree)," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021), and can occur even when the government later rescinds or amends the offending law or regulation, *Hendler v. United States*, 952 F.2d 1364, 1376-77 (Fed. Cir. 1991).

Acceptance of those arguments, however, does not end the analysis. It remains to be decided whether the federal government appropriated or occupied the plaintiffs' cognizable property interest. Whether the government appropriated or occupied the plaintiffs' property, not the type of property interest at stake, guides this analysis. The type and extent of government action is the most salient factor in determining whether the physical-takings test applies.

The plaintiffs point out that after the defendant authorized the suspension under the MPRA, they lost 29 percent of their monthly income. The plaintiffs deploy this reality to argue that the defendant in effect occupied that portion of their pensions, that what each plaintiff lost was money, and that out-of-pocket loss was due to the defendant's act of approving the Teamster Fund's MPRA application.

The plaintiffs' attempt to apply the physical-takings test to their claims is too simplistic. Under the plaintiffs' argument, any financial loss approved by a government agency in some way would require application of the test for physical takings, thereby obviating the need for the regulatory-takings test. Even without that shortcoming, the plaintiffs' proposed application of the physical-takings test must fail. The plaintiffs lost a contractual right to a specific level of pension benefits. The result of their loss was, indeed, a loss of money, but what was affected was the contractual right itself, and not the money.

The Supreme Court has twice applied the regulatory-takings test rather than the physical-takings test to laws abrogating contractual rights in multiemployer-pension-plan agreements. *Connolly v. PBGC*, 475 U.S. 211 (1986); *Concrete Pipe & Prods. Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602 (1993). *Connolly* and *Concrete Pipe* are the most relevant precedents to resolving the question of whether the physical-takings test should apply to the plaintiffs' takings claim. In the face of these precedents, the abrogation of contractual rights in multiemployer pension plans must be analyzed under the test for regulatory takings, even when that abrogation results in a financial loss. Other precedents applying the physical-takings test to the appropriation or occupation of a property interest are also relevant to determining whether to apply the physical-takings or regulatory-takings test to the plaintiffs' claims, but these precedents are distinguishable and inadequate to overcome the Supreme Court's use of the regulatory-takings test in *Connolly* and *Concrete Pipe*.

### 1. *Connolly* and *Concrete Pipe*

In *Connolly*, the Supreme Court assessed whether provisions of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") violated the takings clause of the fifth amendment. 475 U.S. at 213.

The Supreme Court recounted the history of ERISA, noting that the purpose of a system of pension-benefit insurance was "'to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans.'" *Id.* at 214 (quoting *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984)). To achieve that goal, Congress created the PBGC to administer an insurance program for pension plans.

A PBGC report found that ERISA had failed to protect pension plans adequately from employer withdrawal. *Id.* at 215-16. Withdrawal of some employers reduced a plan's contribution base, which raised the contribution rate for other employers, which in turn encouraged further withdrawals. *Id.* at 216. The "'vicious downward spiral'" caused or accelerated the termination of pension plans. *Id.* (quoting Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2nd Sess., 22 (1978) (statement of Matthew M. Lind) (hereafter "1978 Hearings")). To solve this problem, Congress enacted the MPPAA, which "'requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan,'" calculated based on the "'employer's proportionate share of the plan's unfunded vested benefits.'" *Connolly*, 475 U.S. at 216 (quoting *R.A. Gray*, 467 U.S. at 725). In simple

terms, Congress required employers to pay money into their pension plan if they wanted to withdraw from that multiemployer plan.

The plaintiffs, trustees of a pension plan, argued that "the imposition of noncontractual withdrawal liability violates the Taking Clause by requiring employers to transfer their assets for the private use of pension trusts and, in any event, by requiring an uncompensated transfer." *Connolly*, 475 U.S. at 221.

The Supreme Court agreed with the plaintiffs "that an employer subject to withdrawal liability is permanently deprived of those assets necessary to satisfy its statutory obligation, not to the Government, but to a pension trust," and that the MPPAA imposed a substantial and "real debt." *Id*. at 222.

The Supreme Court nonetheless declined to treat the case as a physical taking:

> But appellants' submission—that such a statutory liability to a private party always constitutes an uncompensated taking prohibited by the Fifth Amendment—if accepted, would prove too much. In the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others. For example, Congress may set minimum wages, control prices, or create causes of action that did not previously exist. Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another.

*Id*. at 222-23.

Additionally, the fact that the MPPAA effectively abrogated employers' contractual rights under pension plan agreements did not justify the invocation of the physical-takings test:

> Appellants' claim of an illegal taking gains nothing from the fact that the employer in the present litigation was protected by the terms of its contract from any liability beyond the specified contributions to which it had agreed. . . . [T]he fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking. *Bowles v. Willingham*, 321 U.S. 503, 517, 64 S.Ct. 641, 648, 88 L.Ed. 892 (1944); *Omnia Commercial Co. v. United States*, 261 U.S. 502, 508–510, 43 S.Ct. 437, 438, 67 L.Ed. 772 (1923). This is not to say that contractual rights are never property rights or that the Government may always take them for its own benefit without compensation. But here, the United States has taken nothing for its own use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose.

*Id*. at 223-24.

The rejection of the application of the physical-takings test to the MPPAA did not end the takings inquiry. Rather, the Supreme Court held that analysis of the MPPAA required the application of an "ad hoc, factual inquir[y]" into the circumstances of the case, as required by the three *Penn Central* factors applicable to determine whether a regulatory taking has occurred. *Id.* at 224-25.

*Connolly* precludes the plaintiffs' claim that the physical-takings test is appropriate in this case. The MPPAA and the MPRA are akin to two sides of the same coin: Congress deemed both laws necessary to reduce the likelihood that multiemployer pension plans would fail, to improve plan participants' chances of receiving a greater portion of their pension benefits, and to diminish the PBGC's liability for failed pension plans. Both laws require the amendment of pension-plan agreements to a party's financial detriment. The MPPAA attempted to solve this problem by imposing liability on withdrawing employers, and the MPRA attempted to solve the problem by allowing the reduction of pension benefits for participants in "critical and declining" pension plans when the statutory criteria are met. The purposes of the two laws are analogous.

Moreover, the government action in *Connolly* is analogous to the government action in this case. Under both the MPPAA and the MPRA, the government permitted the unilateral modification of multiemployer-pension-plan agreements to the detriment of a party. The government, however, neither seized nor confiscated anything for its own use. The government acted as a regulator, determining which parties should bear the financial cost of failing multiemployer pension plans.

Like the plaintiffs in *Connolly*, the plaintiffs in this case have suffered economic losses. The MPRA-authorized suspensions have posed real financial burdens to the plaintiffs, and those hardships should not be minimized. Nonetheless, the Supreme Court rejected the application of the physical-takings test to a legislative effort that imposed costs on a party to a pension-plan agreement to ensure the continuing, long-term viability of multiemployer pension plans.

The fact that the plaintiffs have faced a burden greater than other participants in the plan, such as active employees or participants older than 80, to maintain the plan's solvency does not transform this case into one requiring application of the physical-takings test. The Supreme Court declined to apply that test in *Connolly*, holding that the takings clause is not "violated whenever legislation requires one person to use his or her assets for the benefit of another." *Id.* at 223.

Like the plaintiffs in *Connolly*, the plaintiffs in this case have suffered the partial nullification of their contract rights by the government-authorized amendment of the plan documents. Although contractual rights are cognizable as property interests under the takings clause, *see King*, 159 Fed. Cl. at 463, the modification of those contract rights and the accompanying financial loss do not automatically justify the application of the physical-takings test. *Connolly*, 475 U.S. at 224-25.

Rather, as *Connolly* makes clear, in the context of congressional amendments to ERISA to shore up multiemployer pension plans, when the government takes nothing for its own use, the regulatory-takings framework applies. In this case, Treasury, Labor, and PBGC took nothing for their own use. Rather, Congress modified the scope of the "anti-cutback" rule and altered the regulatory relationship between the government and multiemployer pension plans.

The plaintiffs' arguments that a physical-takings test should apply are further undercut by *Concrete Pipe*, 508 U.S. 602. In that case, employers challenged the MPPAA as violating the due process clause and the takings clause of the fifth amendment as applied. *Id.* at 636.

