2023-1956

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

WILLIAM KING, ANTHONY GUGLIUZZA, STEPHEN DARDZINSKI, on behalf of themselves and on behalf of a class of others similarly situated,
Plaintiffs-Appellants,

v.

UNITED STATES,
Defendant-Appellee.

Appeal from the United States Court of Federal Claims
in No. 1:18-cv-01115-RAH, Judge Richard A. Hertling

# BRIEF FOR THE UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

ERIC P. BRUSKIN
Assistant Director

GEOFFREY M. LONG
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480,
Washington, D.C. 20044
Telephone: (202) 307-0159

January 25, 2024

Attorneys for Defendant-Appellee

TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT PURSUANT TO FEDERAL CIRCUIT RULE 47.5........................x

INTRODUCTION ........................................................................................1

STATEMENT OF THE ISSUES....................................................................4

STATEMENT OF THE CASE........................................................................4

I. Nature Of The Case.........................................................................4

II. Appellants' Pension Plan And Related Statutory Provisions ...............5

III. Congress Enacts The Multiemployer Pension Reform Act of 2014.....9

IV. The Fund Amends Its Plan To Avoid Insolvency..............................12

V. The United States Provides $1.3 Billion In Financial Assistance To The Fund, And Appellants' Suspended Benefits Are Repaid............14

VI. Appellants' Lawsuit ........................................................................15

SUMMARY OF THE ARGUMENT .............................................................17

ARGUMENT...............................................................................................19

I. Standard Of Review ........................................................................19

II. Appellants Have Not Identified A Cognizable Fifth Amendment Property Interest ..........................................................................20

A. Appellants Have No Property Interest In ERISA's Anti-Cutback Rule...............................................................21

B. The Vesting Of Appellants' Pension Rights Under ERISA Does Not Support Their Assertion Of A Cognizable Property Interest ..........................................................................25

C. The Precedents Relied On By The Trial Court To Find A Property Interest Are Distinguishable......................................28

III. The Fund's Plan Amendment Does Not Give Rise To A Physical Taking ....................................................................................31

A. The Court Should Reject Appellants' Novel Physical Taking Theory ....................................................................................31

B. *Connolly* And *Concrete Pipe* Confirm That An Alleged Interference With Contractual Rights Is Not Susceptible To A Physical Taking Analysis ....................................................36

D. If The Court Concludes That A *Per Se* Test Should Apply, The Matter Must Be Remanded To The Trial Court To Determine Whether Just Compensation Is Due ......................................41

IV. Appellants Cannot Demonstrate A Regulatory Taking ......................42

A. There Has Been No Categorical Regulatory Taking ................42

B. Appellants Cannot Prove A Taking Based On The *Penn Central* Factors ....................................................................................44

1. Appellants Cannot Not Demonstrate Serious Financial Loss ..........................................................................................45

2. Appellants Could Not Reasonably Expect That ERISA Would Not Be Amended To Prevent Pension Plan Insolvency ..................................................................................49

3. MPRA Is A Tailored Effort To Avoid The Dire Consequences Arising From Multiemployer Pension Plan Failure ..........................................................................................56

4. None Of The *Penn Central* Factors Favor The Appellants, And Therefore They Have Not Demonstrated A Regulatory Taking ......................................................................60

CONCLUSION ......................................................................................60

CERTIFICATE OF COMPLIANCE ......................................................62

# TABLE OF AUTHORITIES

## Cases

*A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142 (Fed. Cir. 2014) ....... 30, 43

*Acceptance Ins. Cos. v. United States*, 583 F.3d 849 (Fed. Cir. 2009.....................20

*Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206 (Fed. Cir. 2005)...........31

*Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981)............................. 22, 25

*Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363 (Fed. Cir. 2004) ...........20

*Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344 (Fed. Cir. 2020) .............49

*Appolo Fuels, Inc. v. United States*, 381 F.3d 1338 (Fed. Cir. 2004) .............. 49, 50

*Aviation & Gen. Ins. Co., Ltd. v. United States*, 882 F.3d 1088 (Fed. Cir. 2018)...56

*Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360 (Fed. Cir. 2004) .............46

*Belk v. United States*, 858 F.2d 706 (Fed. Cir. 1988)............................................56

*Biafora v. United States*, 773 F.3d 1326 (Fed. Cir. 2014)......................................21

*Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987)...............................45

*Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41 (1986)...........................................................................................24

*Bowles v. Willingham,* 321 U.S. 503 (1944)..........................................................37

*Branch v. United States*, 69 F.3d 1571 (1995).......................................... 18, 23, 24

*Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003)............ 34, 35, 41

*Buffalo Teachers Federation v. Tobe*, 464 F.3d 362 (2d Cir. 2006) .......................38

*CCA Assocs. v. United States*, 667 F.3d 1239 (Fed. Cir. 2011) ....................... 46, 47

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ........................................32

*Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 746 (2004) .........................6

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) .............. passim

*Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed. Cir. 2001) .......55

*Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602 (1993) ................ 16, 24, 37

*Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211 (1986) .............. passim

*Conti v. United States*, 291 F.3d 1334 (Fed. Cir. 2002) ........................................20

*E. Enters. v. Apfel*, 524 U.S. 498 (1998)................................................................38

*Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380 (1947)...........................................52

*Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326 (Fed. Cir. 2012)................................................................... 15, 20

*Hendler v. United States*, 175 F.3d 1374 (Fed. Cir. 1999).............................. 41, 42

*Horne v. Department of Agriculture*, 576 U.S. 350 (2015)...................................42

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) .........................................33

*King v. United States*, 159 Fed. Cl. 450 (2022) .......................................................5

*King v. United States*, 165 Fed. Cl. 613 (2023) .......................................................5

*Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013) .........................................................................................40

*Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005) ............................... 45, 57, 58

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) .........................................................................................35

*Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331 (Fed. Cir. 2018).......................................................................31

*Loveladies Harbor v. United States*, 28 F.3d 1171 (Fed. Cir. 1994)............... 46, 49

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) .................. 16, 57

*Maritrans Inc. v. United States*, 342 F.3d 1344 (Fed. Cir. 2003)...........................45

*Munn v. Illinois*, 94 U.S. 113 (1876) .............................................................. 18, 23

*Murr v. Wisconsin*, 137 S. Ct. 1933 (2017) ..................................................... 46, 47

*Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359 (1980) ............25

*Nat. Mining Assoc. v. Babbitt*, 172 F.3d 906 (D.C. Cir. 1999) ..............................39

*Norman v. United States*, 429 F.3d 1081 (Fed. Cir. 2005) .............................. 43, 44

*Northrop Grumman Computing Sys., Inc. v. United States*,
823 F.3d 1364 (Fed. Cir. 2016)..........................................................................19

*Omnia Com. Co. v. United States,* 261 U.S. 502 (1923) ........................................37

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001)...................................................32

*Penn Central Transportation Co. v. City of New York*,
438 U.S. 104 (1978)........................................................................... passim

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) ........................................57

*Perelman v. Perelman*, 793 F.3d 368 (3d Cir. 2015) .............................................33

*Phillips v. Washington Legal Foundation,* 524 U.S. 156 (1998) .................... 34, 35

*Piszel v. United States*, 833 F.3d 1366 (Fed. Cir. 2016)................................ passim

*Reoforce, Inc. v. United States*, 853 F.3d 1249 (Fed. Cir. 2017) .................... 45, 58

*Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177 (Fed. Cir. 2004)..............46

*Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260 (Fed. Cir. 2009)........ 57, 58

*Stewart v. Nat'l Shopmen Pension Fund*, 730 F.2d 1552 (D.C. Cir. 1984) ............26

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002)..................................................................... 31, 32, 40

*Taylor v. United States*, 959 F.3d 1081 (Fed. Cir. 2020) .......................................49

*Tyler v. Hennepin County*, 598 U.S. 631 (2023) ....................................................40

*United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945).....................................20

*Webb's Fabulous Pharmacies v. Beckwith, Inc.*, 449 U.S. 155 (1980)....................39

*Welty v. United States*, 926 F.3d 1319 (Fed. Cir. 2019)..........................................41

*Yancey v. United States,* 915 F.2d 1534 (Fed. Cir. 1990)........................................46

Statutes

26 U.S.C. § 401(a)(7)..........................................................................................8

26 U.S.C. § 411(d)(6)...................................................................................... 8, 27

26 U.S.C. § 411(d)(6)(A)................................................................................ 8, 23

26 U.S.C. § 418E(a)..............................................................................................8

26 U.S.C. § 432(e)(9)..........................................................................................10

26 U.S.C. § 432(e)(9)(A)................................................................................ 10, 27

26 U.S.C. § 432(e)(9)(I)(iii)................................................................................12

26 U.S.C. § 432(k)(2)(A)(i)................................................................................14

26 U.S.C. § 432(k)(2)(A)(ii)...............................................................................14

29 U.S.C. § 1001...................................................................................................1

29 U.S.C. § 1001(a).............................................................................................53

29 U.S.C. § 1001a(b)(2).......................................................................................54

29 U.S.C. § 1001a(c)...........................................................................................54

29 U.S.C. § 1002(19)...........................................................................................25

29 U.S.C. § 1002(23)...........................................................................................22

29 U.S.C. § 1053(a)....................................................................................... 22, 25

29 U.S.C. § 1053(a)(2).........................................................................................22

29 U.S.C. § 1054..................................................................................................26

29 U.S.C. § 1054..................................................................................................22

29 U.S.C. § 1054(b)(1) ... 22

29 U.S.C. § 1054(g) ... 2, 23

29 U.S.C. § 1054(g)(1) ... 8, 26

29 U.S.C. § 1085(b)(6) ... 10

29 U.S.C. § 1085(e)(8)(A)(i) ... 9

29 U.S.C. § 1085(e)(9) ... 10

29 U.S.C. § 1085(e)(9)(A) ... 9, 10, 26

29 U.S.C. § 1085(e)(9)(B)(i) ... 10

29 U.S.C. § 1085(e)(9)(B)(iii) ... 12

29 U.S.C. § 1085(e)(9)(D)(i) ... 10, 55

29 U.S.C. § 1085(e)(9)(D)(ii) ... 11

29 U.S.C. § 1085(e)(9)(D)(iv) ... 10

29 U.S.C. § 1085(e)(9)(D)(iv) ... 23, 55

29 U.S.C. § 1085(e)(9)(D)(vi) ... 55

29 U.S.C. § 1085(e)(9)(D)(vi) ... 11

29 U.S.C. § 1085(e)(9)(D)(vi)(X) ... 11

29 U.S.C. § 1085(e)(9)(G)(i) ... 11

29 U.S.C. § 1085(e)(9)(H)(v)(I) ... 11

29 U.S.C. § 1085(e)(9)(H)(vi) ... 11

29 U.S.C. § 1085(e)(9)(I)(iii) ... 12

29 U.S.C. § 1132(a) ... 8, 12

29 U.S.C. § 1144 ... 27

29 U.S.C. § 1301(a)(6) ... 9

29 U.S.C. § 1305(i) ....................................................................................14

29 U.S.C. § 1322a ......................................................................................54

29 U.S.C. § 1322a(a).....................................................................................9

29 U.S.C. § 1322a(b) ....................................................................................9

29 U.S.C. § 1432(a)(1).................................................................................14

29 U.S.C. § 1432(a)(2).................................................................................14

29 U.S.C. § 1432(b)(1)(B) ............................................................................14

29 U.S.C. § 1432(j)(1) ..................................................................................14

American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4......................14

