No. 23-1956

# United States Court of Appeals for the Federal Circuit

WILLIAM KING, STEPHEN DARDZINSKI, on behalf of themselves and on behalf of a class of others similarly situated,
ESTATE OF ANTHONY GUGLIUZZA, by its Personal Representative, Anthony A. Gugliuzza,

*Plaintiffs-Appellants*,

v.

UNITED STATES,

*Defendant-Appellee*.

Appeal from the United States Court of Federal Claims
in No. 1:18-cv-01115-RAH

## REPLY BRIEF OF APPELLANTS

Noah A. Messing
Messing & Spector LLP
250 Park Avenue, 7th Floor
New York, NY 10177
nm@messingspector.com
Telephone: (212) 960-3720

Phillip M. Spector
Messing & Spector LLP
145 West Ostend Street, Suite 600
Baltimore, MD 21230
ps@messingspector.com
Telephone: (202) 277-8173

April 11, 2024

*Counsel for Appellants*

# TABLE OF CONTENTS


TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES .................................................................... ii

INTRODUCTION ..............................................................................1

ARGUMENT ........................................................................................4

I. PLAINTIFFS HAVE AN ENFORCEABLE PROPERTY INTEREST . ........................................................................4

II. THE *PER SE* TEST GOVERNS THIS LITIGATION. .......................9

A. There is no exception to the *per se* rule for cases where the plaintiff does not own the underlying assets ................................10

B. There is no exception to the *per se* rule for property interests arising out of contract. ....................................................14

III. PLAINTIFFS PREVAIL UNDER THE *PER SE* TEST .....................19

IV. PLAINTIFFS' PROPERTY WAS TAKEN EVEN IF THE COURT APPLIES A REGULATORY TAKINGS TEST. ................21

A. *Lucas* ..........................................................................22

B. *Penn Central* ....................................................................22

1. Character of the governmental action ..................................23

2. Reasonable investment-backed expectations.......................24

3. Economic impact on the Plaintiffs.......................................26

CONCLUSION ..................................................................................27

CERTIFICATE OF COMPLIANCE ....................................................29

# TABLE OF AUTHORITIES

## Cases

*767 Third Ave. Assoc. v. United States*,
48 F.3d 1575 (Fed. Cir. 1995) ........................................................................18

*A&D Auto Sales, Inc. v. United States*,
748 F.3d 1142 (Fed. Cir. 2014) ........................................................................8

*Adams v. United States*,
391 F.3d 1212 (Fed. Cir. 2004) .................................................................. 15, 17

*Alessi v. Raybestos-Manhattan, Inc.*,
451 U.S. 504 (1981) ........................................................................................7

*Alimanestianu v. United States*,
888 F.3d 1374 (Fed. Cir. 2018) ......................................................................26

*Alimanestianu v. United States*,
888 F.3d 1374 (Fed. Cir. 2018) ......................................................................26

*Almota Farmers Elevator & Warehouse Co. v. United States*,
409 U.S. 470 (1973) ......................................................................................18

*Bowen v. Public Agencies Opposed to Social Security Entrapment*,
477 U.S. 41 (1986) ..........................................................................................4

*Branch v. United States*,
69 F.3d 1571 (Fed. Cir. 1995) .................................................................. 15, 17

*Brown v. Legal Foundation of Wash.*,
538 U.S. 216 (2003) ................................................................................ *passim*

*Buffalo Teachers Fed. v. Tobe*,
464 F.3d 362 (2d Cir. 2006) ...........................................................................18

*Casitas Mun. Water Dist. v. United States*,
543 F.3d 1276 (Fed. Cir. 2008) ................................................................ *passim*

*Casitas Mun. Water Dist. v. United States*,
708 F.3d 1340 (Fed. Cir. 2013) ......................................................................12

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ........................................................................ 9, 12, 13, 14, 16

*Central Laborers' Pension Fund v. Heinz*,
541 U.S. 739 (2004) ........................................................................ 4, 5, 7

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) ........................................................ 6, 23, 24

*Commonwealth Edison Co. v. United States*,
271 F.3d 1327 (Fed. Cir. 2001) (en banc) ........................................ 15, 17, 24

*Connolly v. PBGC*,
475 U.S. 211 (1986) ........................................................................ *passim*

*E. Enterprises v. Apfel*,
524 U.S. 498 (1998) ........................................................................ 15, 17

*Hartshorne v. Roman Catholic Diocese of Albany*,
129 N.Y.S.3d 268 (N.Y. Sup. Ct. 2020) ................................................ 7

*James v. Campbell*,
104 U.S. 356 (1882) ........................................................................ 14

*Koontz v. St. Johns River Water Mgmt. District*,
570 U.S. 595 (2013) ........................................................................ 1, 9, 13, 14, 15, 17

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) ........................................................................ 4, 8, 13

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) ........................................................................ 23

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ........................................................................ 14, 20

*Louisville Joint Stock Land Bank v. Radford*,
295 U.S. 555 (1935) ........................................................................ *passim*

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ...................................................................... 21, 22

*Mass. Mut. Life Ins. Co. v. Russell*,
473 U.S. 134 (1985) ....................................................................................4, 5

*National Mining Assoc. v. Babbitt*,
172 F.3d 906 (D.C. Cir. 1999) ......................................................................18

*Nachman Corp. v. PBGC*,
446 U.S. 359 (1980) ....................................................................................5, 8

*Omnia Commercial Co. v. United States*,
261 U.S. 502 (1923) ......................................................................................18

*Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361
(Fed. Cir. 2009). ...........................................................................................18

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) .................................................................................. 22, 26

*Pennie v. Reis*,
132 U.S. 464 (1889) ....................................................................................5, 8

*Piszel v. United States*,
833 F.3d 1366 (Fed. Cir. 2016).......................................................................8

