# United States Court of Appeals for the Federal Circuit

---

**WILLIAM KING, STEPHEN DARDZINSKI, ON BEHALF OF THEMSELVES AND ON BEHALF OF A CLASS OF OTHERS SIMILARLY SITUATED, ESTATE OF ANTHONY GUGLIUZZA, BY ITS PERSONAL REPRESENTATIVE, ANTHONY A. GUGLIUZZA,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2023-1956

---

Appeal from the United States Court of Federal Claims in No. 1:18-cv-01115-RAH, Judge Richard A. Hertling.

---

Decided: August 18, 2025

---

NOAH A. MESSING, Messing & Spector LLP, New York, NY, argued for plaintiffs-appellants. Also represented by PHILLIP SPECTOR, Baltimore, MD.

GEOFFREY M. LONG, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also

represented by BRIAN M. BOYNTON, ERIC P. BRUSKIN, PATRICIA M. MCCARTHY.

---

Before DYK, CHEN, and STARK, *Circuit Judges*.

DYK, *Circuit Judge*.

In this takings case, pensioners of a multiemployer retirement fund covered by the Employee Retirement Income Security Act of 1974 ("ERISA") appeal on behalf of themselves and a certified class of similarly situated individuals from a decision of the U.S. Court of Federal Claims ("Claims Court") granting summary judgment in favor of the government. The Claims Court concluded that Congress's enactment of the Multiemployer Pension Reform Act of 2014 ("MPRA"), and the resulting reduction of plaintiffs' pension benefits, did not constitute a taking under the Fifth Amendment. We conclude that the legislation was not a physical taking and plaintiffs did not prove it was a regulatory taking, so we affirm the decision of the Claims Court.

## BACKGROUND

### I

This case involves Congressional action in 2014 authorizing restructuring of pension benefits to prevent future shortfalls by reducing the benefits of current beneficiaries. This involved an amendment to ERISA that had the effect of making ERISA's definition of insolvency more closely resemble that in the Bankruptcy Code. The central question is whether such an intervention results in a physical Fifth Amendment taking of the disadvantaged employees' pension rights, or whether the legislation must be analyzed as a regulatory taking pursuant to the test set forth in the Supreme Court's decision *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).

A

At the outset, it is important to understand that the right to receive pension benefits "is more in the nature of a contract" than a trust and, most importantly, the pension beneficiary does not have a property interest in the assets held by the trust underlying the pension plan. *See, e.g.*, *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540, 542–43 (2020) (noting that pensioners under a defined-benefit plan "are legally and contractually entitled to receive th[e] same monthly payments for the rest of their lives" but "possess no equitable or property interest in the plan [assets themselves]").

Before assessing how the MPRA changed ERISA to allow reduction of benefits owed by potentially insolvent multiemployer pension plans, it is helpful to understand the history of pension benefits and the types of past actions designed to deal with actual or potential insolvency. In general, prior to ERISA, there were three types of retirement plans that provided defined benefits in the form of monthly payments to retirees—those offered as annuities by private insurance companies, single-employer defined-benefit plans, and defined-benefit plans (like the one here) created by multiemployer pension funds. All three kinds of plans were susceptible to the risk that the companies contributing to retirement trusts (or paying annuities), or the trusts themselves, would experience financial difficulties that resulted in an inability to pay the promised benefits.

Before the enactment of ERISA in 1974, there was no comprehensive federal regulatory framework for employer-provided pension plans. *See Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980). Rather, in the case of financial difficulties, the right to receive annuity benefits was governed by the Bankruptcy Code, state insurance law, or state contract law.

For single-employer pension plans, financially troubled employers burdened by significant pension liabilities could

declare bankruptcy under the Bankruptcy Code's definition of insolvency if their current liabilities exceeded assets. The Bankruptcy Code defined (and still defines) insolvency as an entity's "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation," with some exemptions not relevant here. 11 U.S.C. § 101(32)(A). Stated differently, "[i]nsolvency is determined by whether assets exceed liabilities, and not . . . whether the debtor was able to pay its debts as they become due." 2 Collier on Bankruptcy ¶ 101.32 (16th ed. 2012).

Where a company faced insolvency so defined because its liabilities (including pension liabilities) exceeded the company's assets, the Code permitted either the liquidation of the company (Chapter 7) or a restructuring of the company's debts (Chapter 11). Under either approach, the pensioners, through the trustees of their plans, effectively held only unsecured claims in bankruptcy. The end result was that many plans were terminated, and pensioners had their benefits reduced on a pro rata basis, if they received them at all.[1] *See, e.g.*, 120 Cong. Rec. 4,280 (1974) (statement of Rep. Ray Madden) ("Over the years, when employers, corporations, or industries closed operations, moved to new locations, failed under bankruptcy or fired employees, they escaped their obligation to carry out their pension or retirement contracts."); *see also id.* at 4,288 (statement of Rep. Mario Biaggi) ("When a company effectively goes out of business all of its assets and commitments go into the

---

[1] Even where an employer did not seek bankruptcy protection, employers frequently avoided pension obligations to employees by operation of contract law and the terms of their respective plan documents. *See* Norman Stein, *Raiders of the Corporate Pension Plan*, 5 Am. J. Tax Pol'y 117, 136–40 (1986).

general fund of bankruptcy and are lost to the worker. He receives no pension payments.”).[2]

A similar situation arose when private insurance companies that provided annuities became insolvent. Such entities were and are ineligible to seek federal bankruptcy protection. *See* 11 U.S.C. § 109(b), (d). Instead, they were and are heavily regulated by state law and may be liquidated in state court when they become insolvent. *See Sims v. Fidelity Assurance Ass'n*, 129 F.2d 442, 448–49 (4th Cir. 1942), *aff'd*, 318 U.S. 608 (1943); *see also* S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5817, 6275. For these purposes, the states generally defined and define insolvency to cover both the situation where an insurance company's liabilities exceed its assets (the definition in the Bankruptcy Code),[3] or where the company lacks

---

[2] Shortly after ERISA was enacted, Congress amended the Bankruptcy Code to provide priority status to certain unsecured claims for fringe benefits, including pension payments. *Howard Delivery Serv. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 654 (2006)