The Supreme Court held that nothing had changed since the decision in *Connolly*, and that the effects of the MPPAA on the plaintiffs needed to be evaluated under *Penn Central*. *Id.* at 643. The Supreme Court rejected the plaintiffs' attempt to "shoehorn" their claims under the physical-takings test. *Id.* It did not matter that the property was reallocated for the purpose of protecting the PBGC:

> That the solvency of a pension trust fund may ultimately redound to the benefit of the PBGC, which was set up in part to guarantee benefits in the event of plan failure, is merely incidental to the primary congressional objective of protecting covered employees and beneficiaries of pension trusts like the Plan.

*Id.* at 644. The Supreme Court relied on *Connolly* for the proposition that the nullification of a contractual right in the context of ERISA did not constitute a physical taking when the government took nothing for its own use. *Id.*

As in *Concrete Pipe*, the MPRA's putative benefits to the PBGC in this case are "merely incidental" to the major benefit to all plan participants and beneficiaries of the Teamsters Fund's ongoing solvency. *Id.* The Supreme Court has indicated that in the highly regulated environment of ERISA, Congress's adjustments to the regulatory framework cannot effect a physical taking when the government seizes nothing for its own use.

The plaintiffs attempt to distinguish *Connolly* and *Concrete Pipe* on three grounds. First, the plaintiffs highlight that the Supreme Court has since held that a physical taking may involve intangible property. (ECF 171 at 4 (discussing, among other cases, *Brown v. Legal Found. Wash.*, 538 U.S. 216 (2003)).) Second, the plaintiffs argue that the fact that legislation that destroys contractual rights "does not always" result in a taking does not mean that such legislation *can never* result in a taking. (ECF 171 at 9.) Third, the plaintiffs distinguish the MPPAA from the MPRA because the MPPAA merely created new rules of liability, while the MPRA supposedly appropriated plaintiffs' property interests. (*Id.* at 12.)

First, as discussed above, whether the allegedly taken property is tangible or intangible does not affect the application of *Connolly* and *Concrete Pipe* to the present case—what matters is whether the government appropriated or occupied that property. Second, the Supreme Court's holding that legislation destroying contractual rights does not always result in a taking is consistent with the application of a regulatory-takings test. A more flexible, *ad hoc* factual

inquiry is necessary. Third, the plaintiffs' proposed distinction between the MPPAA and the MPRA does not hold up. The MPPAA altered employers' liability to pension plans, just as the MPRA altered pension plans' liability to plan participants. Both pieces of legislation involved regulatory changes to the rules of liability for multiemployer pension plans.

In sum, *Connolly* and *Concrete Pipe* are the precedents most like this case and govern its outcome. The Supreme Court twice rejected the physical-takings test when Congress adjusts the regulatory framework for multiemployer pension plans, but the government seizes nothing for its own use. Accordingly, the physical-takings framework is inapplicable to the plaintiffs' claims.

The plaintiffs rely on precedents involving government appropriation or occupation of property in support of their effort to apply the physical-takings test. Even beyond the saliency of *Connolly* and *Concrete Pipe* to this case, the precedents on which the plaintiffs rely are distinguishable and cannot bear the weight the plaintiffs put on them.

**2. Cases Involving Government Appropriation of Property**

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). The plaintiffs argue that the physical-takings test should apply because the plaintiffs' contractual right to unreduced pension benefits was appropriated. The plaintiffs rely, for example, on *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), and *Horne v. Department of Agriculture*, 576 U.S. 351 (2015).

***a. Cedar Point***

In *Cedar Point*, a California regulation required agricultural employers to permit union organizers to enter the employers' property for up to three hours per day, 120 days per year. 141 S. Ct. at 2069. A district court denied the plaintiffs' request for a preliminary injunction and granted the defendant's motion to dismiss, holding that the regulation did not effect a physical taking, and the employers had not argued that the regulatory-takings test under *Penn Central* applied. *Id.* at 2070. The Ninth Circuit affirmed on the ground that because the regulation did not permanently deprive the plaintiffs of all economically beneficial use of their property, application of the physical-takings test was inappropriate. *Id.*

The Supreme Court reversed the decisions of the lower courts, holding that the "access regulation appropriates a right to invade the growers' property and therefore constitutes a *per se* physical taking." *Id.* at 2072. "Rather than restraining the growers' use of their own property, the regulation appropriates for the enjoyment of third parties the owners' right to exclude." *Id.* at 2072. The Supreme Court emphasized the importance of the right to exclude under common-law principles of property rights. *Id.* at 2072-73 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) for the proposition that "[t]he right to exclude is 'one of the most treasured' rights of property ownership").

Justices Breyer, Sotomayor, and Kagan dissented from the majority opinion in *Cedar Point*. They asserted that the majority viewpoint risked rendering "[m]yriad regulatory schemes"

unconstitutional because such regulatory schemes also depended "upon intermittent, temporary government entry onto private property." *Cedar Point*, 141 S. Ct. at 2089. For example, electricity installations, sewage collection, internet accessibility, and health inspections all require intermittent physical intrusion onto private property according to regulations. *Id.*

In response to the minority's concerns, the majority of the Supreme Court held that "many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights." *Id.* at 2079. "[T]he government does not take a property interest when it merely asserts a 'pre-existing limitation upon the [property owner's] title.'" *Id.* (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1028-29 (1992)).

Additionally, "the government may require property owners to cede a right of access as a condition of receiving certain benefits, without causing a taking." *Cedar Point*, 141 S. Ct. at 2079. "Under this framework, government health and safety inspection regimes will generally not constitute takings." *Id.*

The California access regulation fell under neither of those exceptions because "no traditional background principle of property law requires the growers to admit union organizers onto their premises," and "unlike standard health and safety inspections, the access regulation is not germane to any benefit provided to agricultural employers or any risk posed to the public." *Id.* at 2080.

By contrast, the suspension of the plaintiffs' benefits under the MPRA was consistent with "longstanding background principles" regarding the plaintiffs' entitlement to receive their unreduced pension benefits. *See id.* at 2079-80. Since before the enactment of the MPRA, the plaintiffs' pension benefits were subject to reduction under ERISA if the Teamsters Fund faced a "substantial business hardship" or became insolvent. *See* 29 U.S.C. §§ 1082(d), 1441. The MPRA was a modest extension of those exceptions to the "anti-cutback" rule.

Furthermore, the suspension of the plaintiffs' benefits constituted an assertion of pre-existing limitations on the plaintiffs' property rights. Even before ERISA was enacted, plan documents provided that if the Teamsters Fund were terminated, assets would be distributed in the form of shares that would be reduced *pro rata* if the funding was insufficient. (ECF 165-1 at 17-18.) The trustees also retained and frequently exercised the right to amend the plan documents to comply with evolving ERISA, Internal Revenue Code, and regulatory requirements. (ECF 169-1 at 10-12.) Although this case presented the first curtailment of the plaintiffs' benefits in this manner, the possibility that the plaintiffs' pension benefits could be revised, including being curtailed, inhered in the property interest. That the plaintiffs did not expect any reduction to their benefits is not relevant to the issue of whether such a reduction was inherent in the plan; under the plan documents prior to ERISA and after the enactment of ERISA, a reduction in benefits was always a possibility were the Teamsters Fund to become insolvent.

In addition, the reduction of the plaintiffs' benefits under the MPRA is more akin to a health and safety regulation than the California access regulation rejected in *Cedar Point*.

Although the plaintiffs experienced personal hardships as a result of the reduction of their benefits, those hardships were a necessary condition to the continued solvency of the Teamsters Fund. If the suspension had not been approved under the MPRA and the Teamsters Fund had become insolvent, the plaintiffs eventually would have received an even smaller fraction of their monthly benefit payment, and the PBGC would have been subjected to further liability, putting the stability of more pensions at risk. Like a health-inspection regulation, the MPRA required the plaintiffs to face hardships, but the potential benefits of the long-term solvency of the Teamsters Fund and of the enhanced stability of the PBGC, which accrue both to the Teamsters Fund participants and beneficiaries and to the public from the MPRA suspensions, counterbalance to a degree the harm to the plaintiffs. Because of the competing interests at stake and the difficulty of balancing the benefits of the MPRA suspensions against the plaintiffs' hardships, the regulatory-takings test is a more appropriate framework for assessing the plaintiffs' claims.

In sum, *Cedar Point* does not support the plaintiffs' argument that the government's authorization of the suspension of pension benefits constituted a physical taking. The reduction of the plaintiffs' benefits did not amount to a government appropriation of the plaintiffs' property. Rather, implicit in the plaintiffs' right to their benefits was the assumption under both ERISA and the plan documents that the plaintiffs' pension benefits could be curtailed.