Employee Retirement Income Security Act of 1974, Pub. L. 93-406,
88 Stat. 829......................................................................................................1

§ 2(a) ..........................................................................................................53

Multiemployer Pension Plan Amendments Act of 1980 (MPPAA),
Pub. L. No. 96-364, 94 Stat. 1208 ..................................................................36

§ 3(b)(2) .....................................................................................................54

§ 3(c) ..........................................................................................................54

§ 102 ..........................................................................................................54

Multiemployer Pension Reform Act of 2014, Pub. L. No. 113-235,
Div. O, 128 Stat. 2130......................................................................................1

<u>Rules</u>

RCFC 23(c)(3) ..............................................................................................21

<u>Other Authorities</u>

3 Ronald J. Cooke, *ERISA Practice and Procedure* § 7:7 (2023)............................9

Gov't Accountability Officew, "Private Pensions: Multiemployer Plans and PBGC Face Urgent Challenges," , https://www.gao.gov/assets/gao-13-428t.pdf [https://perma.cc/KC3T-96UU] (Mar. 5, 2013)....................................................9

Internal Revenue Service, "Tax Consequences of Plan Disqualification," https://www.irs.gov/retirement-plans/tax-consequences-of-plan-disqualification [https://perma.cc/ZX52-BRKF] (Aug. 28, 2023) .................................................7

## STATEMENT PURSUANT TO FEDERAL CIRCUIT RULE 47.5

No other appeal in or from the same civil action in the trial court was previously before this Court or any other appellate court. Counsel for defendant-appellant, the United States, is not aware of any cases pending before this Court or any other court or agency that will directly affect, or be directly affected by, the Court's decision in this appeal.

## INTRODUCTION

The New York State Teamsters Conference Pension and Retirement Fund (Fund) is a private multiemployer pension fund, governed by the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 829 (codified as amended at 29 U.S.C. § 1001, *et seq.*) (ERISA). In 2016, the Fund was in "critical and declining status," and estimated that it would become insolvent by 2027. Appellants are (or were) retired participants in the Fund.

The Pension Benefit Guaranty Corporation (PBGC) acts as an insurer for pension funds, protecting the benefits of participants and their beneficiaries, although the guaranteed benefits paid to participants of an insolvent fund may be a fraction of the full, pre-insolvency benefits. Due to a growing number of financially threatened multiemployer pension funds, Congress became concerned that the demands on the PBGC's insurance fund would become overwhelming. Thus, in 2014, Congress enacted the Multiemployer Pension Reform Act of 2014, Pub. L. No. 113-235, Div. O, 128 Stat. 2130 (MPRA). MPRA provides pension funds with a means to avoid insolvency by permitting the trustees of a troubled fund to apply to the Department of the Treasury (Treasury) for approval to reduce benefits. The fund must show that that its proposed benefits reductions (known as suspensions) are not greater than necessary to avoid insolvency, that no participant's benefits will be reduced to less than 110 percent of the PBGC-

guaranteed benefit, and that other participant protections are in place. If approved by Treasury, the suspension is put to a vote of participants and, if participants do not vote against the suspension, the Secretary of the Treasury will authorize the fund to go forward. If so authorized, the pension fund's suspension is not subject to ERISA's "anti-cutback rule," 29 U.S.C. § 1054(g), or to a similar provision in the Internal Revenue Code (IRC or Code), both of which generally prohibit plan amendments that reduce accrued benefits.

The Fund applied to suspend benefits, and Treasury authorized the suspension after the participants voted in favor. The suspension went into effect on October 1, 2017, and appellants' monthly benefits were reduced by 29 percent going forward. In November 2022, however, the Government approved "special financial assistance" (SFA) for the Fund. Since then, the Fund has received $1.3 billion in appropriated funds, which is projected to ensure that the Fund can pay all benefits through 2051. As a requirement of the SFA, the suspension ended and the Fund repaid appellants' reduced benefits with SFA funds.

Appellants filed suit at the Court of Federal Claims in 2018, claiming that the United States' authorization of the Fund's benefit suspension amounted to a taking requiring just compensation. Appellants are wrong. As an initial matter, appellants lack a cognizable Fifth Amendment property interest. Although appellants have creatively presented their takings claim, they are at bottom

challenging the provision of MPRA limiting the application of the anti-cutback rule. Precedent makes clear that no one has a property interest in a rule of law, and Congress was free to exempt from the anti-cutback rule private plans' benefit-reducing plan amendments.

Even if there were a property interest, appellants have not demonstrated a taking. Their claims do not sound in physical takings jurisprudence, because the Government did not appropriate money from appellants. Instead, appellants at most were frustrated in their expectation that the Fund would not amend its plan to reduce benefit payments on a going-forward basis. Appellants therefore must show that the Government's actions in authorizing the Fund's plan amendment constitute a taking under the *ad hoc*, multifactor test prescribed in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978) (*Penn Central*), but they cannot. Most significantly, they cannot show the serious financial loss that is a prerequisite to a regulatory taking – 29 percent of their monthly pension benefit is simply insufficient, to say nothing of the fact that their benefits have now been repaid. Moreover, appellants cannot reasonably have expected that their benefits would not be reduced by the Fund to avoid even further reductions resulting from insolvency.

MPRA is a refinement of ERISA by Congress – an adjustment to the benefits and burdens of economic life to ensure the continued viability of the

nation's multiemployer pension funds. The Government helped protect the appellants' pension plan from insolvency by authorizing the Fund to reduce benefits, and then provided SFA to the Fund to repay the reductions. Appellants' claim for even more relief under the Takings Clause cannot succeed.

## STATEMENT OF THE ISSUES

1. Whether appellants' rights under a private multiemployer pension plan included the right to be free of legislative changes to ERISA, such that appellants have demonstrated a cognizable Fifth Amendment property interest as a basis for their takings claim.

2. Where appellants' pension plan was amended by reducing their benefit payments on a going-forward basis, whether the amendment and subsequent foregone payments give rise to a physical taking.

3. Whether appellants suffered a regulatory taking, either as a categorical matter or based on the *ad hoc* analysis prescribed in *Penn Central*.

## STATEMENT OF THE CASE

### I. Nature Of The Case

Plaintiffs-appellants, William King, Anthony Gugliuzza, and Stephen Dardzinski, appeal a judgment of the United States Court of Federal Claims. Appx2.[1] Appellants asserted to the trial court that the actions of the United States

[1] Appellant Anthony Gugluizza has died during the pendency of this appeal. Applnts. Br. at 16, ECF No. 16. We understand that appellants' counsel intends to

in relation to appellants' multiemployer pension plan amounted to a taking of appellants' property, requiring just compensation pursuant to the Fifth Amendment to the United States Constitution. On April 8, 2022, the trial court issued a reported decision denying the Government's partial motion for summary judgment, in which the Government had asserted that appellants lack a cognizable Fifth Amendment property interest. *King v. United States*, 159 Fed. Cl. 450 (2022), Appx10324-10373. On April 20, 2023, the trial court issued a reported decision denying appellants' motion for summary judgment and granting summary judgment to the United States. *King v. United States*, 165 Fed. Cl. 613 (2023), Appx3-46.

## II. Appellants' Pension Plan And Related Statutory Provisions

Appellants are or were retired participants in the Fund. The Fund's plan of benefits was established effective January 1, 1954, pursuant to its trust agreement and plan document. Appx12759. The plan "consists of the Plan document . . . and any amendment thereto," with "certain provisions relating to the plan" contained in a trust agreement and other documents not relevant here. Appx12760-12761. The operative version of the plan document provides that "[t]he general administration of the Plan and the responsibility for carrying out [its] provisions . . . are placed in

---

soon raise this matter with the Court, but that Mr. King and Mr. Dardzinski will remain as appellants irrespective of the resolution of this issue.

the Trustees." Appx12810. The Fund's trust agreement in turn empowers the trustees to demand employer contributions pursuant to collective bargaining agreements, invest those contributions, pay pension benefits, and suspend payment of benefits if warranted by the financial condition of the Fund. Appx12892-12894.

The corpus of employer contributions and other money and property held by the trustees is referred to as the "Fund Estate." Appx12892. The trust agreement limits the right of access to this Fund Estate:

> [No] member of the Union, or any other person who may properly come under the Pension Plan . . . shall have any right, title or interest in or to the Fund Estate or any part thereof, except the right of the member of the Union, or other person, who is covered for pension or retirement benefits, to pension or retirement benefits, subject to such terms and conditions as the Trustees shall have determined for entitlement thereto, and further subject to the limitations, terms and conditions that may or shall be specified in the Pension Plan or in any amendment or amendments thereto . . . .

Appx12894-12895.

In 1976, the Fund's plan document was "amended and completely restated . . . to comply with the applicable requirements of [ERISA] and the [IRC], as amended." Appx12759.[2] The plan document was amended and restated several

---

[2] When Title I of ERISA was enacted in 1974, Title II of ERISA amended the IRC to condition the eligibility of pension plans for preferential tax treatment on compliance with many of the Title I requirements. *See Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 746 (2004). The result was a "curious duplicate

more times, including on January 1, 2015. *Id.* As restated, "[i]t is intended that the Plan be a qualified plan within the meaning of section 401(a) of the Code." Appx12760. Qualified status has tax impacts for the trust, employers, and employees.[3] In addition to the intent that the plan be qualified, the trustees "intended that the Plan operate in accordance with the applicable provisions of the Code, ERISA and regulations issued thereunder." Appx12761.

The plan document is complicated. Among much else, the plan document addresses eligibility and participation, credit for service, and how benefits are paid. "Accrued benefit," a concept at the heart of appellants' takings claim, are defined, in the case of a participant who has reached normal retirement age, as "the monthly pension benefit, payable in the normal form, that would be payable upon the retirement of the Participant as of the date of reference." Appx12762. The normal form of payment is a life annuity, which "provides monthly payments for the life of the Pensioner." Appx12794.

The plan document also provides that "[t]he Trustees may modify or amend the provisions of the Plan at a regular or special meeting." Appx12813.

---

structure" with nearly verbatim replication in the IRC of whole sections of text from Title I of ERISA. *Id.* (quotations omitted).

[3] *See generally* Internal Revenue Service, "Tax Consequences of Plan Disqualification," https://www.irs.gov/retirement-plans/tax-consequences-of-plan-disqualification [https://perma.cc/ZX52-BRKF] (Aug. 28, 2023).

Amendments may not "have the effect of decreasing a Participant's Accrued Benefit in violation of section 411(d)(6) of the [IRC]." *Id.* In turn, § 411(d)(6) of the IRC provides that "[a] plan shall be treated as not satisfying [IRC vesting requirements] if the accrued benefit of a participant is decreased by an amendment of the plan" except in specified circumstances. 26 U.S.C. § 411(d)(6)(A); *see also id.* § 401(a)(7) (providing that trusts that do not comply with IRC § 411 are not qualified).