*Reoforce, Inc. v. United States*,
853 F.3d 1249 (Fed. Cir. 2017).....................................................................24

*Rose Acre Farms, Inc. v. United States*,
373 F.3d 1177 (Fed. Cir. 2004).....................................................................24

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002) ............................................................................ 11, 13, 16

*Thole v. U.S. Bank N.A.*,
140 S. Ct. 1615 (2020) ........................................................................ 4, 5, 6, 8

*Tyler v. Hennepin County*,
598 U.S. 631 (2023) ............................................................................. 4, 5, 6, 8

*United States v. Gen. Motors Corp.*
323 U.S. 373 (1945) ............................................................................ 11, 16, 18

*Webb's Fabulous Pharmacies v. Beckwith*,
449 U.S. 155 (1980) ........................................................... 1, 2, 9, 12, 13, 14

**Statutes**

29 U.S.C. § 1002(19) ..................................................................................5

29 U.S.C. § 1053(a) ....................................................................................5

**Rules**

RCFC 56(a) ...............................................................................................21

**Other Authorities**

Br. for Respondent Justices of the Washington Supreme Court, 538 U.S. 216
(2003) (No. 01-1325), 2002 WL 31387469 ..................................................15

Br. of the Chief Justice et al. as Amici Curiae in Support of Respondents,
538 U.S. 216 (2003) (No. 01-1325), 2002 WL 31399644 ..................................16

Br. of the Conference of Chief Justice as Amicus Curiae in Support of
Respondents, 538 U.S. 216 (2003) (No. 01-1325), 2002 WL 31387432 ...........15

Petition for Writ of Certiorari, 538 U.S. 216 (2003) (No. 01-1325) .......................16

## INTRODUCTION

This appeal comes down to one central issue: Does the *per se* test apply? Plaintiffs' opening brief showed that at least seven controlling cases applied the *per se* test in circumstances like these. These cases include *Brown* (money earned from bank deposits). And *Webb's* (money earned from sums placed into interpleader). And *Koontz* (mandated relinquishment of "funds related to a specific, identifiable property interest"). And *Tyler* (money from sale of property). And *Armstrong* (liens). And *Louisville Bank* (mortgages). And *Casitas* (water rights). All applied the *per se* test. The Government has failed to explain away these authorities. It has cited no cases *declining* to apply the *per se* test when a specific right to a specific payment from a specific pool of money is taken. None—not a single case from any court in U.S. history.

The refusal of the Court of Federal Claims (CFC) to apply the *per se* test reflects error. As Plaintiffs' opening brief showed, the CFC badly misread *Brown* and the other *per se* cases that we just listed. Br. of App. ("Br.) at 30-34. And its reading of the *Connolly* trilogy of cases also conflicted with numerous controlling, on-point cases. Br. at 34-38.

Remarkably, the Government's brief now *abandons the CFC's reasoning on both of these issues*. Instead, in an effort to preserve the outcome below, the Government peddles its own novel readings of *Brown* and the *Connolly* trilogy.

The Government interprets *Brown* to mean that the *per se* rule can only apply if property interests arise from "ownership." And the Government reads *Connolly* to mean that the *per se* rule cannot apply if a property interest arises out of "contract." These inventive theories, however, fare no better than the CFC's opinion. No court has ever read these cases this way—much less endorsed either of these broad exceptions to the *per se* test. And doing so here for the first time would require this Court to overrule a century of holdings in which the *per se* test was applied to non-owned property (*e.g.*, *Louisville Bank*, *Webb's*, *Armstrong*, *Casitas*) and to rights arising from contractual agreements (*e.g.*, *Brown*, *Louisville Bank*, *Casitas*). To be clear: To evade the *per se* test, the Government tries to convince this Court to recognize entirely new rules of law that would impose sweeping new limits on when the *per se* test applies—and overrule numerous precedents from the Supreme Court and this Court.

To paraphrase Mark Twain, controlling cases are stubborn things. The *per se* test applies. Plaintiffs' pension rights were *taken* not regulated.

Four other points bear mention.

First, this is not a case where controlling precedent *should* be bent into submission. The decision below empowers the Government to appropriate the pension rights of vulnerable retirees. More than 700 widows and widowers each lost

a massive amount of money that their spouse worked for many years to earn. The case's equities favor *them*, not the Government.

Second, the Government authorized bureaucrats to decide on a case-by-case basis which economic rights to reallocate and which ones to preserve. Thus, the actions by the Government do not remotely resemble even-handed, universally applicable regulation. The opportunity for mischief is obvious and should alarm this Court.

Third, the Government's theories jeopardize the wide array of economic rights that arise under contracts or without an ownership interest. Below, we discuss some of the risks that would attend deciding this case in the Government's favor.

Finally, Congress has made reversing the CFC's decision easy. By issuing Make Up Payments to most members of the putative class, the total damages will be far smaller than they would have been without the ARPA bailout. This case is now largely about the principle that vested pensions cannot be appropriated and about giving a remedy to hundreds of widows and widowers. The Government has many tools to help struggling pension funds. But seizing private, vested pensions is not—and never has been—one of them. The Court should reverse.

## ARGUMENT

### I. PLAINTIFFS HAVE AN ENFORCEABLE PROPERTY INTEREST.

On the threshold issue of whether Plaintiffs have a property interest, the CFC decided the issue correctly: Plaintiffs have a property interest in their vested pension, which is paid from a specific source—the Fund, which (even before the bailout) held more than $1,700,000,000, in trust, to pay these obligations. APPX12526. As a reminder, and as explained in Plaintiffs' opening brief: The Supreme Court has long explained that the Fifth Amendment protects vested property interests (*Landgraf*); nine different cases previously concluded that vested retirement or other employment benefits give rise to a property interest under the Takings Clause; the Supreme Court repeatedly has held that vested pensions create a binding contractual right (*Heinz*, *Thole*, *Russell*); New York state law confirms that vested pensions give rise to property interests; and the same federal agencies involved in this case understood that vested pensions confer "ownership" and a "permanent right." Br. at 22-34.