[3] *See, e.g.*, N.Y. Ins. Law § 1309(a) (2025) (defining insolvency in part as “not having sufficient assets to reinsure all outstanding risks with other solvent authorized assuming insurers after paying all accrued claims owed”); Fla. Stat. Ann. § 631.011(14) (2025) (defining insolvency in part as occurring when “all the assets of the insurer, if made immediately available, would not be sufficient to discharge all its liabilities”); Ky. Rev. Stat. § 304.33-030(12) (2025) (defining insolvency as occurring when an insurer's “assets do not exceed its liabilities plus the greater of” statutorily required capital and surplus or issued capital stock); *see also* Cal. Ins. Code § 985(a)(1) (2025) (defining insolvency as occurring when an insurer's assets do not exceed the sum of its liabilities as required by Section 36 of the California Insurance Code).

the ability to pay its debts as they become due in the regular course of business (similar to the definition adopted by ERISA, as discussed below).[4] In cases of liquidation, annuitants frequently saw their monthly payments reduced significantly. A prominent example of this was the liquidation of the Executive Life Insurance Company of New York ("ELNY") in 2012. *See In re. Exec. Life Ins. Co. of New York*, 959 N.Y.S.2d 513, 514–15 (App. Div. 2013). As part of the liquidation, "ELNY's assets were to be distributed on a pro rata basis to payees of ELNY annuities." *Id.* This had the effect of reducing the benefits of "approximately 15% of payees[,] . . . some by significant percentages." *Id.*

Multiemployer plans existed before ERISA. As Congressional reports made clear when considering the Multiemployer Pension Plan Amendments Act of 1980, "[p]rior to ERISA, trustees in a [multiemployer] plan experiencing a serious drain on assets because of large numbers of retirees and contribution base declines could avoid insolvency by reducing benefits." H. Rep. No. 96-869, pt. 1, at 60 (1979); *see also id.* at 54 ("[P]lan trustees had the flexibility to control escalating costs by deferring funding, tightening

---

[4] *See, e.g.*, N.Y. Ins. Law § 1309(a) (2025) (defining insolvency in part as occurring when "an authorized insurer is unable to pay its outstanding lawful obligations as they mature in the regular course of business"); Fla. Stat. Ann. § 631.011(14) (2025) (defining insolvency in part as occurring when "the insurer is unable to pay its debts as they become due in the usual course of business"); Cal. Ins. Code § 985(a)(2) (2025) (defining insolvency in part as an "inability of the insurer to meet its financial obligations when they are due"); Ky. Rev. Stat. § 304.33-030(12) (2025) (defining insolvency in part as occurring when "the insurer is unable to pay its debts or meet its obligations as they mature").

vesting or eligibility rules, or in extreme cases, reducing benefits.”).

## B

With the enactment of ERISA, Congress created a “comprehensive and reticulated” regulatory scheme to protect benefits offered by single-employer and multiemployer pension plans. *Nachman Corp.*, 446 U.S. at 361.

ERISA required covered retirement plans to “provide that an employee’s right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age.” 29 U.S.C. § 1053(a). A “nonforfeitable” benefit was “a claim . . . to that part of an immediate or deferred benefit under a pension plan which [arose] from the participant’s service, which [was] unconditional, and which [was] legally enforceable against the plan.” *Id.* § 1002(19). By making such claims “nonforfeitable,” ERISA protected against the loss of pension benefits for those employees who switched or lost their jobs before drawing on their pensions, *see Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 512 (1981), a phenomenon that frequently occurred before the statute’s enactment, *see* S. Rep. No. 93-383, at 45–46 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 4889, 4929–30.

A part of ERISA’s protections of pension benefits was known as the “anti-cutback rule,” which provided that “[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan.” 29 U.S.C. § 1054(g)(1); *see also Cent. Laborers’ Pension Fund v. Heinz*, 541 U.S. 739, 744 (2004). The anti-cutback rule contained two exceptions, the first of which existed with the initial enactment of ERISA and permitted benefit reductions in the event of a “substantial business hardship” of the employer or employers contributing to the plan (a situation not present here). 29 U.S.C. § 1082(d)(2); *see also* Employee Retirement Income Security Act of 1974, Pub. L. 93-406 § 303, 88 Stat. 829, 872. The second exception was added to ERISA by amendment in 1980 and permitted the

sponsor of a multiemployer pension plan to reduce benefits if the plan became "insolvent." *See* Multiemployer Pension Plan Amendments Act of 1980, Pub. L. 96-364 sec. 104, § 4245, 94 Stat. 1208, 1259 (codified at 29 U.S.C § 1054(g)(1); *id.* § 1441(d)(1); *id.* § 1426(a)).

As originally enacted and as modified in 1980, ERISA did not utilize the Bankruptcy Code's definition of insolvency. Instead, ERISA defined insolvency as occurring when "the plan's available resources are not sufficient to pay benefits under the plan when due for the plan year." 29 U.S.C. § 1426(b)(1). This definition was significantly narrower than the definition of the term in the Bankruptcy Code, as it did not focus on the long-term shortfall of a plan's assets compared to its liabilities. The result was that a plan with a long-term shortfall was still permitted, indeed required, to pay current benefits, exacerbating that long-term shortfall. Thus, current beneficiaries of a fiscally troubled plan would continue to receive full benefits, such that the resources of the plan were further depleted, at the expense of future beneficiaries.[5]

[5] Another component of ERISA was the establishment of the Pension Benefit Guaranty Corporation ("PBGC"), which provides statutorily guaranteed minimum payments to participants of insolvent plans. The PBGC guarantee does not fully protect the future beneficiaries. If a plan becomes insolvent, a portion of the unfunded vested benefits of the plan are guaranteed by the PBGC, an entity whose funding is largely made up of premiums paid by employers contributing to ERISA-covered pension plans. *See* 29 U.S.C. § 1305(a). But ERISA does not provide that the PBGC guarantees the entirety of a plan's pension liabilities; the statute sets a maximum insured benefit amount for each pensioner whose plan becomes insolvent (under ERISA's definition). *Id.* § 1322a(c).

C

In 2014, Congress became concerned about the fiscal health of many of the nation's multiemployer pension plans, which were projected to have liabilities exceeding assets, such that they would be unable to pay benefits due in future plan years. *See* Pension Benefit Guar. Corp., 2014 Projections Report 5–6 (2015); U.S. Chamber of Comm., The Multiemployer Pension Plan Crisis 3–4, 14 (2017). This had two potential consequences. It threatened the financial stability of the PBGC, and (as relevant here) it threatened the stability of plans whose payment obligations were in excess of the PBGC's guaranteed amounts.