**b. *Horne***

Under the facts giving rise to *Horne*, the U.S. Department of Agriculture promulgated a California Raisin Marketing Order, which required raisin growers to set aside a percentage of their raisin crops "for the account of the Government, free of charge." 576 U.S. at 354. "The Government then sells, allocates, or otherwise disposes of the raisins in ways it determines are best suited to maintaining an orderly market." *Id.*

The Supreme Court held that the reserve requirement constituted a "clear physical taking" because "[a]ctual raisins are transferred from the growers to the Government," and "[t]itle to the raisins passes to the Raisin Committee." *Id.* at 361. Although raisin growers had a "speculative hope" that proceeds may be left over and returned to them, the Supreme Court emphasized that the government took possession and control over the raisins and essentially held full title and ownership over the raisins. *Id.* at 362.

The actions of Treasury, the PBGC, and Labor in this case differ from those of the Raisin Committee in *Horne*. The government in this case never took "title" to the plaintiffs' pension benefits. The government had neither "possession" nor "control" over the plaintiffs' pension benefits. Although Treasury authorized the suspension of benefits under the MPRA, the Teamsters Fund trustees retained control over the administration and distribution of the plaintiffs' pension fund benefits; the *trustees*, not the government, sought by their own accord to amend the Teamsters Fund plan documents and ultimately implemented the reduction of benefits. The trustees had controlled the administration and distribution of pension benefits since well before the enactment of the MPRA.

This case would be like *Horne* only if the government authorized the reduction of the plaintiffs' benefits under the MPRA and then seized the reallocated funds directly from the plaintiffs or the Teamsters Fund estate. In this case, title or ownership of the plaintiffs' pension benefits never passed into the hands of government. Rather, the Teamsters Fund adjusted the plaintiffs' benefits as permitted by the MPRA with the goal of ensuring long-term solvency.

### 3. Cases Involving Government Occupation of Property

As an alternative to the appropriation theory, the plaintiffs argue that their pension benefits were unconstitutionally occupied. The plaintiffs analogize their claims to *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003); *Armstrong v. United States*, 364 U.S. 40 (1960); and to *Casitas Municipal Water District v. United States*, 543 F.3d 1276 (Fed. Cir. 2008). The decision in *Yee v. City of Escondido, California*, 503 U.S. 519 (1992) is more relevant.

#### a. *Brown*

In *Brown*, the Supreme Court evaluated whether the state of Washington effected a taking in its regulation of the IOLTA program. 538 U.S. at 220. The IOLTA program had four components:

> (a) the requirement that *all* client funds be deposited in interest-bearing trust accounts, (b) the requirement that funds that cannot earn net interest for the client be deposited in an IOLTA account, (c) the requirement that the lawyers direct the banks to pay the net interest on the IOLTA accounts to the Legal Foundation of Washington (Foundation), and (d) the requirement that the Foundation must use all funds received from IOLTA accounts for tax-exempt law-related charitable and educational purposes.

*Id.* at 224 (italics in original).

The IOLTA program was challenged as an illegal taking. The plaintiffs challenged on different grounds both "the requirement that their funds must be placed in an IOLTA account," and "the later transfers to the Foundation of whatever interest is thereafter earned." *Id.* at 234.

The Supreme Court held that the requirement that funds be placed in an IOLTA account was "merely a transfer of principal and therefore does not effect a confiscation of any interest." *Id.* That claim was thus required to be analyzed as a potential "regulatory taking" under *Penn Central*. *Id.*

The Supreme Court held, however, that a *per se* approach was appropriate to determine whether a taking had occurred regarding the interest earned on IOLTA accounts. *Id.* at 235. In a previous, related case, the Supreme Court had held that the interest earned in IOLTA accounts was private property cognizable under the takings clause of the fifth amendment. *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 172 (1998) ("[T]he interest income generated by funds held in IOLTA accounts is the 'private property' of the owner of the principal.") Accordingly, "the

transfer of the interest to the Foundation [in *Brown*] seems more akin to the occupation of a small amount of rooftop space in *Loretto*." *Brown*, 538 U.S. at 235.

The transfer of the principal in *Brown* involved the transfer of funds owed to the plaintiffs to a trust-bearing account, *i.e.*, from the plaintiff to a third party. Nonetheless, ownership of the principal never changed hands; nothing was "confiscated." *See id.* at 234-35. By contrast, the interest on the accounts was transferred to a third party that had no previous legal right to any part of that fund, *i.e.*, the Legal Foundation of Washington.

The suspension of the plaintiffs' benefits under the MPRA is more similar to the transfer of the principal than to the transfer of the interest in *Brown*. Although the plaintiffs' pension benefits were prospectively reduced, the reduction did not constitute a "confiscation." *See id.* Rather, the Teamsters Fund trustees exercised a right predating the MPRA to reduce plaintiffs' pension benefits as allowed by the plan documents and under the ERISA framework. The funds that were not paid out to the plaintiffs were not transferred to a new, intervening third party; rather, they remained part of the trust estate, to which plan participants and beneficiaries have always had only limited access, for the benefit of the other participants and beneficiaries of the Teamsters Fund.

The suspension of the plaintiffs' benefits would be akin to the transfer of interest in *Brown* if, for example, Treasury had not only authorized the suspension of benefits but also used that money to subsidize other, third-party insolvent funds or the PBGC itself. Treasury's authorization to the Teamsters Fund to reduce the plaintiffs' benefits, however, did not benefit any third party. Instead, the Teamsters Fund avoided insolvency through the government's permission to retain more assets in the trust estate, to which the plaintiffs had limited rights, anyways.

Accordingly, the plaintiffs' focus on *Brown* is misplaced. The reduction of the plaintiffs' pension benefits did not constitute "occupation" or "confiscation" of their property interest.

**b. *Armstrong***

Under the facts giving rise to *Armstrong*, the plaintiffs owned "materialmen's liens under state law for materials furnished to a prime contractor building boats for the United States." 364 U.S. at 41. That prime contractor defaulted, and the federal government exercised its option under the contract to seize the hulls and manufacturing materials owned by the prime contractor. The plaintiffs were not parties to the contract between the federal government and the prime contractor. The federal government failed to pay the plaintiffs for the materials, and their liens were extinguished. *See id.*

The plaintiffs argued that the federal government had destroyed their liens in violation of the takings clause. *See id.* at 42. The Court of Claims held that because the ships were constructed for eventual use by the government, the federal government had "inchoate title" to the liens and that there was therefore no taking. *Id.*

The Supreme Court reversed, holding that the liens constituted a cognizable property interest under the fifth amendment. *Id.* at 46.

The Supreme Court proceeded to analyze whether the destruction of the liens constituted a taking. *Armstrong* was issued in 1960, after *Pennsylvania Coal* but before *Penn Central*. *See Pa. Coal*, 260 U.S. 393 (1922); *Penn Central*, 438 U.S. 104 (1978). The Supreme Court nonetheless articulated "the difficulty of trying to draw the line between what destructions of property by lawful governmental actions are compensable 'takings,'" and destructions of property that are "a mere 'consequential incidence' of a valid regulatory measure." *Armstrong*, 364 U.S. at 48.

The Supreme Court held that the destruction of the liens constituted a physical taking:

> The total destruction by the Government of all value of these liens, which constitute compensable property, has every possible element of a Fifth Amendment 'taking' and is not a mere 'consequential incidence' of a valid regulatory measure. Before the liens were destroyed, the lienholders admittedly had compensable property. Immediately afterwards, they had none. This was not because their property vanished into thin air. It was because the Government for its own advantage destroyed the value of the liens, something that the Government could do because its property was not subject to suit, but which no private purchaser could have done.

*Id.* It did not matter to the government's argument that the contract between the federal government and the prime contractor permitted the seizure in the event of the prime contractor's default.

*Armstrong* does not support the application of the physical-takings test to the plaintiffs' claims in this case for two reasons. First, the plaintiffs' right to unreduced pension benefits was not totally destroyed; the property interest in this case did not "vanish[ ] into thin air." *Id.* During the pendency of the MPRA-authorized suspensions, the plaintiffs still received most of their benefits; the benefits were reduced by only 29 percent. Most of the plaintiffs have had their benefits restored and received lump-sum make-up payments. Unlike the plaintiffs in *Armstrong*, the plaintiffs in this case were not permanently deprived of all economic value of their property interests.