Like IRC § 411(d)(6), ERISA also prohibits the reduction of accrued benefits, in a provision commonly referred to as the "anti-cutback rule." The rule provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan," except in specified circumstances. 29 U.S.C. § 1054(g)(1). Under ERISA's civil enforcement provisions, *id.* § 1132, participants may have a cause of action to recover benefits due under the terms of the plan, or to enjoin an amendment that violates the terms of the plan or the anti-cutback rule. *See id.* § 1132(a).

There are exceptions to the above-described general statutory prohibition on the reduction of accrued benefits. Pursuant to 26 U.S.C. § 418E(a), insolvent plans may be required to suspend benefits, "notwithstanding" the IRC's vesting requirements in 26 U.S.C. § 411(d)(6). *See also* 29 U.S.C. § 1426(a) (ERISA exception to anti-cutback rule for insolvent plans). Other exceptions to the anti-

cutback rule include certain reductions to early retirement benefits, *id.* § 1085(e)(8)(A)(i), and provisions for a five-year phase-in of benefit improvements. *Id.* § 1322a(b).

When a multiemployer plan becomes insolvent and is unable to pay accrued benefits, the PBGC may step in to guarantee the payment of a basic benefit to each participant and beneficiary. *See* 29 U.S.C. § 1322a(a); *id.* § 1301(a)(6) (definition of "basic benefit"). Set by a statutory formula, this PBGC guaranteed benefit is lower than that to which a participant would be entitled under the terms of the plan. 3 Ronald J. Cooke, *ERISA Practice and Procedure* § 7:7 (2023). For example, appellants' expert opined that the full and unreduced present value of Mr. Dardzinski's monthly pension benefit is $4,116, while his PBGC guaranteed benefit would be $786.50 – an 81 percent reduction. Appx11651-11652.

## III. Congress Enacts The Multiemployer Pension Reform Act of 2014

A number of qualified multiemployer pension plans have recently been at risk of insolvency.[4] In 2014, Congress enacted MPRA, which creates a path to avoid insolvency for multiemployer pension plans that are in "critical and declining status," 29 U.S.C. § 1085(e)(9)(A), which is defined as, among other

[4] *See, e.g.*, Gov't Accountability Office, "Private Pensions: Multiemployer Plans and PBGC Face Urgent Challenges," , https://www.gao.gov/assets/gao-13-428t.pdf [https://perma.cc/KC3T-96UU] (Mar. 5, 2013).

things, a plan that is projected to become insolvent during the current or succeeding 14 plan years (19 years in some instances). *Id.* § 1085(b)(6). MPRA states that notwithstanding § 411(d)(6) of the IRC, "the plan sponsor of a plan in critical and declining status may, by plan amendment, suspend benefits which the sponsor deems appropriate." 26 U.S.C. § 432(e)(9)(A).[5] With respect to ERISA, MPRA similarly provides that "[n]otwithstanding section 1054(g) of [title 29] and subject to [MPRA's requirements], the plan sponsor of a plan in critical and declining status may, by plan amendment, suspend benefits which the sponsor deems appropriate." 29 U.S.C. § 1085(e)(9)(A).

A suspension of benefits is "the temporary or permanent reduction of any current or future payment obligation of the plan to any participant or beneficiary under the plan, whether or not in pay status at the time of the suspension of benefits." *Id.* § 1085(e)(9)(B)(i). MPRA-based suspensions in the aggregate must be "reasonably estimated to achieve, but not materially exceed, the level that is necessary to avoid insolvency." *Id.* § 1085(e)(9)(D)(iv). No participant's payments may be reduced to less than 110 percent of the PBGC guaranteed benefit. *Id.* § 1085(e)(9)(D)(i). The suspensions must be equitably distributed

[5] MPRA made corresponding amendments to ERISA and the IRC, at 29 U.S.C. § 1085(e)(9) and 26 U.S.C. § 432(e)(9), respectively. *See supra* at 6 n.2. In this brief we generally cite to the ERISA provisions, except where the IRC is specifically relevant.

across the participant and beneficiary population, considering, for example, age, years in pay status, and any discrepancies between active and retiree benefits. *See id.* § 1085(e)(9)(D)(vi). The plan may also consider the extent to which active participants could withdraw support for the plan, leading to potential employer withdrawals and the risk of additional benefit reductions. *Id.* § 1085(e)(9)(D)(vi)(X). Participants and beneficiaries over the age of 75 at the time of suspension are subject to lesser reductions, and those over the age of 80 at suspension are not subject to reductions. *See id.* § 1085(e)(9)(D)(ii).

To implement a benefit suspension, the plan sponsor first must apply to Treasury. *Id.* § 1085(e)(9)(G)(i). After a notice and comment period, the Secretary, in consultation with the PBGC and the Department of Labor (DOL), is required to approve the application "upon finding that the plan is eligible for the suspensions and has satisfied the [statutory criteria]." *Id.* If approved, Treasury conducts a vote for participants to approve or reject the proposed suspension. If a majority of participants and beneficiaries does not vote to reject the proposed suspension, then Treasury, in consultation with PBGC and DOL, must authorize the suspension. *Id.* § 1085(e)(9)(H)(vi).[6]

[6] There is an exception to the dispositive nature of the participant vote. If participants vote to reject suspensions, then the Secretary of the Treasury must determine whether the plan is systemically important. 29 U.S.C. § 1085(e)(9)(H)(v)(I). If so, the Secretary must permit the suspension, potentially

If a plan suspends benefits in accordance with MPRA, "[t]he plan shall not be liable for any benefit payments not made as a result of a suspension of benefits." *Id.* § 1085(e)(9)(B)(iii). In its provisions addressing judicial review, MPRA further provides participants and beneficiaries affected by a benefit suspension "shall not have a cause of action" under subchapter I of ERISA. *Id.* § 1085(e)(9)(I)(iii); *see also* 26 U.S.C. § 432(e)(9)(I)(iii) (no cause of action under the IRC). The MPRA thus removes the possibility of suing under ERISA's civil enforcement provisions, codified at 29 U.S.C. § 1132(a).

## IV. The Fund Amends Its Plan To Avoid Insolvency

By 2016, the Fund was in critical and declining status – projected to become insolvent by 2027. *See* Appx13015. In September 2016, the Fund submitted an MPRA application to Treasury. The Fund withdrew that application and, in May 2017, submitted a revised application, proposing benefit reductions of 18 percent for actively employed plan participants, and 29 percent for retirees. Appx13013.

The Secretary approved this second application and the proposed suspension proceeded to a vote of plan participants. Appx13057-13058. A majority of participants did not vote to reject the reductions under the voting rules established

---

with modifications. *See id.* Here, the Fund's participants did not vote to reject the suspensions.

in MPRA. Appx13055-13056. The Secretary therefore authorized the Fund to amend its plan documents to implement the proposed suspension. *See id.*

Following Treasury's authorization, the Fund's trustees amended the plan effective October 1, 2017. Appx12881-12884. The trustees noted that Article 10 of the plan document "provides that the Fund's Board of Trustees may modify or amend the Plan at a regular or special meeting." Appx12881. They further explained that it was their "intent . . . to amend the plan to implement benefit suspensions in compliance with [MPRA]." *Id.* The amendment added a new Section 5.07 to the plan document, providing that "[n]otwithstanding any other provisions of this Plan to the contrary . . . all Affected Participants . . . shall have their pension benefit reduced in accordance with the provisions of Article 18." Appx12882.

The new Article 18 in turn implemented a "Pension Preservation Plan" to "reduce the benefits of Affected Participants in compliance with the conditions and limitations on suspensions set forth under" MPRA and its implementing regulations. Appx12882. Appellants, as "Non-Active Participants," would each receive an adjusted monthly benefit, reflecting a 29-percent reduction to their pre-suspension monthly benefit levels. Appx12883. Appellants were then paid a reduced monthly benefit beginning in October 2017.

## V. The United States Provides $1.3 Billion In Financial Assistance To The Fund, And Appellants' Suspended Benefits Are Repaid

On March 11, 2021, Congress enacted the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 (ARPA). ARPA created a new provision in ERISA, providing that the PBGC shall provide SFA to eligible multiemployer plans. 29 U.S.C. § 1432(a)(1). SFA grants are funded by appropriations from Treasury's general fund, rather than from the PBGC's existing multiemployer insurance fund, and need not be repaid by the plans receiving them. *See id.* §§ 1305(i), 1432(a)(2). A plan is eligible for SFA if a suspension of benefits has been approved under MPRA. *Id.* § 1432(b)(1)(B). The amount of SFA generally shall be such amount required for the plan to pay all benefits due through the plan year ending in 2051. *See id.* § 1432(j)(1).

ARPA also amended the IRC to provide that a plan receiving SFA must reinstate any benefits suspended under MPRA. 26 U.S.C. § 432(k)(2)(A)(i). Plans additionally must provide make-up payments for benefits previously suspended to any participants or beneficiaries in pay status as of the date of SFA. *Id.* § 432(k)(2)(A)(ii).

The Fund submitted an SFA application that was approved. Appx12567-12569. On December 8, 2022, the PBGC transferred $963.4 million to the Fund. Appx12599. The Fund announced that on January 1, 2023, retiree benefits would be restored to pre-suspension levels, with a retroactive payment for December

2022. *Id.* On March 1, 2023, the Fund was to provide a make-up payment to account for suspended benefits. *Id.* Mr. King, for example, was to receive a payment of $76,976.72. Appx12591-12595. The Fund has neither paid interest on restored benefits nor restored benefits to the extent a participant or beneficiary died between October 1, 2017, and December 8, 2022.

With the approval of a later, supplemental SFA application, the total SFA provided to the Fund totals more than $1.3 billion.[7]

VI. Appellants' Lawsuit

After the Fund's benefit suspension took effect in October 2017, appellants sued at the Court of Federal Claims, alleging that the United States had engaged in a taking without just compensation in violation of the Fifth Amendment. The United States moved for summary judgment, asserting that appellants lacked a cognizable Fifth Amendment property interest that could be the subject of a taking – the first inquiry in this Court's two-step takings analysis. *See Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1329 (Fed. Cir. 2012). On April 8, 2022, the trial court denied our motion, holding that appellants had identified a

[7] New York State Teamsters Conference Pension & Retirement Fund, "Final SFA Payment Participant Communication," https://www.nystpensionfund.org/media/1244/20230502-nyst-final-sfa-payment-participant-communication.pdf [https://perma.cc/UKE7-Z95F] (May 2, 2023).

cognizable Fifth Amendment property interest in "their right to unreduced benefits under their vested pensions according to plan documents." Appx10373.

On August 29, 2022, the trial court certified a class of inactive Fund participants and beneficiaries whose benefit payments were reduced pursuant to the Fund's MPRA plan amendment. Appx10471-10472. Although a class was certified, no class notice was undertaken, and no one opted into the class before the entry of judgment

On April 20, 2023, the trial court denied appellants' motion for summary judgment on the existence of a taking and granted our cross-motion. Appx3-46. The trial court held that appellants were precluded from establishing a physical taking, in part due to the Supreme Court's decisions in *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211 (1986), and *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602 (1993). *See* Appx33.