The Government replies largely with a straw man. It claims that Plaintiffs have no property interest in a rule of law (i.e., ERISA's anti-cutback rule). Br. for the U.S. ("Gov.Br.") at 21-24. This argument, however, fails for a simple reason: Plaintiffs' right to a vested pension was created by contract, not by statute. The Supreme Court has held, repeatedly, that vested participants in a defined-benefit plan

are "contractually entitled" to receive vested benefits. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020); *see Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985); *Nachman Corp. v. PBGC*, 446 U.S. 359, 365 (1980). This is the source of Plaintiffs' rights—contract, not Congress. Plaintiffs explained all of this in their opening brief. Br. at 24-25. But the Government disregards this law.

To be sure, ERISA regulates how quickly pension rights must vest. 29 U.S.C. § 1053(a) (discussing how long a person must work before acquiring a vested right); *see Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 749 (2004) (ERISA "regulates vesting"). Yet the vesting itself occurs under private agreements, and ERISA is crystal-clear about this point: "Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable" after certain criteria are met. 29 U.S.C. § 1053(a). The very definition of "nonforfeitable" in ERISA is that the right must be "unconditional" and "legally enforceable against the plan." 29 U.S.C. § 1002(19). Even the Government eventually admits that vesting occurs under *private agreements*, not under ERISA. Gov.Br. at 22 (acknowledging plans "develop their own vesting and benefit accrual rules.").

We are therefore perplexed by the Government's insistence that Plaintiffs' right to a vested pension is a "creature of . . . [f]ederal law." Gov.Br. at 30. That is simply wrong. Congress did not create the Fund. Nor did Congress fund the Fund. Nor did Congress create vesting. *See, e.g.*, *Pennie v. Reis*, 132 U.S. 464, 471 (1889)

(recognizing more than a century ago that the government cannot reduced vested pensions); APPX12769 (Plan defining "Vested" as meaning that a worker "has acquired a non-forfeitable right to a pension benefit **under the Plan**," *not* under ERISA) (emphasis added). Congress did not even cause the Fund to offer vested rights; unlike some other multiemployer plans, *this* pension plan provided workers with the opportunity to earn a vested pension long before ERISA came into effect. APPX08203 (Fund 30(b)(6) designee confirming that employees "could earn a vested pension before ERISA was enacted"). In short, ERISA did not create Plaintiffs' rights. Their rights arise from contract.[1]

The Government next floats a clever (but baseless) theory that Plaintiffs have a right to ***a*** pension but that trustees may freely shrink the ***size*** of that pension. Gov.Br. at 26. But the Government here is confusing *accrual* with *vesting*. *See Heinz*, 541 U.S. at 749 (vesting is "the process by which an employee's already-accrued pension account becomes irrevocably his property").[2] Plaintiffs' pensions

---

[1] The Government cites *Bowen v. Public Agencies Opposed to Social Security Entrapment*, for the (false) notion that a "contractual right" cannot give rise to a property interest. Gov.Br. at 24-25. The Supreme Court could not have been clearer in *Bowen* that it ruled as it did precisely because "the Act itself . . . **created no contractual rights**" with a private party. 477 U.S. 41, 52 (1986) (emphasis added). This Court has distinguished *Bowen* on precisely this basis. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1332 (Fed. Cir. 2003) ("*Bowen* is distinguishable from this case because the agreement in *Bowen* was not a contract involving a private party.").

[2] The same is true of the Government's "exceptions" to the anti-cutback rule: The Government conflates accrued and vested benefits. Gov.Br. at 8. Even the Fund's

vested—and once a pension vests, it cannot be reduced. *Thole*, 140 S. Ct. at 1618 (the "vested participants" in a pension plan "are legally and contractually entitled to receive **those same monthly payments** for the rest of their lives") (emphasis added); *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 513 (1981) (vesting creates a "legally enforceable claim to **100% of the pension benefits** created by a covered plan") (emphasis added). The Government's theory conflicts with this law. It also fails a "smell" test: What would be the purpose of vesting if the trustees could shrink a vested pension to a single penny?[3]

The Government then tries to wish away the *nine* cases we cited that recognized a property interest, under the Takings Clause, in vested retirement or employment benefits. Its lone argument is that those cases did not involve ERISA plans. Gov.Br. at 27. But it does not remotely explain why that matters. The property

---

counsel testified that the MPRA was the "first time" there were cuts to vested benefits. APPX11567.

[3] The Government alludes in passing to the notion that "the Fund reserved the right to amend" the Plan documents to cut vested pensions. Gov.Br. at 29. The CFC decisively rejected this theory after carefully reviewing both applicable law and the Plan's specific language. APPX10348-49. And for good reason. The Government points to no authority from the Federal Circuit, this Court, New York, or anywhere else that already-earned, vested compensation may be *reduced retroactively* by a general right-to-amend clause. In fact, the law is overwhelmingly to the contrary. *See, e.g.*, *Hartshorne v. The Roman Catholic Diocese of Albany*, 129 N.Y.S.3d 268, 278 (2020). And one struggles to see how the notion that a Fund may amend away vested rights can be squared with Supreme Court opinions that vesting means a pension becomes "**irrevocably** [a retiree's] property." *Heinz*, 541 U.S. at 749 (emphasis added). All of which likely explains why the Government barely mentions this argument on appeal.

interest analysis in each of those cases focused on whether benefits had *vested*, not on which statute governed those vested rights. And the Supreme Court has never once qualified its view that (1) ERISA-regulated pensions that vest create irrevocable property rights arising under contract (*Thole*, *Heinz*) and that (2) vested property rights cannot be taken under the Takings Clause (*Landgraf*). The Government also has no response to the fact that the same protections for vesting existed before ERISA was enacted. (*Nachman*, *Pennie*). It would be perverse if vested pensions became *less protected* when ERISA was enacted—given that ERISA was enacted primarily to supplement the protections that existed for pensions. *See Nachman*, 446 U.S. at 361 (Congress through ERISA wanted to ensure that if a worker "has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it").