Congress enacted the MPRA to amend ERISA and to provide an expanded statutory exception to the anti-cutback rule. The relevant amendments had the effect of more closely aligning the definition of insolvency for purposes of the anti-cutback rule to the term as it appears in the Bankruptcy Code, although the statutory definition of "insolvency" in ERISA had not been changed. The MPRA also had the effect of allocating a plan's shortfall to apply more broadly across current and future beneficiaries.

As relevant here, the MPRA empowers administrators of plans that are deemed to be in "critical and declining" status to amend their respective plans to "suspend benefits" to avoid long-term shortfalls. 29 U.S.C. § 1085(e)(9)(A). Broadly speaking, a plan is in "critical and declining status" if it meets statutory criteria delineating an assets-to-liabilities ratio and "is projected to become insolvent" under ERISA's definition—i.e., is unable to pay

---

If a pensioner's benefit level under their plan documents exceeds the PBGC's statutory maximum payment, ERISA requires the plan sponsor to reduce the benefits owed to match the statutory limit (when the plan becomes insolvent). *Id.* §§ 1441(a), (d)(1); *see also id.* § 1322a(c).

benefits as they became due—"during the current plan year or any of the 14 succeeding plan years." *Id.* § 1085(b)(6). This new "suspension of benefits" allows for "the temporary or permanent reduction of any current or future payment obligation of the plan to any participant or beneficiary under the plan." *Id.* § 1085(e)(9)(B)(i). These changes thus permitted the reallocation of the shortfall burden across all plan beneficiaries (with some narrow exceptions, e.g., those over 80 or disabled), while continuing to protect pension benefits to the maximum extent possible.

Before imposing any benefit suspensions under the MPRA, plan sponsors are required to satisfy certain conditions. Benefit reductions are not permitted unless it is established that the plan is in critical and declining status and will experience insolvency within the specified time period. *Id.* § 1085(e)(9)(C)(ii). Plan administrators seeking to suspend benefits are obligated to apply to the U.S. Department of the Treasury ("Treasury") for approval, and to assure Treasury that "all reasonable measures to avoid insolvency have been taken (and continue to be taken during the period of the benefit suspension)." *Id.* Applications must also specify the amount of benefit reductions, which will be "equitably distributed across the participant and beneficiary population, taking into account factors" such as "[a]ge and life expectancy," "[l]ength of time in pay status," the amount and type of benefit, and the history of prior benefit increases and reductions. *Id.* § 1085(e)(9)(D)(vi). Benefits are not permitted to be "reduced below 110 percent of the monthly benefit" guaranteed by the PBGC and cannot apply to any participant over the age of 80 or disabled at the time of suspension. *Id.* § 1085(e)(9)(D). Any benefit reduction is required to be "reasonably estimated to achieve, but not materially exceed, the level . . . necessary to avoid insolvency." *Id.* § 1085(e)(9)(D)(iv).

The MPRA also requires a vote by plan participants before any benefit reductions became effective. If Treasury

approves an application, Treasury conducts a vote, and if a majority of plan participants and beneficiaries do not vote to reject the proposed suspension, Treasury must authorize it. *See id.* § 1085(e)(9)(H).[6] Plan administrators then implement the approved suspension by amending the plan documents. *See id.* § 1085(e)(9)(A).

## II

### A

Here, the New York State Teamsters Conference Pension & Retirement Fund ("Plan") is a private multiemployer defined-benefit plan established in 1954. The Plan consists of a plan document and its amendments, as well as a trust agreement. Under the Plan, participating employers contribute to the "Trust Estate," which is administered by the Plan's trustees. Pensioners hold rights to receive payments from the Trust Estate as provided in the Plan documents. *See* J.A. 12894 (Trust Agreement ¶ 5); J.A. 12811 (Plan Document § 9.06).

The Plan delineates schedules for employees' accrual of benefits and vesting. *See* J.A. 12779 (Plan Document Art. 5). A participant's benefits are "vested" when the participant "has (a) met the minimum service requirements . . . and has acquired a non-forfeitable right to a pension benefit under the Plan, or (b) attained Normal Retirement Age." J.A. 12769 (Plan Document § 2.70). An "accrued benefit" is "the monthly pension benefit, payable in normal form, that would be payable upon the retirement of

[6] Plaintiffs correctly point out that the MPRA requires counting non-votes as "Yes" votes in favor of the proposed suspension. Appellants' Br. 14. The statute also provides that even when a majority of participants and beneficiaries (including non-voters) vote to reject a suspension, Treasury may still permit it. *See* 29 U.S.C. § 1085(e)(9)(H)(v)(I).

the Participant as of the date of reference." J.A. 12762 (Plan Document § 2.01). The "normal form" of payment is a life annuity, which "provides monthly payments for the life of the Pensioner." J.A. 12794 (Plan Document §§ 6.01–.02).

The Plan empowers the trustees to amend the Plan's terms but provides that: "[i]n no event . . . shall any modification or amendment of the provisions of the Plan . . . have the effect of decreasing a Participant's Accrued Benefit in violation of [the anti-cutback rule of ERISA]." J.A. 12813 (Plan Document § 10.01). The Plan thus incorporated by reference ERISA's anti-cutback rule and its exceptions.

In addition to incorporating ERISA's insolvency exception to the anti-cutback rule, the Plan expressly warned that in the event of the Plan's termination, such as due to insolvency, participants could expect to receive benefits only "to the extent [the Plan was] funded as of [the] date" of termination. J.A. 12813 (Plan Document § 10.03).

B

After enactment of the MPRA, in May 2017, the Plan trustees here determined that if the Plan continued to make benefits payments at current levels, it would become insolvent in 2026; that is, within less than 14 years. To avoid this, the trustees filed with Treasury an application under the MPRA to reduce the benefits of retirees by 29 percent and to reduce the benefits of actively employed participants by 18 percent. The proposal was adopted after a majority of participants did not vote to disapprove the amendments.