Second, in *Armstrong*, the government effectively took the shipbuilding materials "for its own advantage" without paying for them. *Id.* At the time of the prime contractor's default and the government's seizure, the government had paid the prime contractor $141,000, but the prime contractor had expended $198,000 in building the ships. *Id.* at 45. Although the facts in *Armstrong* were not fully developed, the Supreme Court suggested that the government had received a windfall through the prime contractor's default. *Id.* at 45 ("We have no way of knowing what the property would have brought had it been sold, but it cannot be said with certainty that it would have brought no more than the amount of the Government's claim.") In this case, the suspension of the plaintiffs' benefits brought no windfall to the government.

Instead, the benefits paid to the plaintiffs were reduced for the advantage of the ongoing solvency of the Teamsters Fund and, indirectly, the financial stability of the PBGC. The government in this case has not taken anything for its own use.

The facts that the plaintiffs' pension benefits were not completely destroyed, and that the federal government did not acquire unpaid-for property purely for its own benefit distinguish this case from *Armstrong*. Accordingly, the plaintiffs' analogy of their claims to those in *Armstrong* do not require the application of the physical-takings rubric.

**c. *Casitas***

At oral argument, the plaintiffs analogized the stream of pension benefits due to them to a stream of water the government has diverted and appropriated for some other purpose.

In *Casitas*, the Federal Circuit held that the "government requirement that [the plaintiff] build [a] fish ladder and divert water to it should be analyzed under the physical takings rubric." 543 F.3d at 1296. That holding was predicated on a line of Supreme Court cases in which "the United States physically diverted the water, or caused water to be diverted away from the plaintiffs' property." *Id.* at 1290. In some cases, the diverted water was dedicated to use by a third party. *Id.*

The Federal Circuit distinguished the government's diversion of water in *Casitas* from the government ordering a gold mine to cease operations in *United States v. Central Eureka Mining Co.*, 357 U.S. 155 (1958):

> In *Central Eureka Mining*, the Court expressly distinguished the physical takings cases on the grounds that "[t]he Government had no need for the gold or the gold mines." . . . The government simply halted mining; it did not commandeer the gold for a public use. At the end of the regulatory restriction, the gold mine still had all of its gold and machinery. In this case, in contrast, the government did commandeer the water for a public use—preservation of an endangered species.

*Casitas*, 543 F.3d at 1294 (internal citation omitted) (quoting *Central Eureka Mining*, 357 U.S. at 166).

In this case, the government did not "commandeer" the plaintiffs' pension benefits; Treasury, Labor, and the PBGC "had no need" for the money in the pension benefits themselves. *See Casitas*, 543 F.3d at 1294. Rather, like the government's order to stop mining in *Central Eureka Mining*, Treasury merely allowed the Teamsters Fund to stop paying a portion of the plaintiffs' pension benefits. Those pension benefits were not then diverted to another unrelated public cause. Furthermore, similar to the end-result in *Central Eureka Mining*, the plaintiffs' benefits have now been restored, and make-up payments have been made. Accordingly, this case is distinct from *Casitas*, and the physical-takings rubric is inappropriate here.

**d. *Yee***

In *Yee*, the plaintiffs, owners of a mobile-home park, challenged a local rent-control ordinance as a physical occupation of their property. 503 U.S. at 523. A pre-existing law already limited the bases upon which a mobile-home park owner could terminate a mobile-home owner's tenancy. *Id.* at 524. The challenged local ordinance permanently set rents for mobile homes at 1986 levels and prohibited rent increases without approval of the city council. *Id.*

The plaintiffs argued that "the rent control ordinance has transferred a discrete interest in land—the right to occupy the land indefinitely at a submarket rent—from the park owner to the mobile home owner [*sic*]," amounting to a "physical occupation of the park owner's land." *Id.* at 527.

The Supreme Court held that there was no occupation of property, and the physical-takings framework was inappropriate. Because the plaintiffs had willingly chosen to rent their land to mobile-home owners and continued to choose to do so, they had voluntarily agreed to the state and local regulatory scheme. *Id.* at 527-28.

The plaintiffs argued that the ordinance unconstitutionally "transfer[red] wealth from park owners to incumbent mobile home owners [*sic*]." *Id.* at 529. The Supreme Court rejected the invocation of the physical-takings test in that context, noting that "[o]ther forms of land use regulation . . . can also be said to transfer wealth from the one who is regulated to another." *Id.* "[T]he existence of the [wealth] transfer in itself does not convert regulation into physical invasion." *Id.* at 529-30.

The plaintiffs also argued that the ordinance had unlawfully eliminated their right to choose tenants and thus their right to exclude. *Id.* at 530-31. Again, the Supreme Court held that although that element of the ordinance may be relevant under the *Penn Central* framework, "[b]ecause they voluntarily open their property to occupation by others, petitioners cannot assert a *per se* right to compensation based on their inability to exclude particular individuals." *Id.* at 531.

The facts of this case are analogous to those giving rise to *Yee*. The plaintiffs cannot demonstrate physical occupation of their pension benefits. When the plaintiffs began contributing to their pensions, the promise of unreduced benefits, even after vesting, was not absolute. Pension benefits could be reduced if the Teamsters Fund were terminated or if the Teamsters Fund faced insolvency. Treasury therefore did not "occupy" the plaintiffs' benefits; Treasury merely extended the regulatory and legislative framework to prevent the plaintiffs from receiving an even smaller portion of their benefits if the Teamsters Fund became actually insolvent.

Additionally, the supposed transfer of wealth from the plaintiffs to the Teamsters Fund or from the plaintiffs to active employees does not necessitate application of the physical-takings test. Rather, the regulatory-takings framework under *Penn Central* is more appropriate. *See id.* at 527-28.

Furthermore, by contributing to their pensions, the plaintiffs voluntarily agreed to the regulatory scheme governing the Teamsters Fund. This regulatory scheme permitted the trustees of the Teamsters Fund lawfully either to amend the plan documents or reduce the benefits they were paying when permitted under ERISA. Under both the plan documents and ERISA, benefits were liable to being reduced. The possibility, even if remote, that the plan documents would be amended and that benefits would be reduced was always inherent in the plaintiffs' contract terms with the Teamsters Fund under the trust agreement, pre-dating ERISA.

In sum, *Yee* suggests that the regulatory-takings test provides the appropriate framework for evaluating whether the reduction of the plaintiffs' pension benefits constituted a taking.

### 4. Conclusion: The Physical-Takings Test Is Not Applicable

The crucial element in determining whether the physical-takings test applies is the government action: the government must have appropriated, occupied, seized, or confiscated the plaintiffs' property interest for the physical-takings test to apply. The type of property interest at stake and whether the property interest ultimately ends up in the hands of a third party are irrelevant to that determination. The plaintiffs bear the burden to demonstrate government action sufficient to give rise to a physical taking. *See King*, 159 Fed. Cl. at 487. Under *Connolly* and *Concrete Pipe*, the plaintiffs cannot do so. The plaintiffs' proposed analogization of their claims to cases involving government appropriation or occupation of property must fail in the face of the Supreme Court's precedents involving legislation to ensure the viability of multiemployer pension plans. Accordingly, the physical-takings test does not apply to the plaintiffs' claims.[9] The regulatory takings framework is more appropriate.

### B. Application of the Regulatory-Takings Test

"The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pa. Coal Co.*, 260 U.S. at 415. The Supreme Court has "generally eschewed any set formula for determining how far is too far,

---

[9] If the physical-takings test did apply, the defendant argues that the plaintiffs still could not demonstrate a physical taking because, after considering the plaintiffs' likely life expectancy and the projected insolvency of the Teamsters Fund, the plaintiffs fared better financially with the suspensions than they would have absent the MPRA-authorized reductions. (ECF 169 at 29-31.) The plaintiffs argue that the Supreme Court in *Horne* rejected the defendant's proposed approach to consider off-setting benefits. (ECF 171 at 18.) Because the physical-takings test does not apply, the parties' argument over the correct application of the physical-takings test to the plaintiffs' claims need not be resolved.

preferring to engage in essentially ad hoc, factual inquiries." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (cleaned up).[10]

A court must consider three factors with "particular significance" in determining whether a regulatory taking has occurred: (1) the "economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Central*, 438 U.S. at 124.

As a preliminary issue, the plaintiffs focus their regulatory-takings argument on the situation before the Teamsters Fund received special financial assistance under the ARPA and delivered lump-sum make-up payments to the plaintiffs and most class members. The defendant, on the other hand, considers the fact that each of the plaintiffs and most class members have received make-up payments in its analysis of this case under the *Penn Central* framework.