The trial court further concluded that appellants could not demonstrate a regulatory taking. The court first held that there was no categorical regulatory taking of the sort described in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). Appx34. Nor had there been a regulatory taking under the multifactor *Penn Central* inquiry, as "[n]one of the three *Penn Central* factors, alone or together, support[ed] the existence of a regulatory taking." Appx45. With

respect to economic impact, (1) appellants had already had their benefits restored and had received a lump sum to repay the suspended benefits, and (2) precedent suggested that, even without considering restoration, a 29-percent diminution was unlikely to support a taking. Appx36. Nor, the trial court held, had appellants demonstrated that the Government unduly interfered with appellants' reasonable, investment-backed expectations. Appx41. With respect to the character of the Government action, the trial court held that "Congress has the power to amend ERISA and regulate multiemployer pension plans," and that "[t]he plaintiffs neither were targeted nor bore a disproportionate share of the burden of maintaining the Teamsters Fund's solvency." Appx45. Instead, "Congress modestly expanded a pre-existing condition on the plaintiffs' receipt of their pension benefits through a narrowing of the 'anti-cutback' rule." *Id.*

The trial court ordered that judgment be entered in the Government's favor, Appx1, which occurred on April 20, 2023. Appx2. This appeal timely followed.

## SUMMARY OF THE ARGUMENT

The first step of the takings analysis asks whether the plaintiff has identified a cognizable Fifth Amendment property interest. The United States has not appealed the finding of a cognizable interest, but the trial court's holding is erroneous, which provides an alternative basis for affirmance. Although appellants inarguably possess certain rights arising from their participation in the Fund's

ERISA-governed pension plan, that bundle of rights does not include Fifth Amendment protection from statutory amendments to ERISA's general prohibition on benefit-reducing plan amendments. "[N]o one is considered to have a property interest in a rule of law." *Branch v. United States*, 69 F.3d 1571, 1577-78 (1995) (citing *Munn v. Illinois*, 94 U.S. 113, 134 (1876)). Appellants thus have no cognizable property interest in the scope of ERISA's anti-cutback rule, as Congress was free to alter the scope of that rule. Appellants' reliance on the vested nature of their pensions is also unavailing because vesting under ERISA is discrete from benefit accrual rules, and the vested nature of appellants' benefits was not affected by the Fund's plan amendment.

Because appellants lack a cognizable Fifth Amendment property interest, the trial court need not have reached the second step of the takings analysis. Having reached the question, however, the trial court correctly concluded that no taking occurred. Treasury's authorization of the Fund's application to suspend benefits does not implicate physical takings jurisprudence because appellants never owned the money contained in the Fund's trust estate. Appellants at most lost an expectation of future benefits that were not paid due to the Fund's plan amendment. It is the loss of that future performance by the Fund, rather than the loss of any money, that is at the heart of appellants' takings claim. Physical takings jurisprudence is therefore inapplicable.

Nor have appellants proven a regulatory taking. No categorical regulatory taking has occurred because the Government's actions have not denied appellants all economically beneficial use of their property. The factors identified in *Penn Central* also militate against a taking. Appellants cannot show serious financial loss – this Court has never found severe economic impact on facts like these, where appellants lost at most 29 percent of their monthly pension payments for a limited time. Appellants also cannot have formed reasonable, investment-backed expectations that ERISA would not be amended in a manner designed to avoid or mitigate the drastic effects of pension plans becoming insolvent, while still protecting participants and beneficiaries. And MPRA is a generally applicable statute that does not single out appellants in a manner that this Court or the Supreme Court have found to be constitutionally significant. The judgment of the trial court should be affirmed.

## ARGUMENT

### I. Standard Of Review

This Court reviews grants of summary judgment by the Court of Federal Claims *de novo*, drawing all factual inferences in favor of the nonmovant. *Northrop Grumman Computing Sys., Inc. v. United States*, 823 F.3d 1364, 1367 (Fed. Cir. 2016).

## II. Appellants Have Not Identified A Cognizable Fifth Amendment Property Interest

"When evaluating whether governmental action constitutes a taking, a court employs a two-part test." *Hearts Bluff Game Ranch*, 669 F.3d at 1329 (quoting *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009), and citing *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1371 (Fed. Cir. 2004)). "First, as a threshold matter, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Hearts Bluff Game Ranch*, 669 F.3d at 1329. "Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" *Id.* The Court may not reach the second step "without first identifying a cognizable property interest." *Id.* (quotations omitted).

This Court will "determine whether an asserted right is one of the rights in the bundle of sticks of property rights that inheres in a *res* by looking to 'existing rules or understandings' and 'background principles' derived from an independent source such as state, federal, or common law." *Am. Pelagic*, 379 F.3d at 1376. In other words, "property interests for purposes of the Fifth Amendment flow from 'the citizen's relation to the physical thing.'" *Conti v. United States*, 291 F.3d 1334, 1341 (Fed. Cir. 2002) (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 383 (1945)).

In its first summary judgment ruling, the trial court held that appellants had identified a cognizable Fifth Amendment property interest, namely their "right to unreduced benefits under their vested pensions according to plan documents." Appx10373. Although we have not appealed that holding, it is erroneous, and the lack of a property interest provides an alternative basis for this Court to affirm the judgment. *See Biafora v. United States*, 773 F.3d 1326, 1334 (Fed. Cir. 2014).[8]

A. Appellants Have No Property Interest In ERISA's Anti-Cutback Rule

The Fund's multiemployer pension plan is a private agreement that has been governed by ERISA and the IRC for almost 50 years. In 1976, the Fund's plan document was "amended and completely restated . . . to comply with the applicable requirements of [ERISA] and the [IRC] of 1954, as amended." Appx12759. As set forth in the operative version of the plan document, "[i]t is

[8] As a preliminary matter, we note that the only appellants in this case are William King, Steven Dardzinski, and potentially the personal representative of Anthony Gugliuzza. *See supra* at 2 n.1. No class opt-in process was completed at the trial court. The trial court's judgment accordingly does not state that anyone was included in the class. Appx2; *cf.* RCFC 23(c)(3). While the summary judgment decision refers to "class members," *e.g.*, Appx12, and the court stated that it was considering the claims of the deceased participants "that are part of the certified class," Appx17, the court also made clear that in fact no class notice process was completed, and that "potential class members have yet to opt into the case." Appx17. Thus, appellants are mistaken in their repeated references to "Class Members." *See* Applnts. Br. at 4, 17, 19, 28. 41, 42, 50, 56. Similarly, the estate of Robert Campbell is not a party to this matter. *See id.* at 19 n. 7; *contra* Appx36.

intended that the Plan be a qualified plan within the meaning of section 401(a) of the Code." Appx12760. In addition, the trustees intend the plan to "operate in accordance with the applicable provisions of the Code, ERISA and regulations issued thereunder." Appx12761.

ERISA contains many important protections for pension plan participants and beneficiaries. These include ERISA's minimum vesting standards, which require pension plans to "provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). ERISA also imposes minimum requirements for benefit accrual, *i.e.*, the annual benefit due to a retiree under the plan. *Id.* § 1054; *see id.* § 1002(23) (defining accrued benefits). These provisions give plans latitude to develop their own vesting and benefit accrual rules. "Rather than imposing mandatory pension levels or methods for calculating benefits, Congress in ERISA set outer bounds on permissible accrual practices, 29 U.S.C. § 1054(b)(1), and specified . . . alternative[s] . . . for the vesting of pension rights, 29 U.S.C. § 1053(a)(2)." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 512 (1981).

Before 2014, the congressionally created outer bounds of multiemployer plan actions permissible under ERISA and the IRC provided only limited circumstances in which a plan amendment could reduce benefits. MPRA altered those outer bounds, permitting prospective, benefit-reducing amendments to avoid

insolvency. *See* 29 U.S.C. § 1085(e)(9)(D)(iv). Whether to suspend benefits is a private choice, to be made by a plan's trustees and ratified through a vote of participants and beneficiaries.[9] If, however, a fund decides to suspend benefits, and all MPRA requirements are met, the implementing plan amendment will not violate ERISA's anti-cutback rule, 29 U.S.C. § 1054(g), or the equivalent IRC provision, 26 U.S.C. § 411(d)(6)(A).

Thus understood, MPRA merely adjusted, in a limited way, Federal laws designed to preserve accrued benefits. *See* Appx26 (describing MPRA as "a modest extension of . . . exceptions to the 'anti-cutback' rule"). Importantly, the possibility that Congress might adjust accrued benefit protections is an inherent feature of appellants' pension rights, which are based on ERISA and the IRC as the governing benefits law for the Fund's pension plan. Congress's prerogative to pare back legislative protections, such as the anti-cutback rule, without incurring takings liability is well-settled in takings jurisprudence. "[A]s the Supreme Court has explained, . . . no one is considered to have a property interest in a rule of law." *Branch*, 69 F.3d at 1577-78 (citing *Munn v. Illinois*, 94 U.S. 113, 134 (1876)). "To treat every statutory change in the rules of liability as a taking would cripple the

[9] Appellants do not here challenge the trial court's conclusions that the Fund was not coerced into suspending benefits, and that the Fund was not acting as the Government's agent. Applnts. Br. at 18 n.5.

ability of federal and state legislatures to adjust the benefits and burdens of economic life." *Branch*, 69 F.3d at 1578. Instead, "the Supreme Court has regarded the Takings Clause as a first cousin of the doctrine of substantive due process and has given broad scope to legislative prerogatives to modify legal rules without having to compensate affected parties for the costs resulting from the changes." *Id.* (citing *Connolly*, 475 U.S. at 223, and *Concrete Pipe*, 508 U.S. at 641).

For example, in *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41 (1986), Congress had changed a section of the Social Security Act to prohibit states from terminating their prior agreements with the Government to participate in the Social Security system. The Supreme Court held that the statutory and contractual right to withdraw from the system that California previously enjoyed did not rise to the level of property within the meaning of the Fifth Amendment. The Court held that the termination provision "was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare." *Bowen*, 477 U.S. at 55. That principle carries additional force here because, unlike in *Bowen*, there is no agreement between the United States and appellants that their benefits would never be reduced. Accordingly, the Government remained free as a regulator to alter the scope of the anti-cutback rule to protect troubled multiemployer plans. Moreover,

as the trial court noted, "the possibility that the plaintiffs' pension benefits could be revised, including being curtailed, inhered in the property interest." Appx26. Appellants thus have no property interest in the anti-cutback rule, and the trial court should have granted judgment to the Government on this basis.

### B. The Vesting Of Appellants' Pension Rights Under ERISA Does Not Support Their Assertion Of A Cognizable Property Interest

Appellants are likely to reply that they do not claim a property interest in ERISA, but rather in their vested pensions. *See* Applnts. Br. at 22 (asserting that "*vesting* answers [the] question" of the property interest). Appellants' focus on vesting conflates two fundamentally distinct concepts in ERISA, namely vesting and benefit accrual protections. "Vesting" is the point at which an employee's right to his normal retirement benefit becomes "nonforfeitable." 29 U.S.C. § 1053(a). "Nonforfeitable" means a "claim" to that part of an immediate or deferred benefit under a pension plan that arises from the participant's service, which is unconditional, and which is legally enforceable against the plan. *Id.* § 1002(19). "[I]t is the claim to the benefit, rather than the benefit itself, that must be 'unconditional' and 'legally enforceable against the plan.'" *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 371 (1980). Thus, ERISA "assures that an employee's claim to the protected benefit is legally enforceable, but it does not guarantee a particular amount or a method for calculating the benefit." *Alessi*, 451 U.S. at 512.