Finally, the Government points to *Piszel v. United States*, apparently for the notion that because the pension sector is highly regulated through ERISA, Congress's authority to amend that regulatory scheme "inheres" in Plaintiffs' rights and so defeats any property interest. Gov.Br. at 28-29. But *Piszel* held just the opposite—that the presence of a pervasive regulatory scheme "**does not** defeat a property interest." 833 F.3d 1366, 1374-75 (Fed. Cir. 2016) (emphasis added). This rule is common sense: Otherwise the Government could seize stock portfolios or publicly traded companies—simply because shares and companies are subject to

extensive regulation by the SEC.[4] Conspicuously, the Government has cited exactly zero cases suggesting, even in dicta, that a pension fund may ever reduce vested pension benefits or that vested pensions are not property interests. Plaintiffs cite more than a dozen apt cases. The Government cites none.

Plaintiffs have a property interest and the CFC resolved this issue correctly. Onwards.

## II. THE *PER SE* TEST GOVERNS THIS LITIGATION.

We showed in Plaintiffs' opening brief that the *per se* test applies when the government is "appropriating private property," while the regulatory taking test applies when the government "instead imposes regulations that restrict an owner's ability to use his own property." Br. at 27-28; *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021). We further showed that the most analogous controlling case, *Brown v. Legal Foundation of Wash.*, 538 U.S. 216 (2003), confirms that a *per se* taking is the right way to view Plaintiffs' claim of a taking of money tied to a specific property interest or fund—and that the Supreme Court has affirmed this result time and again in cases such as *Webb's*, *Koontz*, and *Tyler*.

[4] This Court further has explained that "if a challenged restriction was enacted after the plaintiff's property interest was acquired, it cannot be said to 'inhere' in the plaintiff's title." *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1152 (Fed. Cir. 2014). Here, the challenged restriction—the MPRA's authorization of the seizing of vested pensions—came *decades* after Plaintiffs obtained their property interest in a vested pension.

The CFC held otherwise—that the *per se* test does not apply—based on its own reading of *Brown* and a trilogy of cases starting with *Connolly v. PBGC*, 475 U.S. 211 (1986). But as explained in Plaintiffs' opening brief, the CFC's reading of those cases conflicts with controlling precedent across a wide range of Supreme Court and Federal Circuit cases.

Now, the Government does not even try to defend the CFC's readings of *Brown* and *Connolly*. Instead, it advances its own entirely novel readings of those cases—ones that have never been recognized by any court, would overrule decades of Supreme Court and Federal Circuit precedent, and would have sweeping implications for an array of economic rights. As explained below, its imaginative readings should be rejected.

### A. There is no exception to the *per se* rule for cases where the plaintiff does not own the underlying assets.

The CFC took the view that *Brown* was inapplicable—and the *per se* test therefore inappropriate—because (in its words) Plaintiff's pension benefits "were not transferred to a new, intervening third party; rather, they remained part of the trust estate." APPX00029. But as Plaintiffs showed in their opening brief, the Supreme Court consistently has found a *per se* taking where the property interest did not transfer or change hands. Br. at 32-34. This is not a new rule: For nearly a century, the Supreme Court has applied a *per se* test when the Government takes a vested contractual right to payment—whether or not the security interest changes

hands. *See Louisville Joint Stock Land Bank v. United States*, 295 U.S. 555 (1935) ("*Louisville Bank*"). And this principle was confirmed by the Supreme Court just last year: It held that the plaintiff had stated a *per se* taking claim when the excess proceeds from the foreclosure of a home were never transferred to either the plaintiff or a third party, and instead "remain[ed] with the County" at all times. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 637 (2023). The CFC's "transfer" test, in other words, is indefensible.

The Government does not even try.

Instead, the Government pivots to its own, entirely different rationale to explain away *Brown*. It argues that the *per se* test is inapplicable when a plaintiff does not "own" the assets underlying a property interest. Gov.Br. at 33-35. But for multiple reasons this proposed rule also fails.

1. This "ownership" rule is a figment of the Government's imagination. The Government cites no cases where a court declined to apply the *per se* test because the plaintiff did not own the property or the underlying assets. There are no such cases.

2. The Supreme Court and the Federal Circuit repeatedly have held that there was a *per se* taking where the plaintiff did not own—and never owned—the underlying assets. For instance: A plaintiff with a lease does not own the underlying property, but the Supreme Court nonetheless has held that seizing a **leasehold** is a

*per se* taking. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) (citing *United States v. Gen. Motors Corp.*, 323 U.S. 373, 375 (1945)). *Brown* itself confirmed that the *per se* test applies to takings of a leasehold, *see* 538 U.S. at 233—rendering truly implausible the Government's suggestion that *Brown* silently meant to create a rule that ownership is a prerequisite to a *per se* taking.