In July 2018, plaintiffs filed a class action complaint against the government in the Claims Court. The named plaintiffs are pensioners with vested benefit rights under

the Plan currently receiving payments.[7] Plaintiffs alleged that the MPRA, as applied to them through the Plan administrators, amounted to an uncompensated physical taking in violation of the Fifth Amendment because the amended Plan favored future beneficiaries at the expense of current beneficiaries, allegedly transferring plaintiffs' property interests to the Plan for the benefit of other participants. *See* J.A. 78 ¶ 7 ("[T]he government shift[ed] a specific pool of money from a specific account from plaintiffs to other private citizens.").

In 2021, nearly three years after plaintiffs filed suit, Congress passed the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. 117-2, 135 Stat. 4, which in relevant part provided financial assistance to struggling pension plans, so those plans could issue "make-up" payments to pensioners whose benefits had been reduced pursuant to the MPRA. The make-up payments restored the pensioners' benefits to their respective levels prior to the MPRA, and included reimbursement payments for the reductions that occurred earlier, but the payments did not include interest on the reductions for the time they were in place. 29 U.S.C. § 1432(k). Make-up payments also were not provided to pensioners (or their estates) who died before their respective plans received financial assistance. In July 2022, the Plan trustees applied for financial assistance under the ARPA. The Plan received more than $963 million in assistance, which was projected to ensure the Plan's solvency until 2051. Make-up payments were distributed to all eligible plan participants by March 1, 2023.[8] While the make-

---

[7] One named plaintiff, Mr. Gugliuzza, died during the pendency of this appeal; his estate has substituted as an appellant in his stead.

[8] In the interim, the Claims Court also certified a proposed class. J.A. 10471. The government suggests that

up payments authorized by the ARPA would reduce any damages due to plaintiffs if a taking were established, they do not impact whether there was a taking in the first instance. *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 33 (2012) ("Once the government's actions have worked a taking of property, 'no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.'" (citation omitted)); *accord Hendler v. United States*, 952 F.2d 1364, 1376 (1991).

The parties cross-moved for summary judgment. The Claims Court held that plaintiffs possessed "a specific cognizable property interest in receiving their unreduced and vested pension benefits." *King v. United States*, 159 Fed. Cl. 450, 491 (2022) (*King I*). In a later decision, the Claims Court declined to apply the physical takings analysis, concluding that plaintiffs' claims were properly analyzed as a regulatory taking. *King v. United States*, 165 Fed. Cl. 613, 640 (2023) (*King II*). Applying the *Penn Central* test, the court held that no regulatory taking occurred because the MPRA did not unduly interfere with plaintiffs' investment-backed expectations, the diminution in the value of plaintiffs' property was insufficient, and the character of the government action counseled against finding that a taking had occurred. *See id.* at 648–49. The Claims Court entered judgment in favor of the government. *See id.* at 650.

Plaintiffs appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

---

the class exists in name only, as "no one opted into the class before the entry of judgment," and "no class notice was undertaken." Appellee's Br. 16. For present purposes, we assume that the class was properly certified.

## DISCUSSION

We review determinations of summary judgment de novo. *See Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1371 (Fed. Cir. 2009). "Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Arko Exec. Servs., Inc. v. United States*, 553 F.3d 1375, 1378 (Fed. Cir. 2009)). The parties agree that there is no material factual dispute.[9]

The Fifth Amendment prohibits the government from taking private property "for public use, without just compensation." U.S. Const. amend. V. We apply a two-part test to determine "whether governmental action constitutes a taking," in which we first consider whether the claimant has identified a cognizable property interest and, if so, whether that interest has been taken. *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1329 (Fed. Cir. 2012). A taking may be either physical or regulatory, with a different standard applied to each at the second step in the analysis.

### I

We begin by considering whether plaintiffs have "a cognizable Fifth Amendment property interest" in their pension benefits. *Id.* In undertaking this assessment, we look to "'existing rules or understandings' and 'background principles' derived from an independent source such as state, federal, or common law." *Am. Pelagic Fishing Co. v. United*

---

[9] Plaintiffs insist that MPRA's authorization of reduction of vested benefits under ERISA is "unprecedented." The government disputes this point. *See, e.g.*, Oral Arg. at 39:29–40:36. While there may be a genuine dispute on this fact question, it is not <u>material</u> to our analysis because the government actions here survive the applicable regulatory takings test <u>even if</u> they are unprecedented.

*States*, 379 F.3d 1363, 1376 (Fed. Cir. 2004) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992)).

It is well established that contracts and the rights they secure may be considered "property for purposes of the Takings Clause." *A & D Auto. Sales, Inc. v. United States*, 748 F.3d 1142, 1152 (Fed. Cir. 2014); *see also Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1385 (Fed. Cir. 2019). It is also established that defined-benefit pension plans are contractual in nature. In *Alessi*, the Supreme Court explained that under ERISA, a vested pensioner holds a "claim to the benefit" provided by his retirement plan, "rather than the benefit itself." 451 U.S. at 512 (emphasis added) (quoting *Nachman*, 446 U.S. at 371). "[N]o plan member has a claim to any particular asset that composes a part of the plan's general asset pool." *Hughes Aircraft Co. v. Johnson*, 525 U.S. 432, 440 (1999). In *Thole*, the Court again reiterated that, although vested pensioners are "legally and contractually entitled to receive th[e] same monthly payments for the rest of their lives," 590 U.S. at 540, they "possess no equitable or property interest in the plan," *id.* at 543.

The fact that employees' rights under a plan are vested simply means that they became vested contract rights, which have been earned by working for a specified number of years, and which the employer cannot eliminate. Stated differently, the contract right is "nonforfeitable," such that under ERISA, plan administrators may not refuse to honor benefits that a pensioner has earned because the pensioner lost or changed jobs before retirement. The fact that the contract right is vested vis-à-vis the employer says nothing about whether government action (as opposed to employer action) to modify that contract right amounts to a taking.

We assume, without deciding, that the plaintiffs have identified a cognizable contract right under the Plan documents, which constitutes property for purposes of a takings analysis, *see A & D*, 748 F.3d at 1152, though they do not

hold a property interest in the assets of the Plan itself. The Claims Court concluded that the plaintiffs "identified a cognizable property interest in receiving their unreduced and vested pension benefits at a level contractually promised by the Teamsters Fund plan agreement." *King II*, 165 Fed. Cl. at 626. While the government disagrees with this holding, it "has not appealed the finding of a cognizable interest." Appellee's Br. 17; *see also id.* at 20–30. In light of our conclusion that there was no taking here, we assume that the Claims Court correctly articulated plaintiffs' protected property interest.