The defendant's approach provides the correct analytical framework. Here, the situation before Congress enacted the ARPA and the plaintiffs received their make-up payments is irrelevant to the case, except insofar as it affects class members who died and whose estates did not recover the full make-up payment. Courts must take the facts and the law as they are at the time of decision. *See, e.g.*, *Bradley v. Sch. Bd. Richmond*, 416 U.S. 696, 711 (1974) (noting the "principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary"). The complaint pending in this case alleges that make-up payments have been made to most plaintiffs; the plaintiffs now only seek interest on the withheld benefits, because interest was not included in the make-up payments, and make-up payments for participants and beneficiaries who died between October 2017 and December 2022. (ECF 166 at ¶¶ 87-95.)

Accordingly, the resolution of the plaintiffs' claims must account for the facts that the plaintiffs who are still living have received make-up payments and that their benefits have been restored to pre-MPRA levels. The resolution must also account for the fact that the estates and survivor beneficiaries of prospective class members who died between October 2017 and December 2022 received no make-up payments or smaller payments than they would have received had the participants or beneficiaries lived.

### 1. Economic Impact

The plaintiffs argue that the suspension of their pension benefits under the MPRA has had a "destructive impact" on the plaintiffs. (ECF 164 at 39.) The cuts "deprived [the plaintiffs]

---

[10] The plaintiffs argue that they can demonstrate a categorical regulatory taking under *Lucas*. (ECF 164 at 33-34.) They acknowledge, however, that current Federal Circuit caselaw, most notably *Norman v. United States*, 429 F.3d 1081, 1091 (Fed. Cir. 2005), forecloses their argument on that point. (*Id.*) The plaintiffs posit that "there is no work for this Court to do on this issue," but they preserve the issue for appeal. (ECF 171 at 23.)

of the money they needed to subsist, thrust them into debt, and forced them to forgo medical care." (*Id.*)

The defendant argues that a 29-percent reduction in pension benefits is insufficient to support a regulatory taking, especially given the advantages that reduction gave the plaintiffs regarding the Teamsters Fund's financial stability. (ECF 169 at 37-39.) Moreover, now that the plaintiffs and most class members have received make-up payments and are receiving their pension benefits at the pre-MPRA levels, there is no serious financial loss. (*Id.*)

The plaintiffs respond by rejecting the defendant's suggested numerical threshold for government liability and suggesting that the "ultimate focus" should be "the impact on the plaintiffs, not the plaintiffs' property." (ECF 171 at 28.)

The defendant replies by arguing that the total value of the property interest over its remaining life must be considered and that the MPRA cuts were not so onerous as to constitute a regulatory taking. (ECF 175 at 12-15.)

In evaluating the economic impact of a regulation, no "automatic numerical barrier prevent[s] compensation, as a matter of law, in cases involving a smaller percentage diminution in value." *Yancey v. United States*, 915 F.2d 1534, 1541 (Fed. Cir. 1990). Nonetheless, the Federal Circuit has remarked that it is "'aware of no case in which a court has found a taking where diminution in value was less than 50 percent.'" *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) (quoting the appellant's brief). In *CCA Associates*, an 18-percent diminution in the value of the property interest was held to be too low to constitute a regulatory taking. *Id.* In a case before the Supreme Court, a 10-percent diminution in value of a property interest also was deemed insufficient to support a finding of a regulatory taking. *Murr v. Wisconsin*, 137 S. Ct. 1933, 1949 (2017).

Additionally, a court must "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). When "an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard*, 444 U.S. 51, 66 (1979).

In *Connolly*, the Supreme Court, applying the regulatory-takings test, considered the fact that the withdrawal liability assessed against employers contributing to multiemployer pension plans was roughly proportional to the employer's contributions to the plan and thus supported the conclusion that no regulatory taking had occurred. The liability assessment was "not made in a vacuum." 475 U.S. at 225. "[T]he mere fact that the employer must pay money to comply with the Act is but a necessary consequence of the MPPAA's regulatory scheme." *Id.* at 226.

As to the three named plaintiffs and similarly situated class members, the economic impact of the MPRA suspension and the ARPA precludes finding a regulatory taking. Although the plaintiffs' pension benefits were reduced by 29 percent over a six-year period, those benefits have since been restored, and the plaintiffs have received make-up lump-sum payments for the amount that was withheld from them.

Besides the extent of the loss, the analysis must consider the "value that remains in the property." *Keystone*, 480 U.S. at 497. Because the Teamsters Fund received special financial assistance under the ARPA, it is now projected to remain solvent until at least 2051. *See* 29 U.S.C. § 1432(j)(1). The plaintiffs' pension benefits are thus more secure than they were even before the plaintiffs' benefits were reduced under the MPRA, and that security will likely last for the remainder of the plaintiffs' lifetimes.

At most, the only current loss the three named plaintiffs and similarly situated class members have suffered is the time value of 29 percent of their pension benefits over a period of approximately six years, which would be compensable by interest. The amount of the interest is not of insignificant value to the plaintiffs and the class members they represent, but, when balanced against the benefit of the assured solvency of the Teamsters Fund, that economic loss is less significant. The economic impact of the MPRA in the aftermath of the ARPA's make-up payments on the three named plaintiffs and similarly situated class members cannot support a finding that a regulatory taking occurred.

The members of the class who died before the Teamsters Fund received special financial assistance present a slightly more challenging analytical issue.[11] The estates of participants and beneficiaries who died between October 1, 2017, and December 8, 2022, received either no make-up payments or make-up payments smaller than the size of the pension cuts. (*See* ECF 164 at 11-12.)

Even so, those plaintiffs suffered at most a 29-percent reduction in the value of their pension benefits. Precedents from the Supreme Court and the Federal Circuit suggest that that percentage of diminution in value is likely insufficient to support a taking. *Murr*, 137 S. Ct. at 1949; *CCA Assocs.*, 667 F.3d at 1246.

Notably, the MPRA, the ARPA, and associated regulations were not crafted "in a vacuum." *See Connolly*, 475 U.S. at 225. Rather, they reflect a careful balancing of proportionality as to the parties that should bear more of the financial cost of a multiemployer pension plan's looming insolvency. For example, pension benefits were also reduced for active employees at a lower rate of 18 percent to account for the risk that a higher reduction in future

---

[11] The certified class consists of approximately 10,893 class members who have yet to opt into the class. (ECF 164 at 11 n.7.) The plaintiffs estimate that approximately 1,100 of those class members are estates of participants and beneficiaries who died after their benefits were suspended and before the Teamsters Fund received special financial assistance pursuant to the ARPA. (*Id.* at 11-12.) The plaintiffs' pending complaint alleges that most plaintiffs have received make-up payments, albeit with no adjustment for interest, and that the participants and beneficiaries who passed away received smaller or no such payments. (ECF 166 at ¶ 13.) Although the plaintiffs have noted their intent to add the estate of Mr. Campbell as a named plaintiff and sub-class representative, they have yet to do so. (ECF 164 at 14.) Nonetheless, the interests of the estates of deceased participants and beneficiaries are properly presented in the amended complaint and in the appendices the parties have filed.

benefits for active employees might encourage their withdrawal from the Teamsters Fund. *See* 29 U.S.C. § 1085(e)(9)(D)(iv)(X). If the benefits of active employees were reduced disproportionately to those of vested participants and beneficiaries, the active employees could encourage their employers to withdraw from the plan, precipitating the "'vicious downward spiral'" policymakers have aimed to avoid since the enactment of ERISA. *Connolly*, 475 U.S. at 216 (quoting 1978 Hearings).

Additionally, benefits were not reduced for plan participants who were older than 80 or disabled. *Id.* §§ 1085(e)(9)(D)(ii)(III), 1085(e)(9)(D)(iii). The Teamsters Fund had to demonstrate that there were no other options reasonably available to it to prevent insolvency. *See id.* § 1085(e)(9)(C)(ii) (requiring that the plan sponsor demonstrate that "all reasonable measures to avoid insolvency have been taken (and continue to be taken during the period of the benefit suspension)"). Because the suspension of the plaintiffs' benefits complied with the MPRA, the suspension was roughly proportionate to the financial issues facing the Teamsters Fund and the economic and financial needs of all participants and beneficiaries of the Teamsters Fund. The plaintiffs did not shoulder a disproportionate share of the burden.

Pension benefits are also by design contingent on a participant's or beneficiary's lifespan. The normal form of benefit is a life annuity, which ceases to provide payments upon a participant's or beneficiary's death, unless a survivorship benefit applies. (*See* ECF 169-1 at 45.) Participants and beneficiaries who live long lives reap greater economic reward from the pension system than those who die earlier. The nature of the pension system requires unequal financial burden-sharing based on length of life. The estates of pension participants and beneficiaries who died before the Teamsters Fund received special financial assistance thus have not demonstrated sufficiently adverse economic impact to justify a finding of a regulatory taking.