In contrast, 29 U.S.C. § 1054 governs benefit accrual standards under ERISA. "'[V]esting' governs when an employee has a *right* to a pension; 'accrued benefit' is used in calculating the *amount* of the benefit to which the employee is entitled." *Stewart v. Nat'l Shopmen Pension Fund*, 730 F.2d 1552, 1562 (D.C. Cir. 1984). Set within ERISA's benefit accrual standards is the anti-cutback rule, which again provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan," except in certain circumstances. 29 U.S.C. § 1054(g)(1).

It is ERISA's benefit accrual requirements, rather than its vesting requirements, that are implicated by the Fund's plan amendment reducing appellants' monthly benefit payments by 29 percent. Even after the benefit suspensions, appellants always had a *right* to their pensions, *i.e.*, to claim whatever benefits were due pursuant to plan documents; what changed was the *amount* of that claim. Put another way, absent MPRA, appellants could have challenged the Fund's October 2017 plan amendment by invoking the anti-cutback rule. But Congress provided that a Treasury-authorized benefit suspension pursuant to MPRA will not violate that rule. 29 U.S.C. § 1085(e)(9)(A).

MPRA's non-impact on the vested nature of appellants' pensions is also apparent in the IRC provisions relating to benefit suspensions. Section 411 of the IRC, like § 1053 in ERISA, provides minimum vesting standards for qualified

trusts. A plan "will not be treated as satisfying" these minimum requirements if the accrued benefit of a participant is decreased by an impermissible amendment. 26 U.S.C. § 411(d)(6). But MPRA provides that authorized suspensions are permissible "[n]otwithstanding section 411(d)(6)." 26 U.S.C. § 432(e)(9)(A). Thus, a MPRA-consistent benefit suspension does not violate the IRC's minimum vesting standards.

As a result, appellants are flatly incorrect that vesting answers the question of the property right. Even as vested participants, appellants are not entitled to any more benefits than the Fund's plan document provides. When the Fund trustees amended the plan effective October 1, 2017, appellants' pensions remained vested, but the benefit payments to which they were entitled changed. Thus, even if the Court finds that appellants have a cognizable property interest in their pensions because they are vested, MPRA did not take that property interest from appellants.

Appellants are not assisted by the footnote in which they cite cases that do not involve ERISA, much less the specific intersection of ERISA's vesting requirements and the anti-cutback rule. Applnts. Br. at 23-24 n.8. Nor does New York law help them, Applnts. Br. at 25-26, because ERISA supersedes state law insofar as it relates to employee benefit plans. 29 U.S.C. § 1144. Even so, appellants assert that the Fund's plan document makes New York State law

applicable, Applnts. Br. at 20, but the plan document is clear that New York law applies only if not "otherwise provided by ERISA." Appx12810.

Finally, appellants' characterization of the Fund's statements about its plan and ERISA, Applnts. Br. at 25-26, do not affect the legal question of whether vesting creates a cognizable property right, or the way benefit suspensions operate. And in any event, the materials that appellants cite appear to be consistent with ERISA, including the Fund's statement that "[w]hen you are vested you earn a non-forfeitable right to a pension benefit." Applnts. Br. at 25 (citing Appx4705-4706). Similarly, the Government materials that appellants cite, at 26-27, are facially consistent with the law as described above.

### C. The Precedents Relied On By The Trial Court To Find A Property Interest Are Distinguishable

The origination of appellants' plan-based rights in ERISA, and the operation of ERISA, distinguish this case from the precedents relied on by the trial court with respect to the property interest. Appx10343-10345. *Piszel v. United States*, 833 F.3d 1366 (Fed. Cir. 2016), involved an employment contract governed by Virginia law. *Id.* at 1372 n.3. The Federal Home Loan Mortgage Corporation (Freddie Mac), was a privately-owned, publicly chartered financial services corporation. *Id.* at 1370. Freddie Mac's regulator disallowed certain "golden parachute payments" to executives. *See id.* at 1370-71. After Mr. Piszel was terminated, he asserted that the denial of his contractually provided golden

parachute payment – ordered by Freddie Mac's regulator – amounted to a taking. This Court found a cognizable property interest, holding that the extensive nature of Freddie Mac's regulatory regime did not defeat the contract-based property interest. *Id.* at 1375.

The trial court erred by relying on *Piszel*, Appx10343-10344, because the Government here has not invalidated or otherwise interfered with a private contract governed by state law. Unlike the alteration of a contract governed by state law, Congress's power to alter ERISA inheres in appellants' plan-based rights.

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) (*Cienega Gardens 2003*), is also inapposite. There, Congress annulled provisions in private loan contracts that had permitted borrowers to prepay their loans. *Id.* at 1326. This Court found a property interest, refusing to "read into private contracts limitations that are not even hinted at in their text." *Id.* at 1331. As in *Piszel*, the Government's actions in *Cienega Gardens 2003* had the effect of imposing new terms on existing contracts. That is unlike this case, where Congress's power to alter ERISA inhered in appellants' ERISA-based pension rights, and where the Fund reserved the right to amend the plan document so long as the amendment did not violate the anti-cutback rule (and the benefit-reducing MPRA amendment did not). *Bowen* is more apposite than *Piszel* or *Cienega Gardens 2003*.

Finally, the trial court erred by relying on *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142 (Fed. Cir. 2014). The takings plaintiffs in that case were former car dealers for auto manufacturers that terminated the plaintiffs' franchise agreements during bankruptcy proceedings. *See id.* at 1147. Plaintiffs alleged that the Government had conditioned financial assistance to the manufacturers on the termination of the franchise agreements. Because the challenged Government action did not predate the franchise agreements, this Court held that the agreements were valid and compensable property interests. *Id.* at 1153.

The trial court concluded that the holding in *A & D Auto Sales* should apply here because the enactment of MPRA and Treasury's authorization "postdates the vesting of the plaintiffs' pensions," and so "the existence of an extensive and evolving regulatory framework cannot defeat the plaintiffs' preexisting property interest in the specific level of pension benefits determined and payable in accordance with the plan documents." Appx10345. But we have explained above that vesting does not control the analysis and the plan document amendment was permitted by the terms of the plan. Moreover, the franchise agreements in *A & D Auto Sales* were not creatures of or governed by Federal law. Here, the asserted stick in appellants' pension-based bundle of rights allegedly taken is a provision of Federal law, as to which appellants cannot possess a cognizable property interest.

III. The Fund's Plan Amendment Does Not Give Rise To A Physical Taking

A. The Court Should Reject Appellants' Novel Physical Taking Theory

Appellants' primary argument on appeal is that the trial court erred by rejecting appellants' invocation of a "*per se* takings test." Applnts. Br. at 27. As the trial court noted, the Supreme Court has distinguished between "physical takings" and "regulatory takings" claims. Appx19 (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323 (2002)). Physical takings are brought about by "the government's physical invasion or appropriation of private property," whereas in a regulatory taking "government regulations . . . unduly burden private property interests." *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005).

Regulatory takings are then further subdivided into categorical takings, which occur when "governmental action deprives a property owner of all economically beneficial uses of his property," and non-categorical regulatory takings, "where the property is not rendered totally valueless." *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1340 (Fed. Cir. 2018) (quotations omitted). The term "*per se* taking" may be used to refer to either a physical taking or a categorical regulatory taking. *See Piszel*, 833 F.3d at 1381-82.

The trial court correctly held that physical taking jurisprudence is inapplicable to appellants' claims. "When the government physically acquires

private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (citing *Tahoe-Sierra*, 535 U.S. at 321). Thus, "[t]he government commits a physical taking when it uses its power of eminent domain to formally condemn property." *Cedar Point*, 141 S. Ct. at 2071. "The same is true when the government physically takes possession of property without acquiring title to it." *Id.* "And the government likewise effects a physical taking when it occupies property – say, by recurring flooding as a result of building a dam." *Id.* "These sorts of physical appropriations constitute the 'clearest sort of taking,' . . . and [courts] assess them using a simple, *per se* rule: The government must pay for what it takes." *Id.* (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)).

Appellants assert that the Government's authorization of the Fund's benefit suspension amounts to a physical taking. *See* Applnts. Br. at 27-42. Such a holding would lead to the application of the *per se* rule, thus freeing appellants from the need to prove a regulatory taking under *Penn Central*. In support, appellants push a counterfactual narrative, suggesting that the Government somehow took money that appellants owned. For example, they assert that "more than $1,000/month was lost to each of the Class Representatives – so practical

ouster . . . occurred." *Id.* at 28. They similarly assert that "the Government here authorized the taking of money." *Id.* at 38.

But no amount of clever word play can change the facts. No money was taken from the appellants because they never controlled the assets in the Fund Estate. Participants in a defined benefit plan, such as the appellants, "are entitled only to a fixed periodic payment, and have no 'claim to any particular asset that composes a part of the plan's general asset pool.'" *Perelman v. Perelman*, 793 F.3d 368, 374 (3d Cir. 2015) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 440 (1999)). The Fund's trust agreement makes this point abundantly clear, stating that plan participants do not own the money in the Fund Estate, and that participants are provided benefits only as provided by the plan document and other terms and conditions. Appx12894-12895. As the trial court stated in its first summary judgment opinion, "[p]lan participants have a limited right of access to the trust estate." Appx10328.

Even before the Fund's plan amendment, appellants had no ownership claims to the assets in the Fund Estate from which their *future* benefits would be paid, because those benefits were not yet due. Thus, neither the Government's authorization nor the plan amendment itself took money that the appellants owned. Instead, *future* benefit payments contemplated by the pre-amendment version of the plan would not be made in full, and plaintiffs would never come into ownership

of the full amount previously described (although those benefits were later repaid through SFA).

Appellants' lack of ownership of the money contained in the Fund Estate plainly distinguishes this case from appellants' key case, *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003). *See* Applnts. Br. at 30. *Brown* centered on an "income on lawyers' trust accounts" (IOLTA) program. Attorneys and limited practice officers (LPOs) in Washington State were sometimes required to temporarily hold client funds. *Brown*, 538 U.S. at 227. Rules promulgated by the Washington Supreme Court required LPOs to place client funds in non-IOLTA accounts if the funds could generate net income. *Id.* at 226. If, however, client funds could not generate net income, funds were to be placed in an IOLTA account, with the interest directed to be paid to the Legal Foundation of Washington. *See id.* at 224.