Other cases confirm there is no ownership requirement. The *per se* test has been applied to **easements**, which allow a plaintiff to access property that someone else owns. *See Cedar Point Nursery*, 594 U.S. at 153. And to **mortgages** and **liens**, which are security interests in property owned by someone else. *See Armstrong v. United States*, 364 U.S. 40, 48-49 (1960) (liens); *Louisville Bank*, 295 U.S. at 601-02 (mortgages). And to **interpleader accounts**, even when someone else deposited the money into the account. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980).[5] And to **water rights**, where "although a private entity cannot own water itself, the right to use that water is considered private property." *Casitas Mun.*

[5] The Government cites *Webb's* as a case that references ownership. But in *Webb's* itself, the creditors of the pharmacy had never owned or even touched the money in the interpleader account—the money had been deposited there by a company purchasing the pharmacy. *Id.* at 158-61. The Supreme Court nonetheless held that the creditors had a property interest in their portion of the money in the account and had stated a *per se* claim against the county for interest withheld from that portion. *See id.* at 161-62; *see also id.* at 161 (creditors were "*ultimately* to be the owners" of the portion of the money to which they were due) (emphasis added); *id.* at 162 (property was being held "for the ultimate benefit of Webb's creditors").

*Water Dist. v. United States*, 708 F.3d 1340, 1354 (Fed. Cir. 2013). In other words, the Government's rule that a plaintiff must own an underlying asset to state a *per se* taking claim clashes with decades of controlling caselaw.

3. The Government derives its supposed rule from occasional references in cases to the word "ownership." Gov.Br. at 31, 35. Naturally, some Takings Clause cases involve ownership—so it is unsurprising that it is mentioned from time to time. But none of the cases the Government cites even hint that ownership is a requirement. Instead, time and again, the actual analysis for whether a *per se* taking occurs turns on the existence of a "property interest" or "property right," not property *ownership*.[6] In fact, one of the main cases the Government cites as referencing "ownership" specifies—17 times—that a "property interest" or "property right" is the touchstone of a *per se* taking. *See Cedar Point Nursery*, 594 U.S. at 149-61. Neither that case nor any other created an "ownership" requirement.

4. Finally, the Government's "ownership" rule would have sweeping implications. People do not own the underlying asset for their insurance policies, annuities, wages, leases, sub-leases, bonds, trust distributions, commercial loans,

---

[6] *See, e.g.*, *Koontz*, 570 U.S. at 614 (*per se* approach is the "proper mode of analysis" for taking of "funds linked to a specific, identifiable property interest"); *Tahoe-Sierra*, 535 U.S. at 302 (*per se* taking exists where plaintiff has "property interest"); *Landgraf*, 511 U.S. at 266 (Takings Clause prevents government from depriving private persons of "vested property rights"); *Webb's*, 449 U.S. at 161 (*per se* test applies to taking of "property right" or "property interest").

mortgages, liens, credit-card debt, residual royalties, or a host of other economic rights essential to the U.S. economy. The Government is evidently seeking a rule that would empower it to seize or reallocate these economic rights. Yet, again, it cites no precedent for such a sweeping claim.

The Government's attempts to evade *Brown* (and the other cases on which Plaintiffs have relied) fail.[7] And so it turns to one final argument.

### B. There is no exception to the *per se* test for property interests arising out of contract.

The other reason the CFC chose not to apply the *per se* test was its reading of a trilogy of cases beginning with *Connolly v. PBGC*, 475 U.S. 211 (1986) for the notion that a *per se* taking cannot occur "in the context of . . . pension plans, when the government takes nothing for its own use." APPX00024. Plaintiffs already showed that this reading ignores multiple decisions holding that the *per se* test applies regardless of whether a government appropriates a property interest for itself or for the benefit of a third party. Br. at 35-36 (discussing *Cedar Point Nursery*,

[7] The Government intimates that the *per se* test should be inapplicable because the Government did not "physically" appropriate the pensions from Plaintiffs. Gov.Br. at 31. But as Plaintiffs already showed, there is a long line of controlling cases applying the *per se* test to intangible (that is, non-physical) property. *See* Br. at 29. All of these types of property are intangible. Yet for each, the Court applied a *per se* test. *E.g.*, *Brown*, 538 U.S. at 235 (using a "*per se* approach"). There is no plausible way to read *Brown*—or *Tyler* (money) or *Koontz* (money), *Webb's* (money), *Louisville Bank* (mortgages), *Armstrong* (liens), or *James v. Campbell*, 104 U.S. 356, 358 (1881) (patents), among others—to require the taking of something that is literally "physical."

*Brown*, *Casitas*, *Loretto*). Plaintiffs further showed that the CFC's theory neglects the actual reading that the Supreme Court and this Court consistently have given the *Connolly* trilogy in no fewer than five decisions. Br. at 36-38 (discussing *Koontz*, *E. Enterprises*, *Commonwealth Edison Co.*, *Adams*, *Branch*).

In response, the Government again abandons the CFC's reasoning. In place of the CFC's interpretation of the *Connolly* trilogy, the Government offers an even more extravagant interpretation of those cases—that they should be read to mean that the *per se* test is inapplicable to a Takings Clause claim arising out of a "contractual relationship." Gov.Br. at 37-39. There is no basis in law or reason for such a reading.

At the outset, no case in the nearly forty years since *Connolly* has held that there is an exception to the *per se* test for property interests arising out of a contract. This Court would be the first. Once again, to evade the clear principle that the *per se* test applies to this case, the Government is compelled to ask this Court to manufacture an entirely new rule of law.