## II

We next consider whether the identified property interest has been "taken" within the meaning of the Fifth Amendment. *See Hearts Bluff*, 669 F.3d at 1329. The government may effectuate a taking either by acquiring a property interest for itself or a third party, or by "impos[ing] regulations that restrict an owner's ability to use his own property." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021).

We apply different analyses depending on the character of the government action. A physical occupation or appropriation of property by the government for itself (or by transferring the property interest to a third party) is the paradigmatic taking and is "assess[ed] . . . using a simple, *per se* rule: The government must pay for what it takes." *Id.* Where, however, the government imposes a regulation burdening a claimant's right to use property, the question becomes whether the regulation "goes too far," that is, whether there has been a regulatory taking. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). Answering that question entails "balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Cedar Point*, 594 U.S. at 148.

A

Plaintiffs contend they have suffered a physical taking because they possess a "right to unreduced benefits under their vested pensions," Appellants' Br. 53 (quoting J.A. 10327), and plaintiffs' contract rights were modified in order to benefit other plan beneficiaries.[10] Even assuming

---

[10] This argument was clarified at oral argument:

> Q. What is the taking here? Was it ordered that the contract right be transferred to somebody else? Is it transferred to the government? What is the alleged taking?
>
> . . . .
>
> A. They had a vested right to receive a pension of a specific size from a specific source . . .
> Q. My question is where was the transfer, was the government transferring that to a third party, was it taking it for itself? What is the alleged taking?
> A. The government authorized the pension fund to appropriate that and the fund did so. It quite literally deleted the language from the contract . . . . It was the appropriation of property. The word transfer, doesn't, . . . as a practical matter, that's what happened.
>
> . . . .
>
> Q. So, it's not an argument that the government took the property for itself, it's that it ordered a transfer of the property to the pension fund.
> A. It authorized the pension fund to appropriate the property, and the fund did exactly that.

Oral Arg. at 2:32–4:15.

Plaintiffs originally argued in part that the MPRA transferred their interest in the Plan to benefit the PBGC, but the fact "[t]hat the solvency of a pension trust fund may ultimately redound to the benefit of the PBGC . . . is merely

(without deciding) that this is a correct articulation of plaintiffs' protected contract right, we disagree that this resulted in a physical taking.

Physical or intangible personal property on the one hand, and third-party contract rights on the other, are treated quite differently for takings purposes.[11] The Supreme Court has held that the federal government has broad authority to adopt regulations modifying the rights and obligations under third-party contracts without running afoul of constitutional prohibitions. This has been recognized with respect to employment contracts, *see, e.g.*, *United States v. Darby*, 312 U.S. 100, 117 (1941), purchase and sale contracts, *see, e.g.*, *Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211, 227 (1899), lease

---

incidental to the primary congressional objective of protecting covered employees and beneficiaries of pension trusts like the Plan," and does not give rise to a physical taking. *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 644 (1993).

[11] This is not a case where the plaintiffs held a vested contract right with the government that was later repudiated by the government. *See Piszel v. United States*, 833 F.3d 1366 (Fed. Cir. 2016); *see also* Robert Meltz, Cong. Rsch. Serv., R42635, *When Congressional Legislation Interferes with Existing Contracts: Legal Issues* 13–14 (2012) ("Congress has greater constitutional freedom to impair private contract rights than contractual obligations of the federal government."); Kevin R. Garden, *Fifth Amendment Takings of Rights Arising from Agreements with the Federal Government*, 29 Pub. Cont. L.J. 187, 205–09 (2000) (collecting cases).

agreements, *see, e.g.*, *Bowles v. Willingham*, 321 U.S. 503, 517 (1944), and others.[12]

A prominent example of this principle in the takings context is found in *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923), where the Supreme Court concluded that the government did not commit a taking when it requisitioned a steel company's "entire production of steel plate for the year 1918, and directed the company not to comply with the terms of appellants' contract." *Id.* at 507. While recognizing that "[t]he contract . . . was property within the meaning of the Fifth Amendment," the Court explained that "[t]here are many laws and governmental operations which injuriously affect the value of or destroy property . . . for which no remedy is afforded." *Id.* at 508–09. In *Omnia*, the government did not "take" the appellants' contract right within the meaning of the Fifth Amendment; instead, it imposed upon the steel company an obligation "to deliver its product to the government," which had the effect of "render[ing] impossible" appellants' contract with the company. *Id.* at 511. The contract was "not appropriated but ended." *Id.*

---

[12] *See also NL Indus., Inc. v. United States*, 839 F.2d 1578, 1579 (Fed. Cir. 1988) (no taking where presidential moratorium on operation of nuclear plant resulted in "frustration of a business by loss of a customer"); *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1581 (Fed. Cir. 1995) ("An additional reason for affirming the trial court's decision is that the Supreme Court has held that no taking occurs when, as occurred in this case, expectations under a contract are merely frustrated by lawful government action not directed against the takings claimant."); *Nat'l Mining Ass'n v. Babbitt*, 172 F.3d 906, 917 (D.C. Cir. 1999) (rejecting argument that "interference with contract rights is a [physical] taking").

Similarly, in *Louisville & Nashville Railroad Co. v. Mottley*, 219 U.S. 467 (1911), the Court concluded that no taking occurred where a federal law prohibiting free passenger transport by common carriers had the effect of invalidating a contract for free life-time transport held by the claimants. *Id.* at 472, 484. So too, in *Norman v. Baltimore & Ohio Railroad Co.*, 294 U.S. 240 (1935), the Court rejected a claim that a joint resolution from Congress invalidating so-called "gold clauses" requiring the payment of debts only in gold constituted a taking of creditors' property interest in "express stipulations for gold payments." *Id.* at 291, 307. The Court concluded that "[t]here is no constitutional ground for denying to the Congress the power to expressly prohibit and invalidate contracts although previously made, and valid when made, when they interfere with the carrying out of policy it is free to adopt." *Id.* at 309–10. As Justice Holmes recognized in *Pennsylvania Coal*, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." 260 U.S. at 413.