In sum, the economic impact to the three named plaintiffs and other living class members tilts decidedly against finding a taking. The estates of the participants and beneficiaries who died before special financial assistance was received also have not demonstrated sufficiently adverse economic impact to find a taking, although this factor weighs against them less strongly than against the other plaintiffs. This holding is not intended to trivialize any of the personal, real financial challenges the reduction of pension benefits posed to any of the class members. Those subjective hardships, however, just do not correspond to the objective standards set by binding precedents.

### 2. Interference with Investment-Backed Expectations

The plaintiffs argue that they had expected the level of their pension benefits to be protected and irreducible during their lifetimes, and that these expectations were both subjectively and objectively reasonable. "They worked challenging hours (including a graveyard shift for Mr. Dardzinski), even when sick or in pain; gave up pay raises and other benefits; skipped vacations; and declined other job opportunities in order to earn their vested pension." (ECF 164 at 36.) They relied on their pre-MPRA pension benefits in electing when to retire.

The defendant argues that "the highly regulated nature of ERISA-based multiemployer pension plans . . . is indisputably an important consideration" in evaluating whether the

plaintiffs' expectations were reasonable. (ECF 169 at 40.) The defendant relies on *Connolly* and *Concrete Pipe* for the proposition that the plaintiffs could not have reasonably expected ERISA, the Teamsters Fund pension plan documents, and the benefit levels therein, to remain unchanged and unchanging even as the Teamster Fund approached insolvency. The payment of pension benefits under a pension plan is always contingent on the pension plan's ongoing viability.

The plaintiffs respond that "[e]ven if Plaintiffs knew their pensions could be cut if the fund went insolvent, that is far different than Plaintiffs knowing that their pensions could be cut at any time, for any reason." (ECF 171 at 27.) The plaintiffs argue that they could not have foreseen reduction of their benefits when the Teamsters Fund remained, at least for the time being, solvent.

It is analytically useful to divide this factor into two parts: (1) whether the plaintiffs in fact had reasonable, investment-backed expectations in receiving unreduced pension benefits, and (2) the degree of interference with those expectations.

### a. Reasonable, Investment-Backed Expectations

Consideration of this factor requires "an objective, but fact-specific inquiry into what, under all the circumstances, the [plaintiffs] should have anticipated." *Cienega Gardens v. United States*, 331 F.3d 1319, 1346 (Fed. Cir. 2003); *see also Chancellor Manor v. United States*, 331 F.3d 891, 904 (Fed. Cir. 2003) ("The critical question is what a reasonable owner in the [plaintiffs'] position should have anticipated.")

The Federal Circuit has outlined three factors to aid in determining whether a plaintiff in a regulatory-takings case had reasonable expectations in a regulatory regime:

> (1) whether the plaintiff operated in a "highly regulated industry;" (2) whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property; and (3) whether the plaintiff could have "reasonably anticipated" the possibility of such regulation in light of the "regulatory environment" at the time of purchase.

*Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004) (quoting *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed. Cir. 2001) (en banc)); *accord Reoforce, Inc. v. United States*, 853 F.3d 1249, 1270 (Fed. Cir. 2017) (reciting the same factors).

As to the first factor, there is no doubt that the industry of multiemployer pension plans is highly regulated. ERISA is a "comprehensive and reticulated statute." *Nachman Corp. v. PBGC*, 446 U.S. 359, 361 (1980). In *Connolly*, the Supreme Court observed that pension plans "were the objects of legislative concern long before the passage of ERISA in 1974." 475 U.S. at 226.

Logically, the trustees of pension plans and employers who participate in pension plans operate in a highly regulated industry. Trustees are responsible for remaining apprised of an

ever-growing number of laws and regulations, and judicial decisions interpreting them, related to the administration of pension benefits. *See, e.g.*, *Thole v. U.S. Bank N.A*, 140 S. Ct. 1615, 1621 (2020) ("[U]nder ERISA, fiduciaries who manage defined-benefit plans face a regulatory phalanx.") Similarly, employers "'voluntarily negotiated and maintained a pension plan which was determined to be within the strictures of ERISA.'" *Concrete Pipe*, 508 U.S. at 646 (quoting *Connolly*, 475 U.S. at 227).

The Federal Circuit has instructed courts, however, to put themselves in the plaintiffs' shoes. *See Cienega Gardens*, 331 F.3d at 1346. Retired UPS employees should not be held to the same standard of awareness of ERISA and all its regulatory trappings as the trustees of the Teamsters Fund, UPS, and other contributing employers. The defendant has pointed to no provision in ERISA, the MPRA, the ARPA, or the Teamsters Fund's plan documents bestowing fiduciary duties or obligations on the plaintiffs. Rather, once the plaintiffs' pensions vest, the income the participants and beneficiaries receive from those pensions is generally passive. Accordingly, the plaintiffs, retired UPS employees, do not "operate" in a highly regulated industry merely because they receive monthly pension benefit payments in retirement. *See Appolo*, 381 F.3d at 1349.

The second factor, whether the plaintiffs were aware of the problem of underfunded multiemployer pension plans at the time they "purchased" their pensions, is awkward to apply to the case. *See id.* The plaintiffs began contributing to their pensions when they began working at UPS, and the three named plaintiffs contributed to their pensions for several decades. The plaintiffs' pensions all vested prior to the suspension of benefits under the MPRA.

Both the plaintiffs and the defendant present strong arguments related to this factor. On the one hand, multiemployer pension plans have faced problems with insolvency since before ERISA was enacted. The Teamsters Fund plan documents have always accounted for the potential reduction of pension benefits in the event the plan was terminated. On the other hand, the plaintiffs were repeatedly told that once their pensions vested, their benefits could not be curtailed. This second factor weighs in favor of the plaintiffs.

The third factor asks whether the plaintiffs could have reasonably anticipated the suspension of their benefits given the existing regulatory regime "at the time of purchase." *See id.* This question too is challenging to answer from a temporal perspective as to when the plaintiffs purchased their pension benefits—it is unclear whether the time plaintiffs began employment or vesting should guide the analysis. Although some regulatory reform of multiemployer pension plans was likely foreseeable throughout the period when the plaintiffs were accruing their benefits while they were still employed, the prospect of a 29-percent reduction in their benefit levels after their benefits had vested pursuant to the MPRA suspensions could not have been foreseen.

Generally, plan participants with vested pension benefits are considered to have superior rights to those participants whose benefits have accrued but not yet vested. *See Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 749 (2004) (noting that accrued benefits are less protected from forfeiture than vested benefits). The government's authorization of the suspension of the plaintiffs' benefits under the MPRA turned that assumption on its head: while the plaintiffs

suffered a 29-percent reduction in their pension benefits, the pension benefits of active employees were reduced by just 18 percent.

Additionally, the Teamsters Fund was not projected to become insolvent until 2026. By that time, the plaintiffs and similarly situated class members might have attained the age of 80, become disabled, or died. Even though the solvency of multiemployer plans has been an ongoing issue, and amendments to ERISA and the plan documents to attempt to stabilize such plans have been plentiful, the plaintiffs drew the short straw of the bundle in terms of their age at the time the MPRA was enacted and implemented.

At oral argument, the plaintiffs listed many other options at Congress's disposal to address the growing problem of insolvency of multiemployer pension plans, such as adjusting the insurance fee pension funds pay to the PBGC, adjusting accrual rates but not vesting principles, or adjusting the formula for employer-withdrawal liability, for example.

Although reasonable foreseeability is an objective test, it would be unreasonable to expect the plaintiffs, retired UPS employees, to foresee that they would bear most of the financial cost of keeping the Teamsters Fund afloat between 2017 and 2022. The suspension of the plaintiffs' benefits under the MPRA would not have been reasonably foreseeable to them based on the regulatory structure of ERISA and their role in it. Accordingly, the plaintiffs have established that they had reasonable investment-backed expectations to receive their unreduced, vested pension benefits.

#### b. Extent of Interference with those Expectations

The analysis does not end with a finding that the plaintiffs had reasonable, distinct investment-backed expectations. For example, in *Maritrans, Inc. v. United States*, the Federal Circuit held that "the fact that [the plaintiff] had a reasonable, investment-backed expectation in the non-imposition of a" regulation "[did] not help it," when the government action did not unreasonably interfere with that expectation. 342 F.3d 1344, 1359 (Fed. Cir. 2003). A court is tasked with evaluating "the *extent* to which the regulation has *interfered* with distinct investment-backed expectations." *Penn Central*, 438 U.S. at 124 (emphases added).