Clients whose interest was collected from an IOLTA account asserted a takings claim. The Supreme Court distinguished between physical takings and regulatory takings, *id.* at 233, holding that the claim should be analyzed using a "*per se* approach," rather than a *Penn Central* analysis. *Id.* at 235. The Court had previously held, in *Phillips v. Washington Legal Foundation,* 524 U.S. 156 (1998), that under state law, interest generated in IOLTA accounts is the private property of the owner of the principal. *Id.* at 172. "If this is so," the Supreme Court

concluded in *Brown*, "the transfer of the interest to the Foundation here seems more akin to the occupation of a small amount of rooftop space" in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419 (1982), rather than to the regulation in *Penn Central*. *Brown*, 538 U.S. at 235. The Supreme Court in *Brown* "therefore assume[d]" that the plaintiffs "retained the beneficial ownership of at least a portion of their escrow deposits until the funds were disbursed at the closings," and applied a *per se* test. *Id.*[10]

*Brown* is not like this case because although the interest there was held in an IOLTA account, it was nonetheless "the 'private property' of the owner of the principal," under the rule that interest follows principal. *Brown*, 538 U.S. at 235 (quoting *Phillips*, 524 U.S. at 172). That is, there was a chain of ownership preceding the deposit of the escrow funds, to the confiscation of the interest on those funds. Here, in contrast, the money in the Fund Estate is the property of the Fund and could become appellants' property only as provided by plan documents. Unlike in *Brown*, where the clients owned the funds that happened to be in IOLTA accounts, appellants here never owned the money contained in the Fund Estate. As

---

[10] The Supreme Court nonetheless held that "there [had] been no violation of the Just Compensation Clause of the Fifth Amendment," because funds placed in IOLTA accounts were incapable of generating net earnings for the client, and "just compensation for a net loss of zero is zero." *See Brown*, 538 U.S. at 240 & n.11.

a result, appellants at most lost the benefit of the plan's always-amendable benefit provisions, which merely suggested that appellants would *in the future* be paid benefits at the level described in the plan document, absent an amendment. This does not give rise to a physical taking.

### B. *Connolly* And *Concrete Pipe* Confirm That An Alleged Interference With Contractual Rights Is Not Susceptible To A Physical Taking Analysis

That appellants cannot demonstrate a physical taking is confirmed by two Supreme Court cases that are far more apposite than *Brown*, namely *Connolly* and *Concrete Pipe*. Both cases arose from Congress's enactment of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub. L. No. 96-364, 94 Stat. 1208, which imposed liability on employers that withdrew from ERISA-governed multiemployer pension plans.

*Connolly*, the earlier case, presented a facial challenge to MPPAA. *See Connolly*, 475 U.S. at 219. The plaintiffs asserted that the imposition of noncontractual withdrawal liability violated the Takings Clause by requiring employers to transfer their assets for the private use of pension trusts. *Id.* at 221. The Supreme Court declined to apply a *per se* rule, and instead undertook the regulatory taking inquiry prescribed by *Penn Central*. *See id.* at 227-28. Consistent with this choice, the *Connolly* Court noted that "the fact that legislation disregards or destroys existing contractual rights *does not always* transform the

regulation into an illegal taking." *Id.* at 224 (citing *Bowles v. Willingham,* 321 U.S. 503, 517 (1944) and *Omnia Com. Co. v. United States,* 261 U.S. 502, 508-510 (1923)) (emphasis added). Based on the *Penn Central* analysis, the Supreme Court in *Connolly* held that the withdrawal liability legislation did not facially violate the Takings Clause. *See Connolly*, 475 U.S. at 227-28.

The Supreme Court used the same analytical approach in *Concrete Pipe*, which involved an as-applied Takings Clause challenge to MPPAA's withdrawal liability. *See Concrete Pipe*, 508 U.S. at 605. Reiterating *Connolly*, the Court explained that the employer plaintiff "gain[ed] nothing" from its reliance on a contractual right to be protected "from any liability beyond the specified contributions to which it had agreed." *Id.* at 642 (quoting *Connolly*, 475 U.S. at 223-244). The Supreme Court moreover expressly "reject[ed] Concrete Pipe's contention that the appropriate analytical framework is the one employed in . . . cases dealing with permanent physical occupation or destruction of economically beneficial use of real property." *Concrete Pipe*, 508 U.S. at 643. The Court then undertook the *Penn Central* inquiry and concluded that the Government had not committed a taking. *Id.* at 647. Thus, as stated by the trial court here, "*Connolly* and *Concrete Pipe* are the precedents most like this case and govern its outcome." Appx25. The Supreme Court twice rejected the physical-

takings test when Congress adjusted the regulatory framework for multiemployer pension plans.

Moreover, in the decades since *Connolly* and *Concrete Pipe*, the Supreme Court has never found an alleged imposition on a contractual relationship to be subject to a *per se* rule. To the contrary, in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), a plurality of the Court relied on *Connolly* and *Concrete Pipe* to conclude that retroactive liability imposed on a former mining company under the Coal Act should be analyzed using a regulatory taking framework. *See id.* at 526-528. And the Court did not even cite *Connolly* or *Concrete Pipe* in the 2003 *Brown* decision, indicating that the Court viewed the situations as distinguishable.

Other Federal appellate courts similarly have declined to apply the Supreme Court's physical takings jurisprudence to an alleged interference with contractual rights. For example, in *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362 (2d Cir. 2006), a city's financial control board imposed a wage freeze on teachers' salaries, contrary to union contracts entitling teachers to raises. Citing *Connolly*, the Court of Appeals for the Second Circuit reversed the district court's use of the *per se* taking analysis, holding that "the interference with appellants' contractual right to a wage increase 'arises from [a] public program adjusting the benefits and burdens of economic life to promote the common good'" and "therefore falls into the category of a regulatory, not physical taking[.]" *Id.* at 374 (quoting *Penn*

*Central*, 438 U.S. at 124). Similarly, in *National Mining Association v. Babbitt*, 172 F.3d 906 (D.C. Cir. 1999), the Court of Appeals for the D.C. Circuit, citing *Connolly*, rejected the "assum[ption] that interference with contract rights is a *per se* taking," and instead concluded that the plaintiff would be required to satisfy the non-categorical regulatory taking test to demonstrate that a set of regulations appropriated contract rights. *Id.* at 917. To the extent the Court finds a property interest here, it too should reject application of the physical taking analysis.

### C. Appellants' Other Cited Physical Taking Cases Are Also Inapposite

*Connolly* and *Concrete Pipe* make clear that even when legislation "disregards or destroys existing contractual rights," that "does not always" transform the regulation into a taking. *Connolly*, 475 U.S. at 224. Instead, use of the *Penn Central* analysis is necessary. In their attempt to demonstrate the contrary, appellants rely on inapposite cases. Beyond *Brown*, addressed above, appellants emphasize *Webb's Fabulous Pharmacies v. Beckwith, Inc.*, 449 U.S. 155 (1980). Applnts. Br. at 31. In that case, however, the Supreme Court based its holding on the rule that "[t]he earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property." *Webb's Fabulous Pharmacies*, 449 U.S. at 164. As in *Brown*, which rested on a similar principle, *Webb's* is distinguishable from this case because appellants never owned or controlled any assets contained in the Fund Estate.

Appellants also are not assisted by *Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013), which they claim stands for the proposition that a *per se* analysis is required where the Government commands the relinquishment of funds linked to a specific, identifiable property interest. Applnts. Br. at 31-32 (citing *Koontz*, 570 U.S. at 614). Again, however, appellants have not been required to relinquish any money that they ever owned. That distinguishes this case from the "unconstitutional conditions" line of cases involving real property, including *Koontz*.

Finally, *Tyler v. Hennepin County*, 598 U.S. 631 (2023), is distinguishable for similar reasons. A home was seized and sold by a county to satisfy tax debts, and the Supreme Court held that the homeowner had plausibly alleged that the county's retention of surplus proceeds violated the Takings Clause. *See id.* at 639. The Supreme Court concluded that the legal history of tax debts, Supreme Court precedent, and Minnesota law in other contexts all established that the homeowner retained an interest in the value of the home beyond the amount required to satisfy the tax debt. *See id.* at 639-46. There is here no equivalent to the homeowner's interest in the home.

D. If The Court Concludes That A *Per Se* Test Should Apply, The Matter Must Be Remanded To The Trial Court To Determine Whether Just Compensation Is Due

Appellants assert that if the *per se* rule applies, they satisfy the requirements of that rule. Applnts. Br. at 42-52. Appellants reference a four-part test drawn from *Welty v. United States*, 926 F.3d 1319 (Fed. Cir. 2019), requiring the takings plaintiff to demonstrate that an enforceable property right was taken by the Government for public purposes without just compensation. Applnts. Br. at 42-43 (citing *Welty*, 926 F.3d at 1323).

Even if the Court disagrees with us, judgment for the appellants would be premature because they have not shown that any compensation is due. As the Supreme Court said in *Brown*, "just compensation for a net loss of zero is zero." *See Brown*, 538 U.S. at 240 & n.11; *see also* Applnts. Br. at 49 (acknowledging requirement to show loss).

At the trial court, we asserted that for appellants to show entitlement to just compensation, the court would need to consider the quantum of appellants' losses with reference to this Court's "relative benefits" doctrine, which mandates consideration of benefits that inure directly to the party alleging a taking. *See Hendler v. United States*, 175 F.3d 1374, 1382-83 (Fed. Cir. 1999). Here, that might include the value of avoiding insolvency. Moreover, we asserted, appellants had not established what rate of interest would be appropriate to calculate foregone

investment income. The trial court did not decide these issues given its holding that the physical taking test does not apply. Appx33.

Appellants assert that an inquiry into offsetting benefits is inappropriate in the context of a physical taking. Applnts. Br. at 51. Although the Court need not reach this issue because the appellants' have not demonstrated a taking, appellants are wrong on the law. In *Horne v. Department of Agriculture*, 576 U.S. 350 (2015), the Supreme Court rejected the assertion that, where the Government provided a general regulatory benefit of stabilizing raisin prices to assist all growers, that general benefit needed to be considered in determining whether a taking occurred. *See id.* at 369. That holding does not, however, preclude a finding that the Government's action has conferred a *specific* benefit that is unique to the plaintiff. *See Hendler*, 175 F.3d at 1383.

Consequently, this Court cannot resolve the question of just compensation on the record before it. If the Court concludes that the physical taking test applies (which the Court should not do), the Court would need to remand the case for further proceedings on the question of just compensation.

## IV. Appellants Cannot Demonstrate A Regulatory Taking

### A. There Has Been No Categorical Regulatory Taking

The trial court correctly held that appellants cannot prove a regulatory taking. Appellants first invoke the Supreme Court's "categorical" regulatory

takings jurisprudence, as established in *Lucas*. Applnts. Br. at 52-53. As appellants rightly acknowledge, however, "a regulatory taking is categorical only when the government action deprives 'the owner of all beneficial use of the entire relevant parcel.'" *Id.* at 52 (quoting *Norman v. United States*, 429 F.3d 1081, 1091 (Fed. Cir. 2005)). Appellants also acknowledge that this Court has not extended the concept of a categorial regulatory taking to cases involving intangible property. Applnts. Br. at 52 (citing *A & D Auto Sales*, 748 F.3d at 1151-52).