Moreover, the Government's proposed rule again conflicts with decades of holdings. In *Brown*, the parties told the Supreme Court that the case arose out of a contract between one private party (the depositor) and another (the bank).[8] Yet the

---

[8] *See* Br. for Respondent Justices of the Washington Supreme Court, 538 U.S. 216 (2003) (No. 01-1325), 2002 WL 31387469 ("These credits were a function of . . . a **contracted** percentage rate"); Petition for Writ of Certiorari, 538 U.S. 216 (2003)

Supreme Court unanimously held that the *per se* test applied.[9] In *Tahoe-Sierra*, the Supreme Court affirmed that the *per se* rule applies to a taking of a leasehold—a property interest that arises out of a contract (a lease agreement). 535 U.S. at 322 (citing *Gen. Motors Corp.*, 323 U.S. at 375). Likewise, the mortgage in *Louisville Bank* and the water rights in *Casitas* arose out of contracts. *Louisville Bank*, 295 U.S. at 587-89; *Casitas*, 543 F.3d at 1282. The Supreme Court and this Court repeatedly have applied the *per se* test to cases arising out of contract. The Government's dangerous rule would negate them all.

Policy considerations confirm the wisdom of this wealth of precedent. The Government's novel rule would give it free rein to seize without compensation a dizzying array of assets and revenue streams that are created by contract: bank accounts, retirement accounts, wages, rent, inter-bank loans, stock options, mortgage

---

(No. 01-1325) ("[A] bank is merely a debtor of the depositor whose duties **depend on contract**"); *see also* Br. of the Conference of Chief Justice as Amicus Curiae in Support of Respondents, 538 U.S. 216 (2003) (No. 01-1325), 2002 WL 31387432 ("the **terms of a lawyer's deposit contract** with the bank clearly establish that whatever interest is generated will be used to fund the nonprofit IOLTA foundation"); Br. of the Chief Justice et al. as Amici Curiae in Support of Respondents, 538 U.S. 216 (2003) (No. 01-1325), 2002 WL 31399644 ("[T]he depositor's right is **contractual in nature**"). All emphasis was added.

[9] The Government observes that the Supreme Court "did not even cite *Connolly* or *Concrete Pipe* in the 2003 *Brown* decision, indicating that the Court viewed the situations as distinguishable." Gov.Br. at 38. Precisely. Had the Court actually intended *Connolly* to bar *per se* claims based on a contract, surely it at least would have mentioned *Connolly* before unanimously holding that there the *per se* taking test governed a case arising out of a contract.

payments, car payments, commercial loans, and licensing revenues—to name a few.

The Government's reading also ignores the interpretation that the Supreme Court and this Court consistently have given the *Connolly* trilogy: The regulatory takings test applies to mere "obligations to pay money" as a "liability" that a party can pay from any source, but the *per se* test applies to appropriations of money from an "identifiable fund" or otherwise "linked to a specific, identifiable property interest." *Koontz v. St. Johns River Water Mgmt.*, 570 U.S. 595, 613-14 (2013); *E. Enterprises v. Apfel*, 524 U.S. 498, 540 (1998) (Kennedy, J., concurring); *id*. at 555 (Breyer, J., dissenting for four Justices); *Commonwealth Edison Co.*, 271 F.3d 1327, 1338-40 (Fed. Cir. 2001) (en banc); *Adams v. United States*, 391 F.3d 1212, 1224-26 (Fed. Cir. 2004); *Branch*, 69 F.3d 1571, 1578 (Fed. Cir. 1995). Plaintiffs discussed this caselaw in their opening brief (Br. at 35-37), but the Government provides no response—and its brief does not even mention most of these cases in its *Connolly* discussion. Later, the Government does briefly reference *Koontz*, suggesting it applies only to government commands to relinquish money in "cases involving real property." Gov.Br. at 40. But *Koontz* itself says just the opposite: "[W]hen the government commands the relinquishment of funds linked to a specific, identifiable property interest **such as a bank account** or parcel of property, a '***per se*** **[takings] approach**' is the proper mode of analysis under the Court's precedent." *Koontz*, 570 U.S. at 614 (emphasis added).

The Government bases its supposed rule on a single line in *Connolly* that says "the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking." Gov.Br. at 36-37 (quoting *Connolly*, 475 U.S. at 224). But *Connolly* in this sentence was citing *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923). As Plaintiffs explained in detail below—and as the CFC agreed, APPX10354-60—there is a clear difference in the law between a statute that incidentally "interferes" with or "frustrates" a contract (as in *Omnia*—or *Connolly*) and the "appropriation" of a vested property interest that arises under contract (as in *Brown*, *Gen. Motors Corp.*, *Louisville Bank*, *Casitas*—and here).[10] And yet that is all that *Connolly* was saying in this sentence—that *Omnia* cases do not give rise to a *per se* rule. The Government no longer even tries to argue on appeal that *Omnia* governs this case.[11]

---

[10] *See, e.g.*, *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 476 n.3 (1973) (*Omnia* is a case where the plaintiff was merely "seeking compensation for lost opportunities" rather than for "property taken"); *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1369 (Fed. Cir. 2009) (*Omnia* applies where "the expectation of the [plaintiff] has been disappointed, but it is not an expectation that was based on any property right that was taken"); *767 Third Ave. Assoc. v. United States*, 48 F.3d 1575, 1582 (Fed. Cir. 1995) (*Omnia* applies where the "government . . . did not take any property interest of [the plaintiff]," but instead "a contract expectation is merely frustrated by a regulation directed toward a different party or property interest").

[11] The Government points to two inapt, out-of-circuit cases to try to prop up its argument. One merely quotes the same sentence from *Connolly* that the Government quotes. *National Mining Assoc. v. Babbitt*, 172 F.3d 906, 917 (D.C. Cir. 1999). And the other conflicts outright with the Government's theory, saying it is "fairly obvious" there is a *per se* taking when the government "take[s] over a leasehold

And that is the entirety of the Government's argument about the *Connolly* trilogy. The Government does not even try to defend the CFC's erroneous reading of the cases. It asks this Court to announce an entirely new narrowing rule for *per se* cases that would upend decades of settled takings law. And it ignores the way that five Supreme Court and Federal Circuit opinions actually have interpreted the trilogy.