Not surprisingly, and of crucial relevance to the issue before us today, these principles have been extended to contract rights relating to pension plans.

In *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211 (1986), the Court rejected a facial challenge to amendments to ERISA that imposed withdrawal liability on employers who left a multiemployer pension plan before the plan's termination and thus increased the employers' contractual obligations. *Id.* at 223–24. The Court dismissed the employer's argument that Congress's imposition of withdrawal liability constituted an uncompensated taking because it nullified "the terms of its contract from any liability beyond the specified contributions to which it had agreed." *Id.* at 223. Relying on its earlier decision in *Norman*, the Court explained:

> Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.

*Id.* at 223–24 (quoting *Norman*, 294 U.S. at 307–08). The Court further rejected the employer's physical takings argument because, if accepted, it would mean "the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another," a proposition foreclosed by "the propriety of the governmental power to regulate." *Id.* at 223; *see also id.* at 224 ("[T]he fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking." (citation omitted)). One additional consideration critical to the Court's analysis was that, through the imposition of withdrawal liability, the government "ha[d] taken nothing for its own use." *Id.* at 224. The Court nonetheless considered whether a taking had occurred under a regulatory takings analysis. *See id.* at 224–25.

Similarly, in *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602 (1993), the Court rejected an as-applied challenge brought by an employer that was assessed withdrawal liability under ERISA's amendments. *Id.* at 605, 642. Drawing upon *Connolly*, the Court reiterated that the nullification of contract rights did not constitute an uncompensated per se taking, and that "[i]f the regulatory statute is otherwise within the powers of Congress . . . its application may not be defeated by private contractual provisions." *Id.* at 642 (quoting *Connolly*, 475 U.S. at 223–24). Following *Connolly*, the Court

analyzed the employer's takings claim under the regulatory takings framework. *See id.* at 643–47.

Plaintiffs suggest that *Connolly* and *Concrete Pipe* are inapplicable here because Congress "authorized the pension fund to appropriate" money owed to each pensioner and to transfer those funds to other beneficiaries. Oral Arg. at 3:26–30. They contend that five "controlling cases" support their position: *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980); *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935); and *Armstrong v. United States*, 364 U.S. 40 (1960).

We are unpersuaded. Those cases all involved the government's appropriation of specific physical or intangible property for its own use or the use of others, not the modification of contractual obligations owed by third parties. *Cedar Point* involved a California law that mandated physical access to commercial farms for third parties (labor organizations) so that they could engage in union organizing "for three hours per day, 120 days per year." 594 U.S. at 149. The Supreme Court determined that the law effected a physical taking of the landowner's right to exclude others from the real property. *Id.*

In *Webb's*, a Florida law allowed a county court to claim for itself the interest earned on principal sums deposited with the court in connection with an interpleader action. 449 U.S. at 157–59. The Supreme Court held that the county's assertion of a right to claim the interest deposited in the interpleader account was a physical taking, because the principal in the account was indisputably private property belonging to the creditor claimants, *id.* at 160–61, and the "general rule is that any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal." *Id.* at 162.

Similarly, in *Brown*, the Supreme Court found a physical taking where a state regulatory scheme required attorneys to deposit client funds into separate interest-bearing accounts and to transfer the interest made in those accounts to a state-established nonprofit, concluding that the claimants' interest "was taken for a public use when it was ultimately turned over to the [nonprofit]." 538 U.S. at 224–25, 235.

*Radford* concerned a federal bankruptcy law that prevented mortgagees from foreclosing upon defaulting mortgagors for a period of five years, at the end of which the mortgagor could "pay into court the appraised price of the property" after which the court would, "by an order, turn over full possession and title of said property to the debtor." 295 U.S. at 576–78. In holding that there was a taking, the Court observed that "the position of a secured creditor, who has rights in specific property, differs fundamentally from that of an unsecured creditor, who has none," *id.* at 588, and held that the new law took "without compensation, and [gave to the debtor] rights in specific property which are of substantial value," *id.* at 601–02.

Similarly, *Armstrong* involved the destruction of liens in physical property. 364 U.S. at 42. The government compelled a ship-building contractor to transfer to it "the hulls and all materials held for future use in building the boats," pursuant to a contract. *Id.* at 46. Suppliers of the materials and supplies possessed, under state law, materialmen's liens secured by the ships or supplies until they received payment. *See id.* at 44. The transfer of title to the government had the effect of a "total destruction . . . of all value of these liens, which constitute[d] compensable property." *Id.* at 48. This was a taking "because the Government for its own advantage destroyed the value of the liens . . . . for a public use." *Id.*

The unifying thread across these cases is that the government appropriated specific, identifiable property

interests—whether real property or personal property—for its own or a third party's use. That is not what occurred with the enactment of the MPRA or its application to the Plan. As discussed earlier, the plaintiffs do not hold a property interest in the underlying assets of the Plan, only a contractual right, making them akin to unsecured creditors. *See Thole*, 590 U.S. at 543; *Radford*, 295 U.S. at 588 ("[T]he position of a secured creditor, who has rights in specific property, differs fundamentally from that of an unsecured creditor, who has none."). The modification of those contract rights does not appropriate specific rights in the funds of the Plan (because plaintiffs have no such property rights) and, thus, is not a physical taking.

Plaintiffs additionally rely on the Supreme Court's decision in *Koontz v. St. Johns River Management District*, 570 U.S. 595 (2013), which held that the government commits a physical taking whenever it "commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account or parcel of real property." *Id.* at 613–14. *Koontz* was analyzed as a physical taking because a water district demanded that the claimant either deed a conservation easement to the government, or "pay to replace culverts on one parcel or fill in ditches" on "District-owned land several miles away." *Id.* at 601–02. Critically, the claimant in *Koontz* owned the affected property, unlike plaintiffs here, who have no ownership right in the funds of the Plan. *Koontz* thus lends no support to plaintiffs because they possess only a contract right to demand payment from the Plan, not a specific, identifiable property interest in the Plan's underlying assets.