"'Legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations even though the effect of the legislation is to impose a new duty or liability based on past acts.'" *Concrete Pipe*, 508 U.S. at 646 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976)) (cleaned up).

In *Alimanestianu v. United States*, the Federal Circuit held that there was no government interference with the plaintiffs' investment-backed expectations when the U.S. State Department settled the plaintiffs' claims against the country of Libya. 888 F.3d 1374, 1383-84 (Fed. Cir. 2018). The Federal Circuit held that the plaintiffs' recovery depended on the cooperation of the Libyan government and that the plaintiffs had not provided any evidence of past success of such efforts. *Id.*

In this case, most of the members of the plaintiff class, including the three named plaintiffs, have had their pension benefits restored and have received lump-sum make-up payments in the amount of the reductions made under the MPRA. Interference with those plaintiffs' pension benefits has therefore been negligible. Although the plaintiffs lost the time value of those benefits during the pendency of the benefit suspensions, they have now received the advantage of the Teamsters Fund's solvency, likely for the rest of their lifetimes, under the ARPA.

Relatedly, the regulations expanded a pre-existing exception to the plaintiffs' investment-backed expectations: that pension benefits could be reduced if the Teamsters Fund faced insolvency or other financial hardships. As in *Alimanestianu*, the plaintiffs' right to their pension benefits at an unreduced level has always been contingent on the Teamsters Fund's financial stability. Through the MPRA, the government altered the pre-existing regulations pertaining to the "anti-cutback" rule, which generally protects accrued benefits from curtailment unless a statutory exception applies. The MPRA did not dramatically upset the plaintiffs' expectations in a manner sufficient to give rise to a regulatory taking; rather, it protected the plaintiffs' benefits by preventing the plaintiffs from receiving much less if the Teamsters Fund actually became insolvent.

The plaintiffs who died before the special financial assistance was received experienced a greater degree of interference with their expectations. Their estates received smaller or no make-up payments under the ARPA. That interference is still not substantial enough to support a taking, however, for two reasons. First, as discussed above, the MPRA merely expanded a pre-existing limitation on the plaintiffs' investment-backed expectations.

Second, pension benefits depend on a participant or beneficiary's life span. The financial amount participants and beneficiaries receive in their pension benefits corresponds to their length of life. The estates' expectations thus cannot be as high of those of the still-living plaintiffs. The lack of make-up payments available to estates under the ARPA did not unduly interfere with the estates' expectations because under the Teamsters Fund plan documents, rights to pension benefits are almost always extinguished upon a participant or beneficiary's death. The estates therefore have not demonstrated sufficient government interference with their investment-backed expectations to justify finding a taking.

Accordingly, neither the living plaintiffs nor the estates of deceased plan participants have shown that the government unduly interfered with their reasonable, investment-backed expectations to give rise to a regulatory taking.

### 3. Character of the Government Action

The plaintiffs argue that five aspects of the character of the government action support a taking in this case. First, the cuts to the plaintiffs' benefits "were of lengthy duration—at least five years, and for many of them, permanent." (ECF 164 at 35.) Second, the MPRA applied retroactively to benefits already earned and vested. Third, the burden on the plaintiffs was disproportionate. Fourth, the regulation was "'intrusive beyond the level of traditional governmental limits'" in this area. (*Id.* (quoting *Cienega Gardens*, 331 F.3d at 1338-39).) Fifth,

the courts do not owe deference to the other branches of government in this field, unlike in other takings cases that have implicated national security.

The defendant argues that the MPRA "is a tailored effort to avoid the problems arising from plan failure." (ECF 169 at 46 (capitalization omitted).) The MPRA merely adjusted the burdens and benefits of economic life, and the magnitude or character of the burden on the plaintiffs does not support a taking.

The parties also dispute whether the MPRA unfairly targeted the plaintiffs, in analogy to the case *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260 (Fed. Cir. 2009).

Application of the plaintiffs' proposed factors leads to the conclusion that the character of the government action did not give rise to a regulatory taking. First, regarding the length of the suspension of benefits, "duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim." *Tahoe-Sierra*, 535 U.S. at 342. The plaintiffs' pension benefits were reduced by 29 percent for approximately six years. On the one hand, six years is a long time for retirees to forgo a portion of their pension income and adjust to life without it. On the other hand, the suspension of benefits to living plaintiffs was not permanent, as Congress made up the loss by enacting the ARPA. This factor weighs neither for nor against finding a taking.

Second, although the MPRA applied to pension benefits already earned, the MPRA did not truly apply retroactively.[12] Rather, the MPRA reduced benefits prospectively regarding the pension benefits the plaintiffs would receive after the plan documents were amended. The MPRA would have applied retroactively if, for example, Congress had amended ERISA to allow pension plans to claw back benefits already paid to the plaintiffs. This second factor does not support finding a regulatory taking.

Third, although the plaintiffs faced larger benefit cuts than active employees, the MPRA and its implementation reflected a careful, comprehensive scheme for determining the percentage of cuts that plan participants, including the plaintiffs, faced. Suspension of benefits was a last resort: "all reasonable measures to avoid insolvency [must] have been taken." 29 U.S.C.

---

[12] The plaintiffs rely on *Eastern Enterprises v. Apfel*, 524 U.S. 498, 532 (1998), in which a plurality of the Supreme Court held that "[r]etroactivity is generally disfavored in the law," when evaluating whether a taking had occurred. (*See* ECF 164 at 35.) The Federal Circuit has noted of *Apfel* that five of the justices had concluded "that regulatory actions requiring the payment of money are not takings." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1339 (Fed. Cir. 2001) (en banc). The Federal Circuit held that courts "are obligated to follow the views of that majority." *Id.* The plaintiffs' arguments relying on *Apfel* are nonetheless considered for the sake of completeness.

§ 1085(e)(9)(C)(ii).[13] The benefit suspensions had to be "equitably distributed across the participant and beneficiary population." *Id.* § 1085(e)(9)(D)(vi). One important factor was the "[e]xtent to which active participants [were] reasonably likely to withdraw support for the plan, accelerating employer withdrawals from the plan and increasing the risk of additional benefit reductions for participants in and out of pay status." *Id.* § 1085(e)(9)(D)(vi)(X). No participant who was over the age of 80 or disabled faced any suspension of benefits, and participants between the ages of 75 and 80 faced lesser reductions. *Id.* §§ 1085(e)(9)(D)(ii), 1085(e)(9)(D)(iii). The suspensions were "reasonably estimated to achieve, but not materially exceed, the level that is necessary to avoid insolvency." *Id.* § 1085(e)(9)(D)(iv).

The fact that the plaintiffs faced larger cuts than other participants and beneficiaries does not mean that the cuts were "disproportionate." To the contrary, the regulatory scheme created by the MPRA struck a balance between maintaining a pension plan's insolvency, continuing to provide pension benefits to those who needed them most, and mitigating the risk that active employees would withdraw support from the pension plan. Although the reduction of the plaintiffs' benefits was 11 percentage points higher than the reduction of active employees' benefits, that reduction was not disproportionate upon consideration of the purpose and competing goals of the MPRA.

Fourth, the defendant's action of authorizing the Teamsters Fund to reduce the benefits it paid cannot be characterized as intrusive. As in *Connolly*, the government did not "physically invade or permanently appropriate any of the [plaintiffs'] assets for its own use." 475 U.S. at 225. Rather, the MPRA arose "from a public program that adjusts the benefits and burdens of economic life to promote the common good," *i.e.*, ERISA. *Id.* It is "within the power of Congress to impose" additional requirements on parties participating in the pension industry, with the ultimate goal of protecting pension benefits paid to participants and beneficiaries. *Id.* at 224. In light of the pre-existing ERISA framework and plan documents that permitted the

---

[13] The plaintiffs have not challenged as a factual matter that the conditions for the suspension of benefits were met under the MPRA. The MPRA immunized the Teamsters Fund from liability due to the MPRA-authorized suspensions and denied participants and beneficiaries a cause of action under the MPRA. *See* 29 U.S.C. §§ 1085(e)(9)(B)(iii), 1085(e)(9)(I)(iii). During the second round of summary judgment, the plaintiffs argued in the alternative that Congress's deprivation of the plaintiffs' legal remedies under ERISA also constituted a cognizable property interest taken by the federal government. *See King*, 159 Fed. Cl. at 463 n.5. The parties disagreed at oral argument whether the plaintiffs could have brought a claim against the federal government under the Administrative Procedure Act ("APA") in district court if Treasury approval of the Teamsters Fund's MPRA application was arbitrary and capricious. In any case, the Court of Federal Claims would lack jurisdiction over a claim brought solely under the APA or a claim seeking declaratory or injunctive relief for a taking. *See, e.g.*, *Bowen v. Massachusetts*, 487 U.S. 879, 904-05 (1988). Under governing law, whether the Teamsters Fund's application complied with the MPRA is unreviewable in the Court of Federal Claims.

reduction of benefits if the Teamsters Fund was facing insolvency, the MPRA's modification to the scope of the "anti-cutback" rule was not unduly intrusive.