Presumably because appellants recognize that they lost nothing close to all beneficial use of their pre-amendment accrued benefits – even before the restoration through SFA – appellants make a feeble argument that, "if one accepts . . . the property interest in this case as the right to 'unreduced' vested benefits . . . then that right was taken in its entirely in every meaningful sense." Applnts. Br. at 52-53. That is so, in appellants' view, because "[t]he clause entitling them to fixed pension payments was replaced with a less-valuable clause that provided for 29% lower payments." *Id.* Moreover, appellants assert, MPRA denied them a cause of action against the Fund for amending the plan documents. *See id.* Appellants suggest that the Court has signaled concern about such deprivations of a cause of action. *Id.* (citing *Piszel*, 833 F.3d at 1381-82).

This argument cannot succeed. Appellants did not enjoy a sacrosanct right to unreduced benefits, but even if they did, there is no support for the proposition

that a partial diminution of that right will support a categorical regulatory taking. To the contrary, "only a complete deprivation will constitute a categorical or 'per se' taking," which is in turn determined with reference to the "parcel as a whole," based on "the economic expectations of the claimant with regard to the property." *Norman*, 429 F.3d at 1091. Applied here, the "parcel as a whole" is the total value of appellants' pension. To instead analyze only the portion of the property allegedly taken would eviscerate the requirement of complete deprivation.

Nor are appellants assisted by *Piszel*. Although the Court there stated that there was no "total taking" because Mr. Piszel retained his potential breach of contract claim, *Piszel*, 833 F.3d at 1381-82, the Court did not suggest that a categorical taking of intangible property could exist simply because of the "deletion of a cause of action." Applnts. Br. at 53. *Lucas* and its progeny are inapplicable.

B. Appellants Cannot Prove A Taking Based On The *Penn Central* Factors

Appellants also cannot demonstrate a taking under the non-categorical regulatory taking analysis established by the Supreme Court in *Penn Central*. Absent a categorical regulatory taking, "[w]hether a given regulation goes 'too far' for purposes of the Fifth Amendment is determined by an '*ad hoc*, factual inquiry.'" *Cienega Gardens 2003*, 331 F.3d at 1337 (quoting *Penn Central*, 438 U.S. at 124). For that analysis, the Court may consider "[t]he economic

impact of the regulation on the claimant," "the extent to which the regulation has interfered with distinct investment-backed expectations," and "the character of the governmental action." *Penn Central*, 438 U.S. at 124. The Court may find no taking even if the plaintiff succeeds in proving one of the *Penn Central* factors. *See, e.g.*, *Maritrans Inc. v. United States*, 342 F.3d 1344, 1359 (Fed. Cir. 2003). As held by the trial court and for the reasons set forth below, none of the *Penn Central* factors, separately or when considered together, support the finding of a regulatory taking.

1. Appellants Cannot Not Demonstrate Serious Financial Loss

In balancing the *Penn Central* factors, this Court has quoted the Supreme Court for the point that "the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Reoforce, Inc. v. United States*, 853 F.3d 1249, 1271 (Fed. Cir. 2017) (quoting *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 540 (2005)). "When considering *Penn Central*'s economic impact factor, a court must 'compare the value that has been taken from the property with the value that remains in the property.'" *Maritrans*, 342 F.3d at 1358 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)). Importantly, "[w]hat has evolved in the case law is a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory

imposition in order to merit compensation." *Cienega Gardens 2003*, 331 F.3d at 1340 (quoting *Loveladies Harbor v. United States*, 28 F.3d 1171, 1177 (Fed. Cir. 1994), *abrogated on other grounds by Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1369-70 (Fed. Cir. 2004)).

There is no "automatic numerical barrier preventing compensation, as a matter of law, in cases involving a smaller percentage diminution in value." *Cienega Gardens 2003*, 331 F.3d at 1319 (quoting *Yancey v. United States,* 915 F.2d 1534, 1539, 1541 (Fed. Cir. 1990)). But this Court has observed that it was "aware of no case in which a court has found a taking where diminution in value was less than 50 percent." *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) (quotations omitted). In *CCA Associates*, the Court held that it could not conclude that an 18-percent economic impact was sufficiently substantial to favor a taking. *Id.* And the Supreme Court in *Murr v. Wisconsin*, 137 S. Ct. 1933 (2017), concluded that a 10 percent loss in property value was not a severe economic impact. *Id.* at 1944.

Contrary to appellants' suggestion, Applnts. Br. at 57, the inquiry into economic impact does not consider the overall impact on the plaintiff, but rather is focused on the property interest at issue. Specifically, and as stated in *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177 (Fed. Cir. 2004) (*Rose Acre Farms 2004*), the question is of the impact on the "parcel as a whole." *Id.* at 1189.

The trial court applied these precedents to correctly hold that "[a]s to the three named plaintiffs and similarly situated class members, the economic impact of the MPRA suspension and the ARPA precludes finding a regulatory taking." Appx35. Given the restoration of appellants' benefits, "[a]t most, the only current loss the three named plaintiffs and similarly situated class members have suffered is the time value of 29 percent of their pension benefits over a period of approximately six years, which would be compensable by interest." Appx36.[11] Potential members of the class who died before benefit restoration would suffer a greater impact, but they "suffered at most a 29-percent reduction in the value of their pension benefits," which was "likely insufficient to support a taking." Appx36 (citing *Murr*, 137 S. Ct. at 1949, and *CCA Assocs.*, 667 F.3d at 1246).

Appellants mount a limited challenge to the trial court's finding of insufficiently adverse economic impact. They assert that "the *Connolly* line of cases . . . make[s] clear that no strict numerical threshold exists in *Penn Central* cases when the government takes a sum of money." Applnts. Br. at 57. Appellants also point to the statement in *Connolly* that "as to the severity of the economic impact of the MPPAA, there is no doubt that the Act completely deprives an

[11] The trial court also noted that the Fund was projected to remain solvent until at least 2051, thus making appellants' benefits "more secure than they were even before" the suspension. Appx36.

employer of whatever amount of money it is obligated to pay to fulfill its statutory liability." *Id.* at 57-58 (quoting *Connolly*, 475 U.S. at 225).

While it is true there is no strict numerical threshold, *Connolly* does not stand for the proposition that the complete deprivation of a *portion* of the property interest will demonstrate severe economic impact. Applnts. Br. at 57-58. To the contrary, the Supreme Court *rejected* the possibility that a payment of money will, standing alone, suffice to demonstrate sufficient economic impact. The Court noted that MPPAA contained provisions to "moderate and mitigate" the economic impact of employer withdrawal liability. *Connolly*, 475 U.S. at 226. Thus, "[t]here is nothing to show that the withdrawal liability actually imposed on an employer will always be out of proportion to its experience with the plan, and the mere fact that the employer must pay money to comply with the Act is but a necessary consequence of the MPPAA's regulatory scheme." *Id.*

*Connolly* therefore actually undermines the proposition that appellants could prove a serious economic impact from the limited reduction of their benefit payments, to say nothing of the fact that the suspension was designed to prevent the plan from becoming insolvent and that the Fund has since repaid the suspended benefits. "[T]he economic impact to the three named plaintiffs and other class members tilts decidedly against finding a taking." Appx37.

### 2. Appellants Could Not Reasonably Expect That ERISA Would Not Be Amended To Prevent Pension Plan Insolvency

The *Penn Central* analysis also considers the degree to which the alleged taking has interfered with the plaintiff's distinct, investment-backed expectations. *Penn Central*, 438 U.S. at 124. "[T]he investment-backed expectations factor of the *Penn Central* test is 'a way of limiting takings recoveries to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'" *Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344, 1350-51 (Fed. Cir. 2020) (quoting *Loveladies Harbor*, 28 F.3d at 1177).

This Court has articulated three considerations relevant to assessing investment-backed expectations:

> (a) whether the plaintiff operated in a 'highly regulated industry; (b) whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property; and (c) whether the plaintiff could have reasonably anticipated the possibility of such regulation in light of the 'regulatory environment' at the time of purchase.

*Taylor v. United States*, 959 F.3d 1081, 1088 (Fed. Cir. 2020) (cleaned up). "A plaintiff's subjective expectations are irrelevant to the reasonableness of the expectations." *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004) (citing *Cienega Gardens 2003*, 331 F.3d at 1346 n.42). "Nonetheless, the plaintiff must show that it had an actual expectation that it would not be subjected

to the regulatory restriction." *Appolo Fuels*, 381 F.3d at 1349 (citing *Cienega Gardens 2003*, 331 F.3d at 1346). "The critical question is whether extension of existing law could be foreseen as reasonably possible." *Cienega Gardens v. United States*, 503 F.3d 1266, 1288-89 (Fed. Cir. 2007) (*Cienega Gardens 2007*).

The trial court concluded that "[t]he suspension of the plaintiffs' benefits under the MPRA would not have been reasonably foreseeable to them based on the regulatory structure of ERISA and their role in it." Appx40. In addition, however, the trial court evaluated "the *extent* to which the regulation has *interfered* with distinct investment-backed expectations." Appx40 (quoting *Penn Central*, 438 U.S. at 124). As to that question, the court concluded that the Government did not "unduly interfere with" appellant's reasonable, investment-backed expectations. Appx41. The interference was "negligible" to the extent benefits were repaid, and in any event MPRA only "expanded a pre-existing exception to the plaintiffs' investment-back expectations," *i.e.*, reductions to benefits in the case of Fund insolvency or other hardships. Appx41. Rather than "dramatically upset[ting] plaintiff's expectations," MPRA "protected . . . plaintiffs' benefits." Appx41. With respect to potential class members who, unlike the appellants, died before the payments were received, the trial court noted that MPRA merely expanded a preexisting limitation on the appellants' investment-backed expectations. Appx41. Moreover, the lack of make-up payments due to a

participant's death was consistent with the general rule that pension benefits extinguish upon a participant or beneficiary's death. Appx41.

The trial court erred in finding that appellants possessed reasonable, investment-backed expectations. While the court correctly concluded that the Government did not "unduly" interfere those expectations, Appx41, the trial court did not as a predicate matter give sufficient weight to the many limitations – acknowledged by the court itself – on what appellants could expect under ERISA. The three factors identified in *Taylor* compel the conclusion that ERISA's nature and structure preclude the creation of any reasonable, investment-backed expectation that Congress would not pass a law like MPRA, which was designed to protect employees, the PBGC insurance fund, and the public from the drastic effects of multiemployer pension fund insolvency. In other words, an "extension of existing law" in the nature of MPRA "could be foreseen as reasonably possible." *Cienega Gardens 2007*, 503 F.3d at 1288-89.

First and as stated by the trial court, there can be no question that employee benefits are heavily regulated, and that ERISA is a "comprehensive and reticulated statute." *Nachman*, 446 U.S. at 361. The trial court erred, however, in concluding that appellants "do not 'operate' in a highly regulated industry merely because they receive monthly pension benefit payments in retirement." Appx39. Appellants themselves assert that they made employment decisions based on their

understanding of the value of their pensions. *See* Applnts. Br. at 15-16. Thus, although appellants may not "operate" in the arena of multiemployer pension plans in the same manner as pension fund trustees or contributing employers, they could be reasonably expected to understand their right to pension benefits, that Federal law protected their benefits, and the legal implications of plan insolvency on their benefits. *Cf. Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-85 (1947) (holding that "everyone is charged with knowledge of the United States Statutes at Large" and applicable regulations, even where that rule works hardship).