No court has ever held what the Government now asks this Court to hold—that property interests arising out of contract fall outside of the *per se* test. This Court should reject the Government's invitation to create a dangerous new doctrine. That the Government feels it must press for such a massive reshaping of takings law to prevail in this case—proposing sweeping new exceptions to the *per se* rule for non-ownership or contracts—speaks volumes. The law is not on its side. The *per se* rule governs this litigation.

## III. PLAINTIFFS PREVAIL UNDER THE *PER SE* TEST.

Once the Court decides, correctly, to apply the *per se* test, this case becomes remarkably simple. The *per se* test involves applying four elements. All are satisfied or, at most, should be addressed as part of a trial focused on damages.

The first element is whether Plaintiffs have a property interest. As discussed

---

interest." *Buffalo Teachers Fed. v. Tobe,* 464 F.3d 362, 374 (2d Cir. 2006). Once again: A lease agreement is a contract.

above, the CFC correctly decided that Plaintiffs had such an interest. Plaintiffs view the interest slightly differently than the CFC (Br. at 43) but the CFC's core conclusion is right: Plaintiffs have satisfied this element.

The second element is whether Plaintiffs lost their property right because of government action. The Government fought on this issue fiercely below, arguing that authorizing a third party to appropriate Plaintiffs' pension rights does not give rise to government action. The CFC rejected that argument, and found that this element was met for a *per se* taking. APPX10363-66. That is because case after case—*Loretto, Cedar Point, Brown, Louisville Bank*—has made clear that governments are liable for a taking if they authorize a third party to take property that the governmental actor could not take for itself. In any event, the Government has not contended in its recent appellate brief that the CFC was wrong, so it has forfeited this point. Thus, the second element of the *per se* test is established.

The third element is whether the taking has a public purpose. The Government does not dispute this issue.

Finally, the Government suggests there is a dispute about whether Plaintiffs were harmed. As we explained, Plaintiffs' expert showed that all three Plaintiffs were undisputedly harmed even if one relies only on the calculations on which the Government relied in approving the Fund's pension cuts. Br. at 49-51. In other words, the undisputed evidence shows that Plaintiffs were harmed. At most, this is

an issue to remand for further fact-finding. But this disputed issue certainly cannot be resolved in the Government's favor at the summary judgment stage. RCFC 56(a). Notably, the experts even agreed that at least one of the named Plaintiffs was harmed economically. APPX05656; APPX05688. And the Government (though it implies that some offsetting benefit was received) does not dispute that it caused harm to the hundreds of widows who received no Make Up Payment.

In short, the question of whether Plaintiffs and other putative class members suffered harm collapses into a calculation of damages: It would be inefficient to have one round of post-remand briefing on whether there was harm and a trial about the *size* of that harm. The Court should remand for a trial on damages—or otherwise allow the CFC to decide on appropriate proceedings.

In sum, the *per se* test applies because Plaintiffs' property interest was *appropriated* not regulated. And the *per se* test is satisfied because all four elements have been met.

## IV. PLAINTIFFS' PROPERTY WAS TAKEN EVEN IF THE COURT APPLIES A REGULATORY TAKINGS TEST.

This case should be assessed as a *per se* taking. But as explained in Plaintiffs' opening brief, Plaintiffs prevail even if this Court applies one of the two regulatory-takings tests.

### A. *Lucas*

If the Court chooses to view this case as falling under the regulatory taking test, it should apply the categorical taking analysis of *Lucas*. The Government says *Lucas* is inapplicable because, in assessing whether a taking is categorical, one must look at the "parcel as a whole." Gov.Br. at 44. But the Government misses the point, which is: What is the relevant parcel? The CFC characterized the property interest in the case as "the right to an unreduced vested pension." That right was categorically taken—the MPRA authorized its deletion outright from the plan agreement, and then for good measure, also overrode Plaintiffs' right of action against the fund for damages. All of this is undisputed. The Government categorically eliminated a vested right to property and then closed off any opportunity for legal relief. If that is not a *per se* taking, it is a categorical one.

### B. *Penn Central*

Plaintiffs also demonstrated in their opening brief that each element of the *Penn Central* test—"the character of the governmental action," "interference with investment-backed expectations," and the "economic impact of the regulation on the claimant"— supports a taking here. Br. at 53-58. The Government's responsive brief mostly is content to rely on the CFC's opinion—while failing to engage the extensive evidence that Plaintiffs bring forward on each element.

### 1. Character of the governmental action

In their opening brief, Plaintiffs showed that the cuts to their vested pensions were "of lengthy duration," applied "retroactively," placed a "disproportionate" burden on retirees, and were "intrusive beyond the level of traditional government limits" in this area." Br. at 54. The Government seems to agree these are the relevant factors, but it ignores the evidence Plaintiffs cites for each, and points to no contrary evidence from the record in response. Gov.Br. at 59-60.

Instead, the Government quotes language from *Connolly* about programs that "adjust[] the benefits and burdens of economic life." Gov Br. at 56. But this Court has rejected reliance on this language, describing it as "unhelpful." *Cienega Gardens*, 331 F.3d at 1339 (reversing trial court). And for good reason. As the Supreme Court has observed, "government regulation—by definition—involves the adjustment of rights for the public good." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005) (quotations omitted). If that were enough to defeat a takings claim, the Government would have free rein to seize property, without compensation, for whatever it deems the greater economic good.

The Government then argues that the "burden" of the law is "allocated" in an evenhanded manner. Gov.Br. at 57 (quotations omitted). But this is simply wrong on the facts: The Government authorized cuts of Plaintiffs' pensions that were far larger than those for active workers, APPX05203; the Government's own officials

testified that the MPRA was "heavily tilted against" retirees, APPX06448A; and the Government's internal documents said the statute "weighs too heavily" against retirees, APPX05033. The Government does not address any of this evidence, or explain how it can prevail at the summary-judgment stage on the ground that the law is evenhanded when its own documents and officials say the exact opposite.[12]

### 2. Reasonable investment-backed expectations

Applying the three-factor test set out in *Commonwealth Edison*, the CFC concluded that Plaintiffs had reasonable, investment-backed expectations to their vested pensions. APPX00038-40.