In short, the MPRA modified the third-party contract rights of the plaintiffs in such a way as to extend the

longevity of their Plan's ability to pay benefits.[13] It did not appropriate a specific, identifiable property interest for the benefit of the government or a third party. Under the MPRA, "the United States has taken nothing for its own use." *Connolly*, 475 U.S. at 224. In effect, the MPRA broadened the definition of insolvency under ERISA, allowing the administrators of especially troubled plans to restructure a plan's contractual obligations to some beneficiaries to stave off the further diminishment of the plan's assets. Thus, the Claims Court did not err in declining to apply the physical takings analysis to plaintiffs' claims.[14]

Even though we hold that there is no physical taking here, this does not mean that the government enjoys unfettered discretion to modify contractual rights without takings liability. Instead, its action in enacting the MPRA is precisely the kind of legislative intervention that has historically been analyzed under the regulatory, not physical, takings analysis by the Supreme Court, our court, and

---

[13] In fact, as the Claims Court found, at least some members of the plaintiff class themselves derived some benefit from the reductions in that such measures assured that they would continue to receive benefits for a longer period rather than steer the Plan into insolvency. *King II*, 165 Fed. Cl. at 646.

[14] Our holding that there has been no physical taking does not mean that government action with respect to third-party contract rights can never be a physical taking. Like the government, we are aware of no case that has held that a protected property interest in the form of a contractual can <u>never</u> be the basis for a meritorious per se takings claim. *See* Oral Arg. at 34:00–35:45. Particularly because the Plan documents at issue here do not give the plaintiffs a property right in the assets of the Fund itself, we are not called upon in this case to decide that broad question.

other courts. *See, e.g.*, *Connolly*, 475 U.S. at 224–28; *Concrete Pipe*, 508 U.S. at 643–47.[15] We now turn to that analysis.

B

In considering whether the reduction of plaintiffs' pension benefits under the MPRA constituted a regulatory taking, we are guided by "three factors which have 'particular significance'" to this inquiry: "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Connolly*, 475 U.S. at 225 (quoting *Penn Central*, 438 U.S. at 124).[16]

---

[15] *See also A & D*, 748 F.3d at 1149, 1153 (applying regulatory takings analysis to claims arising from government-induced termination of franchise agreements as a condition for financial assistance to third parties); *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006) (holding that a state's "interference with appellants' contractual right to a wage increase . . . . falls into the category of a regulatory, not physical, taking"); *Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) (applying regulatory takings analysis to claim that earlier ERISA amendment providing for employer withdrawal liability was an uncompensated taking).

[16] Plaintiffs argue in passing that the benefit reductions constitute a "categorical" taking of the kind recognized in *Lucas* because the benefit reductions have deprived them of "the beneficial use of the entire relevant parcel," which plaintiffs define as the 29 percent of accrued benefits that have been reduced. Appellants' Br. 52–53 (quoting *Norman v. United States*, 429 F.3d 1081 (Fed. Cir.

We turn first to the alleged economic impact, which requires plaintiffs to "show 'serious financial loss' from the regulatory imposition in order to merit compensation." *Cienega Gardens v. United States*, 331 F.3d 1319, 1340 (Fed. Cir. 2003) (quoting *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1177 (Fed. Cir. 1994)). In doing so, we must "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). Stated differently, plaintiffs must "show what use or value [their] property would have but for the government action." *A & D*, 748 F.3d at 1157.

Plaintiffs argue that the economic impact suffered by class members supports a regulatory taking because the pension reductions were "devastating" to affected pensioners, such that "[t]he [Plan's] own actuaries predicted that,

---

2005)). Plaintiffs previously conceded, *see King II*, 165 Fed. Cl. at 640 n.10, that this argument is foreclosed by *Norman*, which held that a categorical taking may be found under *Lucas* only when "the owner is deprived of all beneficial use of the 'parcel as a whole,'" 429 F.3d at 1091, but now suggest that *A & D* left open the possibility that *Lucas* would apply to intangible property. Appellants' Br. 52.

We decline plaintiffs' invitation to reassess the application of *Lucas* for two reasons. First, as we have explained, the benefit reductions pursuant to the MPRA did not eliminate all "beneficial use" of plaintiffs' contract rights. *Norman*, 429 F.3d at 1091. Plaintiffs continued to receive pension benefits, albeit at a reduced amount, and the MPRA did not extinguish their rights to demand payment from the Plan. Second, the Supreme Court has expressly cautioned against "shoehorn[ing]" takings claims into the *Lucas* analysis by defining the property interest at issue as that property which has been "taken in its entirety." *Concrete Pipe*, 508 U.S. at 643–44.

wholly apart from the financial impact, the cuts would shorten retirees' lives," and "Treasury itself criticized the 'severity' and 'harshness' of the cuts." Appellants' Br. 57 (internal citation omitted). Plaintiffs assert that the Claims Court failed to appreciate these impacts by narrowly focusing on the numerical diminution in value, which was 29 percent of the pensioners' vested benefits.

We see no error in focusing on the amount of the reduction rather than the impact on individual claimants, as takings jurisprudence is solely concerned with the effects of government action on a claimant's property, *see, e.g.*, *Murr v. Wisconsin*, 582 U.S. 383, 397–99 (2017), rather than the hardship faced by individual claimants. With that focus we cannot agree that the economic loss here was so severe as to support a taking. Plaintiffs' benefits were reduced by 29 percent for an approximately five-year period. The size of the true diminution is likely even less once the value of plaintiffs' contract rights is assessed in light of the value they would have enjoyed absent government action, which would have been significantly reduced when the Plan would have become insolvent in 2026. *A & D*, 748 F.3d at 1157.[17]

In any event, even if we accept the plaintiffs' calculations, the alleged economic loss here does not support a conclusion that a regulatory taking has occurred. Although the Supreme Court and this court have eschewed any rigid

---

[17] According to calculations performed by plaintiffs' expert, the present value of the diminution in value for the named plaintiffs was not 29 percent, but closer to 10 percent. *See* J.A. 3323–27. Even that number may be an inaccurate appraisal of the true value of plaintiffs' contract rights because it includes the statutorily guaranteed payments funded by the PBGC in the event of insolvency, so the calculation of the value of plaintiffs' contractual rights absent the MPRA was overstated. *See id.*

formula for what percentage of reduced value may suffice to establish severe economic harm, courts have consistently declined to find regulatory takings where the diminution in value matched or exceeded that alleged here. As our predecessor court recognized in *Jengten v. United States*, 657 F.2d 1210 (Ct. Cl. 1981), the Supreme Court concluded that no taking occurred in *Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926), where a zoning regulation reduced the value of the subject property by 75 percent, and concluded the same in *Hadachek v. Sebastian*, 239 U.S. 394 (1915), where the diminution in value was 87.5 percent. *Jengten*, 657 F.2d at 1213; *see also Concrete Pipe*, 508 U.S. at 645 (diminution of 46 percent insufficient); *see also CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) ("[W]e are aware of no case in which a court has found a taking where diminution in value was less than 50 percent." (internal quotation marks and citation omitted)).