Fifth, the fact that this case does not implicate national security concerns bears no legal significance and does not alleviate the plaintiffs of their burden to demonstrate that the government action in this case supports a taking.

Analogy of this case to *Rose Acre Farms* is instructive. In that case, the Federal Circuit instructed courts to consider the allocation of the burden posed by a regulation and whether the plaintiff was "single[d] out." 559 F.3d at 1278. An egg producer was not singled out by a health regulation when the regulation "applied to almost any egg producer in the United States," although the regulation only concerned those farms whose flocks had tested positive for salmonella. *Id.* The government's well-established authority to regulate the health and safety of food weighed against finding a regulatory taking. *Id.* at 1278-82.

Similarly, there is no indication that the plaintiffs in this case were unfairly targeted. The MPRA applies to all pension plans, even though only those in "critical and declining" status under the MPRA may apply to reduce benefits. As of April 10, 2023, 48 pension plans have applied to Treasury to suspend benefits under the MPRA.[14] Treasury has approved 18 of those applications. Seven applications were denied, and the remainder were withdrawn. The plaintiffs are not uniquely situated; rather, Congress has adjusted the "anti-cutback" rule for all participants and beneficiaries of multiemployer pension plans. Congress has the well-established authority to regulate multiemployer pension plans. *See Connolly*, 475 U.S. at 226-27 (noting that pension plans "were the objects of legislative concern long before the passage of ERISA in 1974"). Congress chose to address a familiar problem of the solvency of multiemployer pension plans using new tools and procedures in the MPRA.

The plaintiffs cite depositions of a Treasury official and the designated Teamsters Fund deponent to argue that the cuts to the plaintiffs' benefits were novel and disfavored retirees of pension funds. (ECF 164 at 35.) The novelty of the MPRA and the particular amendments to the plan, however, does not equate to a compensable taking of the plaintiffs' benefits under the fifth amendment. Threats to the stability and solvency of pension plans are longstanding. Indeed, it was in responding to such threats almost 50 years ago that Congress enacted ERISA and more than 40 years ago that Congress enacted the MPPAA. The threats to the solvency of multiemployer pension plans have not abated. Demographic changes, longer life spans, and changes to the workforce, among other factors, have put the retirements of millions of workers at risk. The novelty of an approach Congress tries in addressing a public policy problem does not of itself amount to a compensable taking.

---

[14] Applications for Benefit Suspension, U.S. Department of the Treasury, https://home.treasury.gov/services/the-multiemployer-pension-reform-act-of-2014/applications-for-benefit-suspension (last visited Apr. 10, 2023).

The character of the government action of amending ERISA does not rise to a taking. Rather, Congress was acting within its constitutional authority to amend ERISA and to adjust reasonably the benefits and burdens of the regulatory scheme in an attempt to preserve funds' financial stability; the plaintiffs have not borne an undue share of the burden of maintaining the solvency of the Teamsters Fund.

### 4. Balancing the Factors

None of the three *Penn Central* factors, alone or together, supports the existence of a regulatory taking. The plaintiffs have not demonstrated that the economic impact was sufficiently severe to support a finding that a taking occurred because most of them have had their benefits restored and received a lump sum to compensate for the suspension of benefits. Although the estates of participants and beneficiaries who have died have received smaller or no such payments, the economic impact of the MPRA-authorized benefit suspension to them still does not rise to the level of a taking under applicable precedents.

The plaintiffs also have not demonstrated government interference with their distinct investment-backed expectations sufficient to give rise to a taking. The plaintiffs have shown that they had reasonable investment-backed expectations in continuing to receive their pension benefits, but the government did not unduly interfere with those expectations. The government action merely ensured the continued solvency of the Teamsters Fund for the benefit of all its participants and beneficiaries.

Finally, the character of the government action does not support a taking. Congress has the power to amend ERISA and regulate multiemployer pension plans. The plaintiffs neither were targeted nor bore a disproportionate share of the burden of maintaining the Teamsters Fund's solvency. Rather, Congress modestly expanded a pre-existing condition on the plaintiffs' receipt of their pension benefits through a narrowing of the "anti-cutback" rule.

Although the plaintiffs argue that Congress and pension plans had many other tools at their disposal to solve the familiar problem of multiemployer-pension-plan funding, a plan could only suspend benefits under the MPRA after trying all other available options to avoid insolvency. *See* 29 U.S.C. § 1085(e)(9)(C)(ii). The suspension of benefits under the MPRA was already a last-ditch effort to maintain the solvency of pension plans.

The plaintiffs present a very sympathetic claim; they did everything right, worked hard, and provided for their retirements. They did nothing wrong and yet, through no fault of their own, suffered a significant loss to their retirement earnings for several years. Congress ultimately responded to the sympathetic case presented by the plaintiffs and retirees of other pension plans that had received authorizations to reduce their benefits under the MPRA. That balancing of the burdens and benefits of limited economic resources is peculiarly suited to the representative branches of government. Accepting the plaintiffs' arguments, however, would leave Congress with a binomial choice: (1) allow pension plans to become insolvent, in which case beneficiaries would receive a fraction of what they received under the MPRA, or (2) bail out pension plans at taxpayer expense. Initially, Congress chose a third option. Under the MPRA, pension plans could adjust benefits to avoid insolvency altogether. Ultimately, under the

ARPA, Congress made the policy decision to bail out pension plans and their participants and beneficiaries, although the plaintiffs maintain that they are still owed interest and payments to estates of deceased participants and beneficiaries.

The plaintiffs effectively seek to chisel Congress's policy choice to bail out the Teamsters Fund in constitutional stone under the takings clause of the fifth amendment. The Court, however, is guided by the principle that in areas of the law committed to legislative discretion, when Congress's "decisions are mistaken as a matter of policy, it is for Congress to change them." *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 427 (1985). "It is Congress's job to enact policy and it is [the courts'] job to follow the policy Congress has prescribed." *SAS Inst., Inc. v. Iancu*, __U.S. __, 138 S. Ct. 1348, 1358 (2018).

Accepting the plaintiffs' theory of liability here would tie the hands of policy makers and require as a constitutional matter that taxpayers become the insurers of all pension benefits. Congress rejected that choice in the MPRA and then adopted it in the ARPA, but those choices are best left to the discretion of Congress. Pension policy should not be ossified within a constitutional straight jacket. The "government may execute laws or programs that adversely affect recognized economic values," without effectuating a taking. *Penn Central*, 438 U.S. at 124. Rewriting ERISA policy using the takings clause of the fifth amendment would be an improper exercise of judicial authority.

## VI. CONCLUSION

The physical-takings test does not apply to the plaintiffs' claims. Supreme Court precedents reject the application of the physical-takings test to ERISA amendments applicable to multiemployer pension plans when the government seizes nothing for its own use. The government in this case has appropriated nothing for its own use; rather, it altered the governing regulatory framework to permit the Teamsters Fund to reduce the plaintiffs' benefits to avoid insolvency. Finally, the plaintiffs' property has been neither appropriated nor occupied unconstitutionally because the Teamsters Fund trustees have always had the right to amend the plan documents in accordance with evolving legal requirements, especially as related to financial stability. The plaintiffs' effort to apply the physical-takings test to their claims is rejected.

The plaintiffs have also failed to show that a regulatory taking has occurred. The economic impact to the plaintiffs is not enough to support a finding that a regulatory taking has occurred, there was minimal government interference with their reasonable investment-backed expectations, and the character of the government action was relatively unobtrusive.

The defendant's motion for summary judgment is granted, and the plaintiffs' motion for summary judgment is denied. The plaintiffs' motion to certify conditional sub-classes is denied as moot. The Court will issue an order in accordance with this memorandum opinion.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**