The trial court also erred in concluding that appellants lacked awareness of the problems that spawned MPRA. Appx39. Appellants asserted at the trial court that when they started and stayed in their jobs, "they relied on the contractual and legal guarantees against vested pensions being cut." Appx12666. Such reliance is obviously predicated on the continued solvency of the plan – insolvency would reduce benefits to the statutorily-guaranteed level, imposing reductions that appellants hoped would never come. Indeed, appellants understood that the Fund's continued solvency was necessary to the continuance of their benefits. *See* Appx13088-13089 (Mr. King understood that the PBGC basic benefit would be a "reduced amount"); Appx13096-13097 (Mr. Gugliuzza knew that a plan requires money to survive); Appx13100-13101 (Mr. Dardzinski understood that if a multiemployer plan becomes bankrupt, participants "get less money"). Appellants'

understanding is consistent with the trial court's uncontested finding that the "plan documents have always accounted for the potential reduction of pension benefits in the event the plan was terminated," even before ERISA. Appx40; *see, e.g.*, Appx10571-10572 (plan document dated August 1, 1963, explaining that if remaining funds were inadequate at termination, a retiree's share would be reduced on a pro rata basis); Appx12417 (summary plan description from May 1981, explaining that in the event of plan termination there is a ceiling on the amount of the PBGC-guaranteed monthly benefit). The trial court thus erred by finding that appellants were not reasonably aware of the problems that spawned MPRA – namely the potential failure of multiemployer pension plans such as their own – during the period when they were employed and accruing benefits.

Finally, appellants could have reasonably anticipated that a law like MPRA would be Congress's solution to the problem. In enacting ERISA in 1974, Congress found that "owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits." ERISA § 2(a), 88 Stat. 833-34 (codified at 29 U.S.C. § 1001(a)). To address this and other concerns, Congress designed ERISA to "protect interstate commerce, the Federal taxing power, and the interests of participants in private pension plans and their beneficiaries" by, among other things, requiring plan termination insurance. *Id.*

The MPPAA, enacted six years after ERISA, buttressed the law in part by creating a multiemployer plan insurance program that would kick in upon plan insolvency, rather than at termination. *See* MPPAA § 3(b)(2) (codified at 29 U.S.C. § 1001a(b)(2)). This approach reflected Congress's policy in the MPPAA of, among other things, "provid[ing] *reasonable* protection for the interests of participants and beneficiaries of financially distressed multiemployer pension plans" while also "provid[ing] a financially self-sufficient program for the guarantee of employee benefits under multiemployer plans." MPPAA § 3(c) (codified at 29 U.S.C. § 1001a(c)) (emphasis added).

Thus, although Congress was obviously concerned with protecting employee benefit levels, ERISA and the MPPAA also reflect Congress's concern with the protection of the pension system, including emphasizing plan continuation and providing a self-sufficient program for the guarantee of employee benefits. To that end, MPPAA § 102, codified as amended at 29 U.S.C. § 1322a, added a new section to ERISA that provides guaranteed benefits in case of plan insolvency. But that PBGC basic benefit will often be far less than a participant's normal benefit. *See supra* at 9.

Given that appellants' benefit levels would have been imperiled by Fund insolvency, and that the entire purpose of ERISA and subsequent amendments is to avoid pension plan failures that burden the pension insurance system and leave

participants with reduced benefit levels, appellants cannot reasonably have expected that ERISA would not be further refined, through enactments like MPRA, to *avoid* multiemployer plan insolvencies. *See* 29 U.S.C. § 1085(e)(9)(D)(iv) (permitting benefit suspensions only to avoid insolvency). Benefit reductions obviously are not desirable or the norm, but they could be reasonably anticipated as an alternative to a plan insolvency that would lead to deeper reductions.

The possibility of an amendment to ERISA like MPRA is increased by the many participant protections built into the act. For example, the suspension must be equitably distributed across the participant and beneficiary population, 29 U.S.C. § 1085(e)(9)(D)(vi), and no suspension may reduce a participant's benefit level to less than 110 percent of the PBGC guarantee. *Id.* § 1085(e)(9)(D)(i). These provisions and others narrow the scope of MPRA, such that it is consistent with the overarching purpose of ERISA, which is to protect plan solvency and therefore benefit levels.

In sum, MRPA's limited reduction to the scope of the anti-cutback rule, set within the heavily regulated context of multiemployer pension plans, was a "reasonable possibility." *See Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1357 (Fed. Cir. 2001) (en banc). The trial court erred by concluding otherwise.

Because appellants could have no reasonable, investment-backed expectations, the Court need not reach the trial court's further conclusion that MPRA "did not dramatically upset the plaintiffs' expectations in a manner sufficient to give rise to a regulatory taking." Appx41. To the extent the Court does reach that portion of the trial court's analysis, there is no merit to appellants' assertion that the trial court did not adequately consider evidence of harm. Applnts. Br. at 56. To the contrary, the trial court considered the harm to appellants, but balanced it against the benefits of MPRA, concluding that MPRA "protected the plaintiffs' benefits by preventing the plaintiffs from receiving much less if the [Fund] actually became insolvent." Appx41. Appellants' criticism of this conclusion provides no sound basis for this Court to disturb it.

### 3. MPRA Is A Tailored Effort To Avoid The Dire Consequences Arising From Multiemployer Pension Plan Failure

"A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Aviation & Gen. Ins. Co., Ltd. v. United States*, 882 F.3d 1088, 1096-97 (Fed. Cir. 2018) (quoting *Belk v. United States*, 858 F.2d 706, 709 (Fed. Cir. 1988)). The Supreme Court has described this as the "*usual assumption* that the legislature is simply 'adjusting the benefits and burdens of economic life,' [*Penn Central*, 438 U.S. at 124], in a manner that secures an

'average reciprocity of advantage' to everyone concerned, *Pennsylvania Coal Co. v. Mahon*, [260 U.S. 393, 415 (1922)]." *Lucas*, 505 U.S. at 1017-18 (emphasis added).

Consistent with the "usual assumption," the Supreme Court in *Connolly* analyzed the character of the Government action by noting that that under the challenged law, "the Government [did] not physically invade or permanently appropriate any of the employer's assets for its own use":

> Instead, the [MPPAA] safeguards the participants in multiemployer pension plans by requiring a withdrawing employer to fund its share of the plan obligations incurred during its association with the plan. This interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation.

*Connolly*, 475 U.S. at 225.

In *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260 (Fed. Cir. 2009) (*Rose Acre Farms 2009*), this Court applied Supreme Court precedent to conclude that it is necessary to consider "the actual burden imposed on property rights, or how that burden is allocated." *Rose Acre Farms 2009*, 559 F.3d at 1278 (quoting *Lingle*, 544 U.S. at 543). Specifically, *Lingle* "directed that 'the *magnitude or character of the burden* a particular regulation imposes upon private property

rights' is an important consideration." *Rose Acre Farms 2009*, 559 F.3d at 1278 (quoting *Lingle*, 544 U.S. at 543 (emphasis in *Lingle*)).

Applying that rule, the Court in *Rose Acre Farms 2009* held that regulations imposed on all egg producers did not single out the plaintiff. Instead, the regulation applied broadly, even though it only actually affected farms that tested positive for salmonella. *See Rose Acre Farms 2009*, 559 F.3d at 1278-79. Thus, the *Penn Central* character analysis favored the Government, and the Court rejected the plaintiff's contentions that the regulation could have been drafted more broadly to cover food handlers and the egg-consuming public, and that the plaintiff suffered disproportionately because its eggs were more traceable than other producers' eggs. *Id.* at 1279; *see also Reoforce*, 853 F.3d at 1271 (finding that a mining restriction applied to all mining claimants within a proposed addition to a park, and therefore did not target the plaintiff).

Applying *Rose Acre Farms 2009*, the trial court here held that the character of the Government action does not suggest a taking:

> Rather, Congress was acting within its constitutional authority to amend ERISA and to adjust reasonably the benefits and burdens of the regulatory scheme in an attempt to preserve funds' financial stability; the plaintiffs have not borne an undue share of the burden of maintaining the solvency of the Teamsters Fund.

Appx45.

The trial court did not "downplay[]" or "bypass[]" any facts in reaching this conclusion. Applnts. Br. at 55. While benefit suspensions were imposed after appellants' pensions had vested and after they retired, Applnts. Br. at 54, "MPRA did not truly apply retroactively," but rather "reduced benefits prospectively regarding the pension benefits the plaintiffs would receive after the plan documents were amended." Appx42.

Nor were suspensions unfair or tilted. Applnts. Br. at 55. As the trial court concluded, "MPRA and its implementation reflected a careful, comprehensive scheme for determining the percentage of cuts that plan participants, including the plaintiffs, faced." Appx42. "Suspension of benefits was a last resort," Appx42, and the suspensions were not disproportionate. Appx43. Appellants do not acknowledge this analysis much less show error in it.

The same is true with respect to appellants' contention that the suspensions were "novel." Applnts. Br. at 55. "Threats to the stability and solvency of pension plans" predate the enactment of ERISA itself, and "have not abated." Appx44. The "retirements of millions of workers [are] at risk," Appx44, and Fund insolvency would have resulted in drastically reduced benefits to appellants and many others, adding to the burdens on the nation's pension insurance system. Any solution other than that unpalatable result was bound to be novel – to include the many ideas offered by appellants themselves. *See* Applnts. Br. at 39-40 n.16.

Finding novel solutions to significant problems is Congress's job, and "the novelty of an approach that Congress tries in addressing a public policy problem does not of itself amount to a compensable taking." Appx44. Appellants have not shown error in the trial court's conclusion that "[t]he character of the government action of amending ERISA does not rise to a taking." Appx45.

4. None Of The *Penn Central* Factors Favor The Appellants, And Therefore They Have Not Demonstrated A Regulatory Taking

For the reasons set forth above, the trial court correctly concluded that "[n]one of the three *Penn Central* factors, alone or together, supports the existence of a regulatory taking." Appx45. To the contrary, "[t]he 'government may execute laws or programs that adversely affect recognized economic values,' without effectuating a taking." Appx46 (quoting *Penn Central*, 438 U.S. at 124). At bottom, appellants' takings claim is an attempt to "[r]ewrit[e] ERISA policy using the takings clause," Appx46, but the Takings Clause provides no basis for impeding Congress's prerogative in crafting policies to safeguard the nation's multiemployer pension plan system from plan insolvencies.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the trial court's judgment.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Eric P. Bruskin
ERIC P. BRUSKIN
Assistant Director

/s/Geoffrey M. Long
GEOFFREY M. LONG
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington D.C. 20044
Telephone: (202) 307-0159
Fax: (202) 309-0972
E-Mail: Geoffrey.M.Long@usdoj.gov

January 25, 2024

Attorneys for Defendant-Appellee

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations set forth in Federal Circuit Rule 32(b)(1), in that the brief contains 13,912 words.

January 25, 2024

/s/Geoffrey M. Long
GEOFFREY M. LONG