The Government responds first by insisting that Plaintiffs "operate[d] in a highly regulated industry" under the first factor. Gov.Br. at 51 (quotations omitted). But its brief answers itself: In the same breath, the Government concedes that Plaintiffs do not operate in the arena of multiemployer pension plans in the sense that a corporation or a fund does. Gov.Br. at 52; *see Cienega Garden*, 331 F.3d at

---

[12] The Government cites two cases here—one in which a government memorandum applied to "all mining claimants," *Reoforce, Inc. v. United States*, 853 F.3d 1249, 1271 (Fed. Cir. 2017), and another in which government regulations "broadly applied to almost any egg producer in the United States," *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1278 (Fed. Cir. 2009). Gov.Br. at 58. But the MPRA does not "broadly" apply to "all" or even "almost" all pension-holders. The cuts here are confined to (i) a subset of multiemployer pension funds that meet the criteria of the statute, (ii) a further subset of those funds where the trustees apply and Treasury approves the application, and then (iii) a minority of participants in those funds—those retirees with vested pensions. This is a far cry from the nearly universal application of the law in *Reoforce* or *Rose Acre Farms*.

1351 (inquiry looks to whether plaintiffs "do[] business" in the regulated industry). That a corporation doing business in a highly-regulated industry should reasonably expect certain changes to those regulations says nothing about whether reasonable blue-collar workers in Plaintiffs' position should have expected their vested property rights to be seized long after they retired. *See* Br. at 55 (explaining that test looks to a reasonable worker in Plaintiffs' position).

Next, the Government speculates that in light of the "purpose" of ERISA, Plaintiffs "could have" anticipated that Congress would slash their vested pensions. Gov.Br. at 53. But even pension experts did not anticipate that Congress would cut vested pensions. APPX05390 (noting that the MPRA was "unprecedented"); APPX05568 ("very, very novel"). The Government, here in court, is the first party to suggest that workers in Plaintiffs' position should have seen this coming. The Government then asserts that Plaintiffs "obviously" knew that their vested pensions could have been cut in the event of "plan insolvency." Gov.Br. at 52. But the Government's argument is akin to saying that because people can reasonably expect that a local government might foreclose on their house if they fail to pay their taxes, so that government should be able to seize anyone's house without compensation at any time, for any reason. The Government cites no law for this dubious principle.

The CFC erred in one respect on this element: It suggested that while Plaintiffs had reasonable investment-backed expectations, the Government did not interfere

with those expectations because (in the CFC's words) the MPRA "protected the plaintiffs' benefits by preventing the plaintiffs from receiving much less if the Teamsters Fund actually became insolvent." APPX0041. But as Plaintiffs showed, this ruling both misreads the lone case the CFC cites for this proposition (*Alimanestianu*), and overlooks that the parties' experts agree that at least one Plaintiff in fact would not have received less had the Fund become insolvent. Br. at 51, 56. Once again, the Government lacks a response: It does not mention *Alimanestianu*, does not acknowledge the expert reports, and does not explain how the CFC's ruling on this point can survive when it clashes with undisputed evidence in the record.

### 3. Economic impact on the Plaintiffs

Finally, the economic impact factor of the *Penn Central* test asks whether the impact of the taking is "serious" or "substantial." The Government does not rebut the evidence in Plaintiffs' opening brief—including evidence from its own documents and officials—showing that the impact of the cuts on Plaintiffs has been, in any meaningful sense of the terms, serious and substantial. Br. at 57. Instead, the Government tries to avoid the implications of this evidence by arguing that the monetary amount of the loss the Plaintiffs suffered is too small to give rise to a regulatory taking. Gov.Br. at 46-47.

On this point, the Government admits there is no hard numerical threshold in the law, but still devotes most of the rest of this section to arguing that Plaintiffs' claims should fail because their vested pensions were cut by less than a 50 percent threshold. And yet the Government has no meaningful response to Plaintiffs' showing that a numerical threshold is not the rule for monetary takings. In fact, the Government is unable to identify a single case that ever applied a numerical threshold to a monetary taking. And so it is forced to resort instead to one final wild claim—that an appropriation of money on its own can never "suffice to demonstrate sufficient economic impact." Gov.Br. at 48.

The Government here is saying the quiet part out loud. Yet again, the Government proposes a sweeping rule with no articulated limits. This time, it seeks the power to seize without compensation up to 50 percent of bank accounts, brokerage accounts, 401(k) accounts, money wires, wages, bond offerings, life insurance plans and so on—all of which involve money. This Court should reject the Government's attempt to expand its power to plunder.

## CONCLUSION

The CFC's judgment should be reversed.

Respectfully submitted,

*/s/ Noah A. Messing*

Noah A. Messing
Messing & Spector LLP
250 Park Avenue, 7th Floor
New York, NY 10177
nm@messingspector.com
Telephone: (212) 960-3720

Phillip M. Spector
Messing & Spector LLP
145 West Ostend Street, Suite 600
Baltimore, MD 21230
ps@messingspector.com
Telephone: (202) 277-8173

April 11, 2024

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE WITH RULE 32

Pursuant to Federal Circuit Rule 32(b)(3) and Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(e) and Federal Circuit Rule 32(b)(1) because it contains 6,988 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief was prepared using Microsoft Word in 14-point Times New Roman font.

*/s/ Noah A. Messing*

Noah A. Messing

April 11, 2024