Turning to the degree of interference upon plaintiffs' expectations, we apply "an objective . . . inquiry into what, under all the circumstances, the [plaintiffs] should have anticipated." *Cienega Gardens*, 331 F.3d at 1346. In *Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed. Cir. 2001) (en banc), we identified three factors relevant to a determination of whether plaintiffs possess reasonable expectations that their property interests would be unaffected by subsequent government regulation. "First, [were] the [plaintiffs] operating in a highly regulated industry? Second, did the [plaintiffs] know of the problem at the time [they] engaged in the activity? Third, in light of the regulatory environment at the time of the activities, could the possibility of the [government action] have been reasonably anticipated?" *Id.* at 1348. Where these three factors are satisfied, plaintiffs lack a reasonable

expectation to be free of the challenged government conduct. *See id.*[18]

We disagree with the Claims Court and the plaintiffs that the *Commonwealth Edison* factors favor the plaintiffs. "Pension plans [have been] the objects of legislative concern long before the passage of ERISA in 1974." *Connolly*, 475 U.S. at 226. Multiemployer pension plans are heavily regulated under ERISA. The anti-cutback rule is itself a legislative creation. ERISA had always permitted similar benefits reductions in at least some circumstances. *See* Employee Retirement Income Security Act §§ 302(c)(8), 303, 88 Stat. 872–73. The Claims Court correctly recognized that the MPRA simply "altered the pre-existing regulations pertaining to the 'anti-cutback rule'" to expand the circumstances when benefits reductions could be statutorily authorized. *King II*, 165 Fed. Cl. at 646. So too, over the decades, Congress has consistently sought to guard against plan insolvency through legislative amendments.[19] Although the details of these prior interventions differ from

---

[18] Although initially formulated in connection with a due process claim, we have held that the test for reasonable expectations in *Commonwealth Edison* applies with equal force to the *Penn Central* regulatory takings analysis. *See Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 n.5 (Fed. Cir. 2004).

[19] Examples include Congress imposing withdrawal liability on contributing employers, *see* Multiemployer Pension Plan Amendments Act of 1980, Pub. L. 96-364, 94 Stat. 1208, strengthening funding for underperforming plans and providing authority for the PBGC to enforce minimum funding standards, *see* Retirement Protection Act of 1994, Pub. L. 103-465, 108 Stat. 4809, and modifying the funding rules for multiemployer defined-benefit plans, *see* Pension Protection Act of 2006, Pub. L. 109-280, 120 Stat. 780.

those included in the MPRA, they share a common purpose—to bolster the financial stability of multiemployer pension plans and prevent the insolvency of those plans. In light of Congress's persistent activity in this area and the purposes behind those acts, we are not persuaded that the MPRA has unduly interfered with plaintiffs' expectations.

Finally, we consider the character of the government action. *Loveladies Harbor*, 28 F.3d at 1176. "The Supreme Court has recognized that the nature of the government's action is 'critical' in the determination of whether a taking has occurred." *Atlas Corp. v. United States*, 895 F.2d 745, 757 (Fed. Cir. 1990) (quoting *Keystone*, 480 U.S. at 488). This inquiry requires us to weigh the "private and public interests." *Keystone*, 480 U.S. at 492 (quoting *Agins v. Tiburon*, 447 U.S. 225, 260–61 (1980)). A "substantial public purpose" of a statute will weigh against the finding of a taking, *Penn Central*, 438 U.S. at 127, and "[t]here is little doubt that it is appropriate to consider the harm-preventing purpose of a regulation in the context of the character prong," *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1281 (Fed. Cir. 2009).

The MPRA advanced a substantial public purpose: protecting failing multiemployer pension plans, like the Plan here, from insolvency defined as liabilities exceeding assets. 29 U.S.C. § 1085(e)(9)(A). This benefit was not bestowed generally on the public but instead on future and current plan beneficiaries, including plaintiffs, by ensuring that the Plan would remain viable decades into the future. In light of the scale of the problem addressed in the MPRA—the likely collapse of many of the nation's largest multiemployer pension plans, including the Plan here—the "harm-preventing purpose" of the MPRA decidedly weighs against the finding of a regulatory taking. *Rose Acre Farms*, 559 F.3d at 1281. This factor further disfavors plaintiffs because the reductions experienced by plaintiffs were designed to be narrowly tailored to ensure solvency of

the Plan. *See* 29 U.S.C. § 1085(e)(9)(D)(iv) (providing that benefit reductions under the MPRA must be "reasonably estimated to achieve, but not materially exceed, the level . . . necessary to avoid insolvency"). This plainly constituted a "method . . . reasonably designed to attain" the Congressional objective. *Loveladies Harbor*, 28 F.3d at 1176. The legislative enactment effectively conforms ERISA's definition of insolvency more nearly to how the term is used in the Bankruptcy Code. The reallocation of claims to a limited pool of funds was well "within the power of Congress to impose" under a longstanding regulatory scheme, ERISA, which has for decades "adjust[ed] the benefits and burdens of economic life to promote the common good." *Connolly*, 475 U.S. at 224–25.

Under these circumstances, we conclude that the three *Penn Central* factors weigh in favor of the government, and that there was no regulatory taking.

## Conclusion

We have considered the remainder of plaintiffs' arguments and do not find them persuasive. We agree with the Claims Court that the "plaintiffs present a very sympathetic claim; they did everything right, worked hard, and provided for their retirements. They did nothing wrong and yet, through no fault of their own, suffered a significant loss to their retirement earnings for several years" because the pool of assets to pay their claims was insufficient. *King II*, 165 Fed. Cl. at 649. They did not, however, suffer a taking in violation of their constitutional rights. Therefore, we affirm the judgment of the Claims Court.

**AFFIRMED**